1    THE HONORABLE THOMAS S. ZILLY

2

3

4

5

6

7                        UNITED STATES DISTRICT COURT
                         WESTERN DISTRICT OF WASHINGTON
8                                  AT SEATTLE

9

10   | IN RE:  HAWAIIAN AND GUAMANIAN | |
     | CABOTAGE ANTITRUST LITIGATION | NO. 08-md-1972 TSZ |

11

12   This Document Relates to:           **DEFENDANTS' JOINT MOTION TO
                                         DISMISS AND MEMORANDUM IN
     ALL ACTIONS                         SUPPORT THEREOF [ORAL
13                                        ARGUMENT REQUESTED]**

14                                        Note on Motion Calendar: May 8, 2009

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANTS' MOTION TO DISMISS                    **GIBSON, DUNN & CRUTCHER LLP**
Case No. 08-md-1972 TSZ                              555 MISSION ST, SUITE 3000
                                                    SAN FRANCISCO, CA  94105
                                                 415.393.8200  FAX: 415.393.8306

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...........................................................................................1

II.     SUMMARY OF PLAINTIFFS' ALLEGATIONS .......................................2

III.    STANDARD OF REVIEW AND THE REQUIREMENT TO PLEAD AN
        AGREEMENT ..............................................................................................5

IV.     PLAINTIFFS HAVE FAILED TO ALLEGE A CONSPIRACY IN VIOLATION OF
        SECTION 1 OF THE SHERMAN ACT ......................................................8

        A.    Plaintiffs Failed To Allege A Section 1 Violation Regarding Fuel Surcharges Or
              Confidential Contracts ......................................................................9

              1.    Plaintiffs Fail To Allege An Agreement .....................................9

              2.    Plaintiffs' Allegations Regarding The Industry Fail To Support An
                    Inference Of Unlawful Agreement ..............................................9

              3.    Plaintiffs Have Not Pleaded A Plausible Conspiracy Regarding Fuel
                    Surcharges ................................................................................14

              4.    Plaintiffs Have Not Pleaded A Plausible Conspiracy Regarding
                    Confidential Contracts .............................................................15

        B.    Plaintiffs Have Not Pleaded A Section 1 Claim Regarding Capacity ..................16

              1.    Plaintiffs Fail To Allege That Matson's Agreement To Carry Cargo For
                    Horizon Includes An Agreement To Limit Capacity................................17

              2.    Independent Decisions Concerning Vessel Acquisition And Disposal Do
                    Not Establish An Unlawful Agreement ......................................19

V.      PLAINTIFFS' CLAIMS ARE BARRED  BY THE FILED RATE DOCTRINE ...........20

VI.     CONCLUSION.............................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Air Cargo Shipping Serv. Antitrust Litig.*,
  MDL No. 1775, No. MD-06-1775 (E.D.N.Y. Sept. 26, 2008) .................................................. 8

*Alaska Airlines, Inc. v. Carey*,
  2008 WL 2725796 (W.D. Wash. July 11, 2008) ..................................................................... 8

*Bell Atlantic v. Twombly*,
  127 S. Ct. 1955 (2007) ................................................................................................ *passim*

*Blomkest Fertilizer, Inc. v. Potash Corp. of Sask., Inc.*,
  203 F.3d 1028 (8th Cir. 2000) ...................................................................................... 10, 11

*Boyd v. Tempay*,
  2008 WL 1803774 (D. Del. Apr. 18, 2008) ............................................................................ 8

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993) ..................................................................................................... 7, 10

*In re Citric Acid Litig.*,
  191 F.3d 1090 (9th Cir. 1999) ...................................................................................... 10, 14

*Crumley v. Time Warner Cable, Inc.*,
  2008 U.S. Dist. LEXIS 84538 (D. Minn. Mar. 7, 2008)........................................................ 20

*In re Digital Music Antitrust Litig.*,
  2008 U.S. Dist. LEXIS 79764 (S.D.N.Y. Oct. 9, 2008) ..................................................... 8, 10

*E.I. Du Pont de Nemours & Co. v. FTC*,
  729 F.2d 128 (2nd Cir. 1984)............................................................................................. 11

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007).......................................................................................... 13, 14

*In re Graphics Processing Units Antitrust Litig.*,
  527 F. Supp. 2d 1011 (N.D. Cal. 2007) ............................................................................... 12

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*,
  253 F. Supp. 2d 262 (D. Conn. 2003) .................................................................................. 21

*Indep. Iron Works, Inc. v. United States Steel Corp.*,
  322 F.2d 656 (9th Cir. 1963) ....................................................................................... 10, 11

*Int'l Norcent Tech. v. Koninklijke Philips Elects. N.V.*,
  2007 WL 4976364 (C.D. Cal. 2007)...................................................................................... 9

DEFENDANTS' MOTION TO DISMISS
Case No. 08-md-1972 TSZ

– ii –

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA 94105
415.393.8200  FAX: 415.393.8306

*Jacobs v. Tempur-Pedic Int'l Inc.*,
2007 WL 4373980 (N.D. Ga. Dec. 11, 2007)........ 8

*Kendall v. Visa USA, Inc.*,
518 F.3d 1042 (9th Cir. 2008) ........ 5, 7, 18

*Keogh v. Chicago & N.W. Ry. Co.*,
260 U.S. 156 (1922)........ *passim*

*Lady Deborah's, Inc. v. VT Griffin Serv., Inc.*,
2007 WL 4468672 (S.D. Ga., Oct. 26. 2007) ........ 8

*In re Late Fee & Over-Limit Fee Litig.*,
528 F. Supp. 2d 953 (N.D. Cal. 2007) ........ 8, 10

*In re LTL Shipping Services Antitrust Litig.*,
2009 U.S. Dist. LEXIS 14276 (N.D. Ga. Jan. 28, 2009)........ 8, 9, 14, 15

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984)........ 6

*Ocean Logistics Mgmt,, Inc. v. NPR, Inc.*,
38 F. Supp. 2d 77 (D.P.R. 1999)........ 21, 23

*In re Parcel Tanker Shipping Servs. Antitrust Litig.*,
541 F. Supp. 2d 487 (D. Conn. 2008)........ 8, 12, 14

*Richards v. Neilsen Freight Lines*,
810 F.2d 898 (9th Cir. 1987) ........ 15

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC*,
532 F.3d 963 (9th Cir. 2008) ........ 5

*Schafer v. State Farm Fire & Cas., Inc.*,
507 F. Supp. 2d 587 (E.D. La. 2007)........ 8

*Shames v. Hertz Co.*,
07-cv-02174-H-BLM (S.D. Cal. Apr. 8, 2008) ........ 8

*Sheridan v. Marathon Petroleum Co.*,
2007 WL 290556 (S.D. Ind. Sept. 28, 2007),
*aff'd* 2008 WL 2486581 (7th Cir. June 23, 2008)........ 8

*Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*,
476 U.S. 409 (1986)........ *passim*

*Stand Energy Corp. v. Columbia Gas Transmission Corp.*,
2007 WL 3049570 (S.D. W.Va. Oct. 18, 2007) ........ 8

*Temple v. Circuit City Stores, Inc.*,
2007 WL 2790154 (E.D.N.Y. Sept. 25, 2007) ........ 8

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA 94105
415.393.8200 FAX: 415.393.8306

*The America Channel LLC v. Time Warner Cable, Inc.,*
   2007 WL 1892227 (D. Minn. June 28, 2007)........................................................ 8

*Theatre Enters., Inc. v. Paramount Film Distrib. Corp.,*
   346 U.S. 537 (1954)............................................................................................. 6

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield,*
   552 F.3d 430 (6th Cir. 2008) ............................................................................ 12

*Town of Norwood, Mass. v. New England Power Co.,*
   202 F.3d 408 (1st Cir. 2000) ............................................................................. 20

*In re Travel Agent Comm'n Antitrust Litig.,*
   2007 WL 3171675 (N.D. Ohio Oct. 29, 2007) ............................................... 8, 12

*Ulitimax.com, Inc. v. PPL Energy Plus,*
   273 F. Supp. 2d 573 (E.D. Penn. 2003) ............................................................. 21

*United Mine Workers v. Pennington,*
   381 U.S. 657 (1965)........................................................................................... 11

*United States v. Calandra,*
   414 U.S. 338 (1974)........................................................................................... 13

*United States v. Int'l Harvester Co.,*
   274 U.S. 693 (1927)........................................................................................... 14

*United States v. Stolt-Nielsen S.A.,*
   524 F. Supp. 2d 586 (E.D. Pa. 2007) ........................................................... 18, 19

*Walgreen Co. v. AstraZeneca Pharm. L.P.,*
   534 F. Supp. 2d 146 (D.D.C. 2008) ..................................................................... 8

*Walker v. Windstream Commc'ns Inc.,*
   2007 WL 4180721 (M.D.N.C. Nov. 21, 2007) ................................................... 8

*Wellnx Life Sciences, Inc. v. Iovate Health Sciences Research, Inc.,*
   516 F. Supp. 2d 270 (S.D.N.Y. Sept. 26, 2007) ................................................. 8

*Wilcox v. First Interstate Bank,*
   815 F.2d 522 (9th Cir. 1987) ............................................................................. 15

*Williamson Oil Co., Inc. v. Philip Morris USA,*
   346 F.3d 1287 (11th Cir. 2003) ......................................................................... 12

*Zenith Radio Corp. v. Hazeltine Research,*
   395 U.S. 100 (1969)........................................................................................... 24

**Statutes**

15 U.S.C. § 1 ............................................................................................................ *passim*

48 U.S.C. § 1421a ........................................................................................................... 2

49 U.S.C. § 13501 .......................................................................................................... 20

49 U.S.C. § 13701 .......................................................................................................... 21

49 U.S.C. § 14101(b)(1) ...................................................................................... 15, 16, 21

49 U.S.C. § 701 .............................................................................................................. 20

**Other Authorities**

VI Philip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 1429 (2d ed. 2003) ........... 10

**Rules**

Fed. R. Civ. P. 12(b)(6) ........................................................................................... 1, 5, 21

Fed. R. Civ. P. 8(a) ......................................................................................................... 5

DEFENDANTS' MOTION TO DISMISS
Case No. 08-md-1972 TSZ

– v –

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA 94105
415.393.8200 FAX: 415.393.8306

Defendants Matson Navigation Company, Inc., Alexander & Baldwin, Inc., Horizon Lines, LLC, Horizon Lines, Inc., and Horizon Lines Holding Co. (collectively "Defendants") hereby move this Court for an order dismissing the Consolidated Amended Complaint ("CAC") pursuant to Federal Rule of Civil Procedure 12(b)(6). This motion is made on the grounds that the CAC fails to state a claim upon which relief may be granted and that Plaintiffs' claims are barred as a matter of law by the filed rate doctrine.

## I.        INTRODUCTION

In conclusory language, the Consolidated Amended Complaint ("CAC") alleges a conspiracy to artificially raise, fix, maintain and stabilize prices charged for shipping in the noncontiguous domestic ocean trade between the U.S. and Hawaii/Guam. CAC ¶¶ 6, 116, 117, 122(c). Unable to allege any facts supporting such a conspiracy, the CAC makes various allegations about three "means" purportedly used by Defendants (CAC ¶ 7), but, tellingly, no facts demonstrating an unlawful agreement. These allegations fall far short of satisfying the standard for pleading a claim under Section 1 of the Sherman Act that the Supreme Court clarified in *Bell Atlantic v. Twombly*, 127 S. Ct. 1955, 1964-69 (2007); *see also* 15 U.S.C. § 1.[1]

Specifically, while the CAC alleges that the Defendants agreed to coordinate fuel surcharges, the factual allegations establish nothing more than parallel rate increases in a concentrated market during a time of rapidly rising fuel costs, not unlawful agreement. Likewise, the allegations regarding vessel capacity in the Hawaii/Guam trade contain no facts supporting any agreement to increase, decrease or stabilize capacity. Nor do Plaintiffs' allegations regarding Defendants' purported refusal to enter confidential contracts provide any facts to suggest that unilateral decisions as to whether or not to enter confidential contracts were

---

[1]    Defendants accept as true, as they must on this Motion, the well-pleaded factual allegations in the CAC, without conceding the accuracy of those allegations.

the result of any agreement.

As in *Twombly*, Plaintiffs' allegations are at least as consistent with competition as with conspiracy. Indeed, the Court rejected in *Twombly* the very same pleading stratagems Plaintiffs attempt here—reliance on purported parallel behavior and conclusory allegations of agreement. *Twombly*, 127 S.Ct. at 1970-74. Stripped of conclusory legal assertions, the CAC tells a story as consistent with competition as collusion and, therefore, should be dismissed.

Moreover, Plaintiffs' damage claims are barred as a matter of law by the filed rate doctrine. As the CAC itself acknowledges (CAC ¶ 80), Defendants' rates were filed with the Surface Transportation Board ("STB"). While the CAC alleges that the Defendants conspired to raise and fix prices that caused Plaintiffs to pay "more for domestic cargo shipping services than they would have paid" absent the conspiracy (CAC ¶ 122.D), the Supreme Court has held repeatedly that carriers are not subject to treble-damage liability with respect to rates that have been filed with such a regulatory agency. *See Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156 (1922); *see also Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 423 (1986). Thus, Plaintiffs' damage claims must be dismissed. Finally, since Plaintiffs make no allegations of ongoing violations, their claims for injunctive relief should be dismissed as well.

## II.    SUMMARY OF PLAINTIFFS' ALLEGATIONS

Plaintiffs allege a price fixing conspiracy in the market for domestic noncontiguous water freight transportation services between the United States and Hawaii and Guam. CAC ¶ 6.[2] They allege that this conspiracy affected prices on the Hawaii/Guam shipping routes between

---

[2] To the extent Plaintiffs attempt to assert a claim for commerce between the mainland United States and Guam, such claim cannot be sustained because conduct involving unincorporated territories such as Guam (48 U.S.C. § 1421a) is not subject to Section 1 of the Sherman Act, 15 U.S.C. § 1.

October 11, 1999 and May 31, 2008.  CAC ¶ 5.  Plaintiffs contend that two of the defendants in this action, Matson Navigation Company, Inc. and Horizon Lines, Inc., are ocean liner companies that control the vast majority of the Hawaii/Guam shipping trades.  CAC ¶ 8.

Plaintiffs allege that the structure of the Hawaii/Guam trade is largely the result of the restrictions placed on noncontiguous domestic ocean shipping by the Jones Act, which prohibits foreign competition on these routes (CAC ¶ 46), as well as "substantial barriers to entry."  CAC ¶ 57.  Plaintiffs further allege that these barriers include: (1) "high costs of purchasing and maintaining an ocean transport fleet and supporting equipment," (2) "constraints on port space," (3) "expensive machinery and economies of scale," (4) "a high ratio of fixed to variable costs," (5) "the need to develop a customer base," (6) "entrenched market positions of the incumbents," (7) inelastic demand, and (8) the unavailability of near substitutes.  CAC ¶ 57.

Plaintiffs contend that these conditions, when combined with Defendants' membership and participation in trade and industry associations, the existence of an investigation by the United States Department of Justice ("DOJ") into "the possibility of anticompetitive practices in the coastal freight shipping industry," and plea agreements entered by some individuals for conduct in the distinct U.S./Puerto Rico ocean shipping trade, support an inference of the existence of conspiracy in the Hawaii/Guam trade.  CAC ¶¶ 72-77.

**Fuel Surcharges.**  With respect to the purported "agreements to [] coordinate fuel surcharges," Plaintiffs allege four groups of "facts."

- After January 1, 1999, Matson and Horizon "acted in lockstep" on fuel surcharges as a percentage of revenue over 29 consecutive changes during a nine-year period.  CAC ¶ 83; *see also* CAC ¶¶ 9-10.
- Matson and Horizon announced changes to the surcharge effective for the same time frame.  This included a change by both companies in May 2006 from quarterly adjustments to announcing "that they would make surcharge changes

DEFENDANTS' MOTION TO DISMISS
Case No. 08-md-1972 TSZ

– 3 –

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA  94105
415.393.8200 FAX: 415.393.8306

whenever they deemed it necessary."  CAC ¶ 85.

- Fuel costs vary among ocean lines due to "differences in vessels and fuel efficiency, different routes, the use of hedging, and individual fuel conservation efforts."  CAC ¶ 86.  The carriers also "use different technologies, different routes, with different distances, different operations, carry different cargos, with different weights . . ."  *Id*.; *see also* CAC ¶ 11.

- Defendants' fuel surcharge increases far exceeded the actual increases in the prices of fuel during the Class Period.  CAC ¶ 87; *see also* CAC ¶ 11.

While the CAC is silent as to any specific time, place or person who entered into any specific agreement as to these fuel surcharges, Plaintiffs allege that Defendants have imposed fuel surcharges in a "conspiracy to raise and maintain prices above competitive rates."  CAC ¶ 89; *see also* CAC ¶¶ 9-11, 82, 86, 88-91, 94-95.

**"Agreement" Not To Enter Confidential Contracts.**  Plaintiffs acknowledge that ocean carriers in the Hawaii/Guam trade are equally free under the ICC Termination Act to file  tariffs with the STB or to enter into confidential contracts for most goods shipped.  CAC ¶ 80.  Indeed, they allege that, although Matson and Horizon generally used "public pricing" (i.e., tariffs), for these services, Matson entered into confidential agreements with some customers, including automakers, in order to compete with a successful new entrant to the trade.  CAC ¶¶ 99-101.  They do not allege any facts to indicate that Matson and Horizon entered into any agreement with each other regarding the use of confidential contracts.  *See generally* CAC.

**Capacity Limitation.**  Plaintiffs contend that Defendants have agreed to ship each other's containers on a regular basis for some undetermined amount of time and that each charges the other less for this service than they charge other customers.  CAC ¶¶ 12, 96.  They conclude that the mere existence of such agreements indicates that "Horizon and Matson colluded to and reduced the capacity and price competition on the Pacific Ocean."  CAC ¶ 98.  However, Plaintiffs point to no agreement to limit capacity or price competition, and in fact allege that

Defendants increased capacity by adding new vessels.  CAC ¶ 98.

Plaintiffs further allege that Matson acquired ships from "a potential competitor, APL" before the class period began and from a Jones Act shipyard during the class period, in order to "ensure the duopolists' continuing dominance in the Hawaii and Guam trade routes."  CAC ¶¶ 13-14.  Plaintiffs admit, however, that the APL acquisitions resulted in "a more efficient passby service to Hawaii and Guam on vessels heading for the Far East."  CAC ¶ 13.  Plaintiffs allege no facts that indicate these acts, which actually increased capacity and market efficiencies for customers, involved any agreement among Defendants.

Finally, Plaintiffs assert that an alleged "capacity limitation agreement" may be inferred because "[w]hen Matson and Horizon sell their U.S.-built ships for scrap, the contracts specify the vessels cannot be resold by the scrap yard and operated by potential competitors."  CAC ¶ 15.  Plaintiffs allege no facts suggesting an agreement between Defendants as to ship disposal.

### III.   STANDARD OF REVIEW AND THE REQUIREMENT TO PLEAD AN AGREEMENT

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  The Supreme Court recently clarified this pleading standard in *Bell Atlantic v. Twombly*, 127 S. Ct. 1955 (2007), stating that although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.* at 1964-65; *see also Kendall v. Visa USA, Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008); *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 970 (9th Cir. 2008).

Section 1 of the Sherman Act prohibits any "contract, combination . . . or conspiracy, in

DEFENDANTS' MOTION TO DISMISS
Case No. 08-md-1972 TSZ

– 5 –

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA  94105
415.393.8200  FAX: 415.393.8306

restraint of trade or commerce." 15 U.S.C. § 1.   Independent action is not so proscribed. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984).   Where, as here, a plaintiff purports to allege horizontal price-fixing, the "crucial question" is whether the facts alleged demonstrate an anticompetitive "agreement" among competitors—as opposed to conduct that has "stemmed from independent decision."   *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954).   Thus, a plaintiff may attempt to plead a Section 1 conspiracy in two ways.   A plaintiff may allege direct evidence of an actual agreement, by alleging facts that, if proven, would be sufficient to establish an unlawful agreement, *Twombly*, 127 S. Ct. at 1970-71 & nn. 9-11, or a plaintiff may attempt to allege an unlawful agreement indirectly, by pleading facts that, if proven, would support a reasonable inference of collusion.  *Id*. at 1965.

In *Twombly*, the Supreme Court aligned the pleading standard of Rule 8 with these substantive principles of antitrust law.   In that case, the plaintiffs claimed that four major telecommunications companies conspired to refrain from entering each other's regions and to block entry by other new competitors into their own regions.   127 S. Ct. at 1962-63.   The complaint did not allege direct evidence of a conspiracy, however, merely parallel conduct, along with other facts (such as concentration in the industry and the failure of defendants to pursue potentially profitable economic opportunities) that, plaintiffs claimed, would support a reasonable inference of conspiracy.  *Id*. at 1962-63, 1970-74.

The Supreme Court found that such allegations failed to state a Section 1 claim.   Mere parallel conduct, the Court observed, "does not suggest conspiracy," *Twombly*, 127 S. Ct. at 1966, but may instead be the product of a "rational and competitive business strategy unilaterally prompted by common perceptions of the market."   *Id*. at 1964.   Recognizing that a plaintiff

ultimately must prove the existence of an antitrust conspiracy with evidence that "tend[s] to rule out the possibility that the defendants were acting independently," *id*. the Court held that a complaint must contain allegations that are more suggestive of conspiracy than of independent lawful behavior. *Id*. at 1965-66. Indeed, the Court noted the "practical significance" of failing to test an antitrust plaintiff's complaint for a "plausible entitlement to relief" (*id*. at 1967) *before* permitting a plaintiff to engage in discovery "lest a plaintiff with 'a largely groundless claim' be allowed to 'take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.'" *Id*. at 1966 (citations omitted).

The Court held that the facts alleged in the *Twombly* complaint did not meet this standard and could be readily explained by unilateral conduct. 127 S. Ct. at 1970-74. The Court explained that "[e]ven 'conscious parallelism,' a common reaction of 'firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions' is 'not itself unlawful.'" *Id*. at 1964 (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993)). The Court thus concluded that "[b]ecause the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint should be dismissed." *Id*.

In sum, after *Twombly*, a plaintiff "must allege facts such as a 'specific time, place or person involved in the alleged conspiracies' to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin." *Kendall*, 518 F.3d at 1047 (quoting *Twombly*, 127 S. Ct. at 1970 n.10). Allegations of parallel conduct or other facts equally consistent with both collusion and unilateral action cannot state a claim for a Section 1 violation. *Id*. at 1049; *see also*

DEFENDANTS' MOTION TO DISMISS
Case No. 08-md-1972 TSZ

– 7 –

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA  94105
415.393.8200  FAX: 415.393.8306

1    *Alaska Airlines, Inc. v. Carey*, 2008 WL 2725796, at *4, *7 (W.D. Wash. July 11, 2008).[3]

2    ## IV.    PLAINTIFFS HAVE FAILED TO ALLEGE A CONSPIRACY IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

4            Here, Plaintiffs allege that Matson and Horizon engaged in an overall conspiracy to affect

    the prices for domestic noncontiguous ocean shipping services, yet the CAC is bereft of factual

    allegation establishing an agreement between Matson and Horizon to raise, fix, maintain or

    stabilize prices or otherwise restrain trade, much less any specific times, places or persons that

    would have been involved in the formation of such a conspiracy.  Nor do they assert any factual

    support for their theories that Matson and Horizon, in furtherance of their conspiracy, fixed fuel

    surcharges, impeded potential competitors from entering the trade, or refrained from entering

    confidential contracts.  And, in the single instance in which Plaintiffs actually allege the

    existence of an agreement—Matson and Horizon's publicly advertised agreements to purchase

    space on each other's vessels—Plaintiffs provide no factual allegations to support any inference

    that the agreements are unlawful.  In the words of another court recently confronted with a

    strikingly similar pleading:  "While the allegations allow one to imagine that a conspiracy may

    ---

    [3]     *See also*, *e.g.*, *In re LTL Shipping Services Antitrust Litig.*, 2009 U.S. Dist. LEXIS 14276, *55-56 (N.D. Ga. Jan. 28, 2009); *In re Digital Music Antitrust Litig.*, 2008 U.S. Dist. LEXIS 79764, at *45-46 (S.D.N.Y. Oct. 9, 2008); *In re Air Cargo Shipping Serv. Antitrust Litig.*, MDL No. 1775, No. MD-06-1775, at 16-17 (E.D.N.Y. Sept. 26, 2008); *Shames v. Hertz Co.*, 07-cv-02174-H-BLM, at 6-7 (S.D. Cal. Apr. 8, 2008); *Jacobs v. Tempur-Pedic Int'l Inc.*, 2007 WL 4373980, at *2-4 (N.D. Ga. Dec. 11, 2007); *Boyd v. Tempay*, 2008 WL 1803774, at *2 (D. Del. Apr. 18, 2008); *In re Parcel Tanker Shipping Servs. Antitrust Litig.*, 541 F. Supp. 2d 487, 491 (D. Conn. 2008); *Walgreen Co. v. AstraZeneca Pharm. L.P.*, 534 F. Supp. 2d 146, 153 (D.D.C. 2008); *Walker v. Windstream Commc'ns Inc.*, 2007 WL 4180721, at *3 (M.D.N.C. Nov. 21, 2007); *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 961-65 (N.D. Cal. 2007); *Lady Deborah's, Inc. v. VT Griffin Serv., Inc.*, 2007 WL 4468672, at *7-8 (S.D. Ga., Oct. 26. 2007); *In re Travel Agent Comm'n Antitrust Litig.*, 2007 WL 3171675, at *12 (N.D. Ohio Oct. 29, 2007); *Stand Energy Corp. v. Columbia Gas Transmission Corp.*, 2007 WL 3049570, at *2 (S.D. W.Va. Oct. 18, 2007); *Sheridan v. Marathon Petroleum Co.*, 2007 WL 290556, at *9 (S.D. Ind. Sept. 28, 2007), *aff'd*, F.3d , 2008 WL 2486581 (7th Cir. June 23, 2008); *Wellnx Life Sciences, Inc. v. Iovate Health Sciences Research, Inc.*, 516 F. Supp. 2d 270, 290-91 (S.D.N.Y. Sept. 26, 2007); *Temple v. Circuit City Stores, Inc.*, 2007 WL 2790154, at *7 (E.D.N.Y. Sept. 25, 2007); *The America Channel LLC v. Time Warner Cable, Inc.*, 2007 WL 1892227, at *5 (D. Minn. June 28, 2007); *Schafer v. State Farm Fire & Cas., Inc.*, 507 F. Supp. 2d 587, 596-97 (E.D. La. 2007).

    ---

have occurred, imagination is not enough." *In re LTL Shipping Services Antitrust Litig.*, 2009 U.S. Dist. LEXIS 14276, *52 (N.D. Ga. Jan. 28, 2009) ("*LTL Shipping*").

## A. Plaintiffs Failed To Allege A Section 1 Violation Regarding Fuel Surcharges Or Confidential Contracts

### 1. Plaintiffs Fail To Allege An Agreement

The CAC contains no direct factual allegations that Defendants entered into an unlawful agreement concerning fuel surcharges or confidential contracts. *See, e.g.*, ¶¶ 9-11, 16. It offers bare and conclusory allegations of agreement, but "[t]he addition of 'magic words' [, such as 'combined' and 'coerced',] [is] not alone sufficient to state a claim under § 1 of the Sherman Act." *Int'l Norcent Tech. v. Koninklijke Philips Elects. N.V.*, 2007 WL 4976364, at *8 (C.D. Cal. 2007) (citing *Twombly*, 127 S. Ct. at 1965). Here, the CAC is bereft of factual allegations establishing any agreement between Defendants to fix prices or otherwise restrain trade, much less any specific times, places or person that would have been involved in the formation of such a conspiracy. Nor does the CAC contain factual allegations that "actively" and "plausibly" suggest a conspiracy. Because the allegations fail to show that conspiracy is more likely than independent action, they should be dismissed. *Twombly*, 127 S. Ct. at 1964-66.

### 2. Plaintiffs' Allegations Regarding The Industry Fail To Support An Inference Of Unlawful Agreement

The CAC relies heavily on allegations related to the structure and conditions of the Hawaii/Guam trade, Defendants' membership and participation in trade associations, the existence of a DOJ investigation into "the possibility of anticompetitive practices in the coastal freight shipping industry," and plea agreements entered by some individuals for conduct in the *Puerto Rico* ocean shipping trade to support an inference of conspiracy in the Hawaii/Guam trade. *See, e.g.*, CAC ¶¶ 7, 46, 56-57, 59, 68-77. However, the facts alleged in the CAC do not

DEFENDANTS' MOTION TO DISMISS
Case No. 08-md-1972 TSZ

– 9 –

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA  94105
415.393.8200  FAX: 415.393.8306

support that inference and instead actually undermine Plaintiffs' claims.

***Industry Structure.***   Plaintiffs allege that the ocean shipping trade is "highly concentrated," with "substantial barriers to entry."   CAC, ¶ 57.   This allegation, at most, identifies "conditions [] propitious for the emergence of collusion," but cannot render plausible the inference of agreement.   *See, e.g.*, *In re Digital Music Antitrust Litig.*, 2008 U.S. Dist. LEXIS 79764, at *43 (S.D.N.Y. Oct. 9, 2008).

Taking Plaintiffs' allegations regarding the trade as true, similar pricing levels are not surprising—indeed, they are likely—and do not give rise to an inference of conspiracy.   In a concentrated market, it is not unusual for a company, acting independently, to price its products or services at the same level as other industry participants or to follow the prices set by a "price leader."   With only a few competitors in the market, each realizes that if one company reduces its price in an attempt to gain market share, the other companies will likely match the lower price, thus defeating the attempt of the first company to gain market share—while simultaneously ensuring that all companies in the industry will experience lower revenues and smaller profit margins.   *See Indep. Iron Works, Inc. v. United States Steel Corp.*, 322 F.2d 656, 665 (9th Cir. 1963); *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 963-64 (N.D. Cal. 2007); *see also* VI PHILIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW, ¶ 1429 (2d ed. 2003).

Accordingly, in a concentrated industry with high barriers to entry, such consciously parallel pricing is both common and lawful.   *Brooke Group Ltd.*, 509 U.S. at 227; *In re Citric Acid Litig.*, 191 F.3d 1090, 1102 (9th Cir. 1999).   Given the structure of the Hawaii/Guam trade, it hardly would have been surprising for Defendants to match each other's prices.   *See Blomkest Fertilizer, Inc. v. Potash Corp. of Sask., Inc.*, 203 F.3d 1028, 1034 (8th Cir. 2000) (en banc).

DEFENDANTS' MOTION TO DISMISS                          – 10 –
Case No. 08-md-1972 TSZ

GIBSON, DUNN & CRUTCHER LLP
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA  94105
415.393.8200  FAX: 415.393.8306

Thus, because Plaintiffs' allegations concerning the concentration in the Hawaii/Guam trade are at least as consistent with independent behavior (if not more so), they cannot support a plausible inference of unlawful agreement.

***Fungible Products with Inelastic Demand.***    Likewise, courts consistently have recognized that parallel pricing is common in a competitive market for fungible goods or services characterized by inelastic demand.  *See*, *e.g.*, *Indep. Iron Works, Inc.*, 322 F.2d at 665; *Blomkest*, 203 F.3d at 1033; *E.I. Du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 139 (2nd Cir. 1984).    Here, Plaintiffs' allegations that ocean shipping services are "fungible" and "homogenous," subject to "inelastic demand", and that "near substitutes do not exist," CAC ¶¶ 54-55, 57, therefore also cut against their conspiracy theory.  They establish that the two competitors in this trade have a strong incentive to match one another's prices and behavior in order to avoid losing customers or being placed at a competitive disadvantage.  They do not make the allegations of conspiracy plausible.

***Participation in Trade Associations and Industry Groups.***  Plaintiffs also attempt to draw some inference of conspiracy from each Defendant's participation in trade associations and industry groups.  CAC ¶¶ 68-71.  But the Supreme Court has flatly held that such activities are "not illegal, either standing alone or as  part of a broader scheme itself violative of the Sherman Act."  *United Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965).

Plaintiffs' allegations that Defendants are members of the Maritime Cabotage Task Force and the Transportation Institute indicate nothing more than that many entities, including two of the Defendants, created a forum to discuss their common concerns.  CAC ¶ 69.  Nor is Plaintiffs' general and conclusory allegation that Defendants had "opportunities to exchange information

DEFENDANTS' MOTION TO DISMISS
Case No. 08-md-1972 TSZ

– 11 –

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA  94105
415.393.8200  FAX: 415.393.8306

and enter into agreements to the detriment of Plaintiffs and the Class" at the meetings of these associations (CAC ¶ 70) sufficient, as it alleges merely "opportunities" rather than any specific meeting or agreement.  *See, e.g.*, *Twombly*, 127 S. Ct. at 1970 n.10; *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436-37 (6th Cir. 2008); *In re Parcel Tanker Shipping Servs. Antitrust Litig.*, 541 F. Supp. 2d 487, 491-92 (D. Conn. 2008).

Likewise, Plaintiffs' allegation that Defendants "had ready access" to certain historical industry data through an independent third party service known as PIERS does not make the conspiracy or agreement alleged here more plausible.  CAC ¶ 71.  As the CAC makes clear, PIERS data is available to anyone who is willing to pay its subscription fee.[4]  Exchange of and access to such historical data does not imply collusion.  *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1313 (11th Cir. 2003) (rejecting a similar argument based on an exchange of *non-public* sales information between defendants).  Notably, the CAC does not allege that PIERS publishes pricing data.

**DOJ Investigation.**  The mere fact that the DOJ commenced an investigation into ocean shipping in the Jones Act trades and that, in the distinct Puerto Rico trade, individuals have entered guilty pleas also does not render the alleged unlawful activity here plausible.  CAC ¶¶ 72-77.  These references to governmental investigations and proceedings are insufficient, as a matter of law, to elevate the CAC to the level of plausibility required to withstand a motion to dismiss.  *See, e.g.*, *In re Graphics Processing Units Antitrust Litig.,* 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (fact of a grand jury investigation "carries no weight in pleading an antitrust conspiracy claim"); *In re Travel Agent Comm'n Antitrust Litig.*, 2007 WL 3171675, at *11-12

---

[4]   *See* http://www.piers.com/about/ for further information on PIERS.

DEFENDANTS' MOTION TO DISMISS
Case No. 08-md-1972 TSZ

– 12 –

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA  94105
415.393.8200  FAX: 415.393.8306

(Oct. 29, 2007 N.D. Ohio).

The fact of a grand jury's investigative subpoena says nothing about the plausibility of the conspiracy alleged in the CAC.  Indeed, it cannot even be assumed that the confidential proceedings of the grand jury, whose proceedings are confidential, is investigating the same theories addressed by the CAC.  Likewise, statements made by the DOJ concerning the scope of the *government's* investigation (CAC ¶ 9) cannot support any inference rendering the *CAC's* claims more plausible.  And of course grand juries have "wide latitude to inquire into violations of criminal law," (*United States v. Calandra*, 414 U.S. 338, 343 (1974)), including issuing subpoenas, that has no application to private civil litigation.

Plaintiffs' use of the guilty pleas of individuals in the Puerto Rico shipping trade to draw some inference of conspiracy in the Hawaii/Guam trade is even more attenuated.  Plaintiffs do not allege that any employee of Matson has entered any guilty pleas or even that Matson competed in the Puerto Rico trade (it did not).  The only link between the individuals who have pleaded guilty for conduct committed in the Puerto Rico trade and this complaint is that one Horizon executive, Kevin Gill, allegedly "had responsibilities for marketing and pricing of ocean shipping services" including Hawaii and Guam shipping routes.  CAC ¶ 75.  But Plaintiffs do not allege that Mr. Gill's guilty plea concerned anything but his responsibilities in the Puerto Rico trade.  *Id*.  This "if it happened there, it could have happened here" fallacy was expressly rejected by the Second Circuit, which found conclusions reached by a government investigation in one market did not raise inferences of antitrust violations in a separate market.  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007).  Plaintiffs cannot allege any meaningful connection between the plea agreements involving a different market from the one at issue here,

rendering these allegations irrelevant to their claims.  *See*, *e.g.*, *In re Parcel Tanker Shipping Servs. Antitrust Litig.*, 541 F. Supp. 2d at 492.

### 3.     Plaintiffs Have Not Pleaded A Plausible Conspiracy Regarding Fuel Surcharges

Plaintiffs' allegation that "Defendants' agreement to charge uniform fuel surcharges is reflected in their lockstep pricing changes," CAC ¶ 82, is similarly insufficient.  Because similarities in prices and other conduct are the norm—not the exception—in competitive markets, "[a] section 1 violation cannot . . . be inferred from parallel pricing alone, nor from an industry's follow-the-leader pricing strategy."  *In re Citric Acid Litig.*, 191 F.3d at 1102 (internal citations omitted); *see also Twombly*, 127 S. Ct. at 1964.  Even accepting Plaintiffs' conclusory allegations of parallel pricing as true, "an allegation of parallel conduct . . . will not suffice" to support a reasonable inference of conspiracy.  *Twombly*, 127 S. Ct. at 1966; *see also United States v. Int'l Harvester Co.*, 274 U.S. 693, 708-09 (1927).

The Second Circuit recently applied these principles and affirmed the dismissal of a complaint that alleged not only parallel pricing but other parallel conduct.  *In re Elevator Antitrust Litig.*, 502 F.3d at 51.  The Court held that these allegations were consistent with independent action, explaining:

> Similar contract terms can reflect similar bargaining power and commercial goals (not to mention boiler plate); similar contract language can reflect the copying of documents that may not be secret; *similar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy;* and similar equipment design can reflect the state of the art.

*Id.* at 51 (emphasis added); *see also In re LTL Shipping*, 2009 U.S. Dist. LEXIS 14276, at *55-56 (dismissing Section 1 claims based on uniform fuel surcharges where plaintiffs alleged "parallel pricing conduct, the sharing of surcharge price information publicly using websites, and

the claim that opportunities arose at which the Defendants could have met and hatched a price-fixing conspiracy").

The plausibility of Plaintiffs' allegations is further undercut by Plaintiffs' recognition that fuel costs *increased* throughout the class period. CAC ¶ 88 (noting increases of 333% for diesel fuel and 396% for residual fuel oil). In the face of such dramatic increases, it is neither surprising nor suspicious that Horizon and Matson each decided to assess fuel surcharges in order to protect their respective bottom lines. *See, e.g.*, *Twombly*, 127 S. Ct. at 1972 (rejecting plausibility of inference of collusion where there is "an obvious alternative explanation"); *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 904 (9th Cir. 1987) ("The fact that many, if not all, firms in an industry react similarly to a particular practice does not evidence an industry-wide agreement when there is a legitimate business purpose for each firm's behavior"). Fuel surcharges were part of a legitimate and rational response to the common problem of rising fuel costs faced by all transportation providers, including those providing ocean shipping services, s*ee, e.g.*, *In re LTL Shipping*, 2009 U.S. Dist. LEXIS 14276, at *65, and not the type of "idiosyncratic" conduct that plausibly suggests a Section 1 violation. *See, e.g.*, *Wilcox v. First Interstate Bank*, 815 F.2d 522, 528 (9th Cir. 1987) (holding that "near uniformity in prime interest rates" reflected nothing more than a competitive market for funds). As explained above, that the resulting increases in the percentage to be applied as a surcharge were the same is not surprising considering the structure of the Hawaii/Guam trade.

### 4. Plaintiffs Have Not Pleaded A Plausible Conspiracy Regarding Confidential Contracts

The CAC contains conclusory allegations that Horizon and Matson "entered into an illegal agreement to avoid entering into confidential agreements" pursuant to 49 U.S.C.

GIBSON, DUNN & CRUTCHER LLP
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA 94105
415.393.8200 FAX: 415.393.8306

§ 14101(b)(1).  CAC ¶ 99.  The CAC, however, contains no facts supporting this conjecture.  Indeed, the allegations of the CAC undermine this assertion.

Plaintiffs admit, as they must, that ocean carriers in the Hawaii/Guam trade are allowed by law to use either tariffs *or* confidential contracts for most goods shipped.  CAC ¶ 80.  Indeed, they allege that, although Matson and Horizon generally used "public pricing" (i.e., tariffs) for these products, Matson also entered into confidential agreements with automakers in order to compete against Pasha, a recently entered competitor in the Hawaii automobile shipping trade.  CAC ¶¶ 99-101.  Thus, if true, the facts pleaded demonstrate that Matson entered into confidential contracts when that was the rational business decision.  And Plaintiffs allege no facts concerning *any* action taken by Horizon as a result of a purported agreement, other than the assertion that Horizon generally uses "public pricing."  *Id.*  In short, Plaintiffs allege nothing but parallel conduct.  Because the CAC contains nothing to indicate that Matson and Horizon entered into any agreement with respect to the use of confidential contracts, it fails to state a claim against the Defendants on those grounds.

**B.     Plaintiffs Have Not Pleaded A Section 1 Claim Regarding Capacity**

Plaintiffs contend that the Defendants conspired to "decreas[e] and stabiliz[e] shipping capacity."  CAC ¶ 7.  The allegations concerning this alleged "conspiracy" fall into two categories:  (1) allegations concerning "capacity sharing agreements" (CAC ¶¶ 12, 96-98) and (2) allegations concerning unilateral actions by Matson or Horizon to purchase or dispose of vessels (CAC ¶¶ 13-15).  The first category of these allegations represents the only instance in which Plaintiffs actually allege the existence of an agreement, but significantly the agreement alleged does not include an agreement to reduce or stabilize capacity.  The second category suffers from the same infirmity as most of the other claims in the CAC—the absence of any facts that would support even an inference of any agreement between Matson and Horizon.

1

2

### 1. Plaintiffs Fail To Allege That Matson's Agreement To Carry Cargo For Horizon Includes An Agreement To Limit Capacity

In the single instance in which Plaintiffs actually allege a specific agreement, the CAC attempts to draw an inference that Defendants' publicly advertised agreements "to ship each other's containers on a regular basis" are unlawful.  CAC ¶ 96; *see also* ¶¶ 12, 97-98.  As primary support for that theory, Plaintiffs point to a specific contract in which Matson agreed to sell space to Horizon on its sailings from Los Angeles.  CAC ¶ 98.  But Plaintiffs do not allege that *this contract* reduces or limits capacity, restricts either carrier's ability to add or subtract vessels from the trade, or limits the carriers' decisions concerning the rates they charge their customers.

Rather, Plaintiffs attempt to draw some inference of a "conspiracy" based on Horizon's unilateral decision to remove a vessel from service at some later point.  CAC ¶ 98.  But the CAC contains no allegations that Horizon removed its vessel from service as a result of any *agreement with Matson* to do so.  Indeed, it is equally plausible that Horizon's decision to remove its vessel from service was a unilateral sound business decision made in the face of competitive market conditions.  *See Twombly*, 127 S. Ct. at 1966; CAC ¶ 98.

While Plaintiffs claim that this arrangement reduced capacity and price competition, the CAC alleges only that Matson sailed every other Wednesday from Los Angeles, Horizon introduced a vessel in the opposite week, and Matson increased its capacity by adding another vessel in 2000, which reduced Horizon's vessel utilization "considerably."  CAC ¶ 98.  Matson then sublet to Horizon a portion of the capacity on Matson's vessels and, the CAC alleges, Horizon removed its vessel.  *Id*.  The contract allowed one carrier to transport containers on the vessels of another carrier in exchange for a negotiated price and was a matter of public

DEFENDANTS' MOTION TO DISMISS
Case No. 08-md-1972 TSZ

– 17 –

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA 94105
415.393.8200 FAX: 415.393.8306

knowledge, not the result of a surreptitious back-room meeting.   CAC ¶¶ 12, 96, 98.   The contract thus preserved the additional capacity that Matson had introduced by adding its vessel, and increased competition by allowing Horizon to compete with Matson by re-selling space on that vessel to customers.

Indeed, the allegations in the CAC underscore why such an arrangement makes business sense.   The CAC points out that both Hawaii and Guam rely heavily on the shipment of goods by sea, including perishable and time-sensitive goods such as food, fuel and building materials. CAC ¶¶ 49-50.   Adding additional vessels to provide more frequent service is very expensive. *See* CAC ¶¶ 57.   Given the high fixed-costs of operating a vessel, it is particularly inefficient to add an additional ship on a route that already has sufficient capacity.   *See id*.

Thus, viewed in that light, the agreements alleged are a straightforward way for one carrier to increase its capacity in a market and to recover some of the cost of doing so by selling space on its ship to another carrier, which allows that other carrier to serve the market better—a result benefiting both carriers and their customers, and is in fact pro-competitive.   The agreements are consistent with Defendants' efforts to retain and grow each of their respective customer bases by offering more service than they otherwise could without the agreements.   *See, e.g.*, *Kendall*, 518 F.3d at 1049 ("Allegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a violation of the antitrust laws.") (citing *Twombly*, 127 S. Ct. at 1964-66 & n.5).   Nor is there anything improper about such agreements.   *Cf. United States v. Stolt-Nielsen S.A.*, 524 F. Supp. 2d 586, 609 (E.D. Pa. 2007).[5]   And it is a far cry from what is required to

---

[5]   In *Stolt-Nielsen*, the question before the court was whether the defendant had taken prompt and corrective action to terminate anticompetitive activity as required by its conditional

DEFENDANTS' MOTION TO DISMISS
Case No. 08-md-1972 TSZ

– 18 –

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA  94105
415.393.8200  FAX: 415.393.8306

"nudge[] their claims across the line from conceivable to plausible."  *Twombly*, 127 S. Ct. at 1974.

### 2.   Independent Decisions Concerning Vessel Acquisition And Disposal Do Not Establish An Unlawful Agreement

Plaintiffs also point to independent decisions by Matson and Horizon to acquire or retire vessels (CAC ¶¶ 12-14, 98), but none of these allegations support Plaintiffs' theory because those were acts that did not involve any agreement between Defendants.  Plaintiffs allege no facts indicating that any of these decisions were made jointly by Matson and Horizon, facts without which the claim cannot stand.

Plaintiffs' allegation that Matson purchased vessels from other ocean carriers (CAC ¶¶ 13-14) establishes nothing more than a decision by Matson to enter into such a transaction with non-Defendants and cannot support the Section 1 violation alleged in the CAC.  Moreover, Plaintiffs admit that Matson's acquisitions from APL (a non-Jones Act carrier that, as a matter of law, was ineligible to serve the Hawaii trade) resulted in "a more efficient passby service to Hawaii and Guam on vessels heading for the Far East."  CAC ¶ 13.  That pro-competitive effect further undermines Plaintiffs' theory.  In this context, Plaintiffs' allegation that Matson did not lower its rates despite obtaining a "much lower cost, more efficient service" is a non sequitur; it establishes only that Matson attempted to make a profit—nothing more.  *Id.*

Plaintiffs' allegation that the alleged "capacity limitation agreement" may be inferred from the fact that "[w]hen Matson and Horizon sell their U.S.-built ships for scrap, the contracts

---

leniency status, or if it had continued to commit criminal antitrust violations beyond the "termination" date that it had originally disclosed to the Department of Justice in obtaining amnesty.  The court found that "a variety of topics, such as sublets, relets, and co-service agreements . . . were lawful for discussion" in that context, among the competing chemical parcel tanker carriers, and thus, were not evidence of continued *anticompetitive* conduct that occurred after the asserted "termination" date.  524 F. Supp. 2d at 609.

DEFENDANTS' MOTION TO DISMISS             – 19 –
Case No. 08-md-1972 TSZ

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA  94105
415.393.8200 FAX: 415.393.8306

1   specify the vessels cannot be resold by the scrap yard and operated by potential competitors"

2   (CAC ¶ 15) is even more attenuated.  Plaintiffs do not allege any agreement between Matson and

3   Horizon to implement these specifications.  And such contracts are consistent with both

4   companies' unilateral (and legal) action to protect their respective businesses and avoid liability

5   for vessels beyond their useful life.

6       As with the other theories, Plaintiffs fail to allege even a discussion between Matson and

7   Horizon about an unlawful agreement, much less an unlawful agreement itself.  That failure

8   necessitates dismissal of the capacity sharing claim.

9   **V.    PLAINTIFFS' CLAIMS ARE BARRED BY THE FILED RATE DOCTRINE**

10      Regardless of the sufficiency of the CAC under *Twombly*, Plaintiffs' damages claim

11   should be dismissed under the filed rate doctrine.  Under that doctrine, rates publicly filed with a

12   regulatory agency may not be the subject of an antitrust damages action.  *Keogh v. Chicago &*

13   *N.W. Ry. Co.*, 260 U.S. 156, 162 (1922); *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*,

14   476 U.S. 409, 417 (1986); *see also Town of Norwood, Mass. v. New Eng. Power Co.*, 202 F.3d

15   408, 419 (1st Cir. 2000) (noting that "[i]t is the *filing* of the tariffs, and not any affirmative

16   approval or scrutiny by the agency, that triggers the filed rate doctrine."); *Crumley v. Time*

17   *Warner Cable, Inc.*, 2008 U.S. Dist. LEXIS 84538, *21 (D. Minn. Mar. 7, 2008).

18      The CAC alleges a conspiracy to artificially raise, fix, maintain and stabilize prices

19   charged for shipping services in the Hawaii/Guam trade. CAC ¶¶ 6, 116, 117, 122(c).  Those

20   rates were filed by Defendants with the STB pursuant to the Interstate Commerce Commission

21   Termination Act ("ICC Termination Act").  *See* CAC ¶ 80.  The STB is an administrative agency

22   created by Congress to police the domestic shipping industry by, among other things, regulating

23   the rates charged in the tariffs filed in the noncontiguous domestic trade.  *Id.*; *see also* 49 U.S.C.

24   § 701 (terminating the Interstate Commerce Commission ("ICC"); 49 U.S.C. § 13501

(establishing STB); 49 U.S.C. § 13701 (providing for complaints as to reasonableness of shipping rates and surcharges to be filed with the STB and setting forth STB's authority to police rates it deems "unreasonable").  The CAC acknowledges that, although the ICC Termination Act allows carriers to enter into confidential shipping contracts with terms that may be exempt from regulation, the tariff-filing requirement governs unless the parties enter into such confidential contracts.  *Id.*; *see also* 49 U.S.C. § 14101(b)(1) (permitting confidential contracts).

While Plaintiffs allege that they paid rates and surcharges governed by such publicly-filed tariffs (CAC ¶ 80), it has been well-settled for over 80 years that civil antitrust claims for treble damages premised on tariffs filed with a regulatory body like the STB are barred by the filed rate doctrine.[6]  In *Keogh*, the seminal filed rate doctrine case, the Supreme Court considered whether rates filed with and approved by the ICC could be a basis for a civil antitrust action for treble damages alleging an unlawful conspiracy to fix freight rates against defendant railroad companies.  260 U.S. at 160.  The defendants argued that because every rate complained of had been duly filed with and approved by the ICC, there could be no civil antitrust liability premised upon such rates, even if they were arrived at through price-fixing.  *Id.*  The Court agreed with the defendants and held that a private shipper could not recover damages premised upon rates duly filed with and approved by the ICC.  *Id.* at 161-162.[7]

The *Keogh* Court based its holding on four primary rationales.  260 U.S. at 162-65.  First,

---

[6]    A challenge to an antitrust claim based on the filed rate doctrine may be properly raised on a 12(b)(6) motion to dismiss.  *See, e.g.*, *Square D*, 476 U.S. at 411; *Ulitimax.com, Inc. v. PPL Energy Plus*, 273 F. Supp. 2d 573, 574 (E.D. Penn. 2003); *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262, 267 (D. Conn. 2003); *Ocean Logistics Mgmt, Inc. v. NPR, Inc.*, 38 F. Supp. 2d 77, 78 (D.P.R. 1999).

[7]    When it went into effect, the Termination Act transferred to the newly-created STB all jurisdiction formerly held by the ICC and/or the Federal Maritime Commission over domestic transportation by water, rail and motor carriers.

---

DEFENDANTS' MOTION TO DISMISS
Case No. 08-md-1972 TSZ

– 21 –

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA  94105
415.393.8200  FAX: 415.393.8306

the Court reasoned that when a tariff rate was accepted by a regulatory body such as the ICC, it became the "legal" and required rate. *Id.* at 162. It followed that there could be no antitrust liability for charging a required rate—even one arrived at through price-fixing. *Id.* Second, if the plaintiff were to ultimately prevail on its antitrust claim and receive damages, that plaintiff would be paying a lower rate than other shippers thereby undermining the requisite uniformity of rates among similarly-situated shippers. *Id.* at 162-63. Third, the Court reasoned that because courts do not have the authority or the expertise to set rates, a plaintiff could not meet its burden of proving that a lower nondiscriminatory rate could have been charged. *Id.* at 164. Finally, because courts are not rate-makers, the plaintiffs could not prove, and the Court could not determine, a rate with which to calculate damages. *Id.* at 164-65.

In *Square D*, the Supreme Court specifically addressed the continuing viability of *Keogh* in light of various intervening changes in the law. The Court stated the question as whether carriers are subject to treble damages liability if rates they have filed with the ICC (now the STB) have been fixed pursuant to an agreement in violation of Section 1 of the Sherman Act. *Square D*, 476 U.S. at 410. First, it found that *Keogh* established that "shippers could not recover treble-damages for overcharges whenever tariffs have been filed," regardless of whether the agency had conducted a formal review of the rates. *Id.* at 417, n.19. Then, it specifically addressed whether *Keogh* should be overruled on the basis of intervening changes in substantive transportation law or procedural rules.

The Court found that "*Keogh* represents a longstanding statutory construction that Congress has consistently refused to disturb, even when revisiting this specific area of law." *Square D*, 476 U.S. at 421-22. With respect to arguments that changes in class action practice

DEFENDANTS' MOTION TO DISMISS
Case No. 08-md-1972 TSZ

– 22 –

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA  94105
415.393.8200 FAX: 415.393.8306

and sophistication in evaluating damages might warrant re-examination of various *Keogh* rationales, the Court was unequivocal:  "Even if it is true that these developments cast Justice Brandeis' reasons in a different light, however, it is also true that the *Keogh* rule has been an established guidepost at the intersection of the antitrust and interstate commerce statutory regimes for some 6 ½ decades.   The emergence of subsequent procedural and judicial developments does not minimize *Keogh*'s role as an essential element of the settled legal context in which Congress has repeatedly acted in this area."  *Id* at 423.

These principles are directly applicable here, where Plaintiffs allege an unlawful conspiracy in connection with Defendants' publicly filed noncontiguous domestic ocean shipping rates.  In an attempt to avoid the application of this doctrine, the CAC alleges that Congress intended to deregulate interstate ocean shipping when it passed the ICC Termination Act.  In *Ocean Logistics Management, Inc. v. NPR, Inc.*, 38 F. Supp. 2d 77 (D.P.R. 1999), the court rejected this argument and dismissed claims based on rates filed with the STB.  *Id.* at 85-87.  In that case, as here, plaintiffs had argued that the filed rate doctrine did not apply to rates filed in a Jones Act trade pursuant to the ICC Termination Act.  *Compare* CAC ¶ 78 *with Ocean Logistics Mgmt., Inc.*, 38 F. Supp. 2d at 88.  The *Ocean Logistics* court rejected that argument and applied the filed rate doctrine to bar a treble damages antitrust action against carriers in the noncontiguous ocean trade notwithstanding the passage of the ICC Termination Act.  In so doing, the court reasoned that because the complaint attacked rates that were "filed with the regulatory agency under a comprehensive regulatory system," the filed rate doctrine applied.  *Id* at 85.  The court further noted that although the ICC Termination Act gave the plaintiffs the ability to opt out of the regulatory scheme, the parties in that case plainly had not done so.  *Id.* at

DEFENDANTS' MOTION TO DISMISS
Case No. 08-md-1972 TSZ

– 23 –

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA  94105
415.393.8200  FAX: 415.393.8306

86-87. Thus, the rates at issue remained subject to the full scope of the regulatory system. *Id.*

The CAC should be dismissed for the same reason. The "domestic ocean shipping charges and shipping charges" that Defendants' allegedly fixed were publicly filed in Defendants' tariffs. *See* CAC ¶ 80. Thus, it is apparent that any alleged "artificially high prices" about which Plaintiffs complain were the rates for transportation services (and/or fuel surcharges) contained in Defendants' tariffs. As the Supreme Court held in *Keogh* and *Square D*, there can be no antitrust damages premised on such rates. Accordingly, Plaintiffs' damage claims should be dismissed.

Nor are Plaintiffs entitled to injunctive relief. Plaintiffs allege a conspiracy within the Class Period of October 11, 1999 to May 31, 2008. CAC ¶ 5. Plaintiffs' allegations of harm are specified as being "[d]uring the Class Period." CAC ¶ ¶ 116, 118-121. Injunctive relief under the Clayton Act requires threatened loss or damage that is ongoing. *See Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 131 (1969). Since Plaintiffs make no allegations of ongoing violations, their claims for injunctive relief should be dismissed as well.

## VI.    CONCLUSION

Because the CAC contains no allegations of an unlawful agreement between Defendants, and because Plaintiffs' claims are barred by the filed rate doctrine, the CAC should be dismissed.

DATED:  March 20, 2009

GIBSON, DUNN & CRUTCHER LLP

By_____s/Joel S. Sanders_____

Joel S. Sanders
Rachel S. Brass
Rebecca Justice Lazarus
GIBSON, DUNN & CRUTCHER LLP

*Attorneys for Defendants Matson Navigation Company, Inc. and Alexander & Baldwin, Inc.*

1    DATED:  March 20, 2009                    McGUIREWOODS LLP

2                                              By_____s/Richard J. Rappaport_____

3                                                 Richard J. Rappaport
                                                  Amy B. Manning
4                                                 Tammy L. Adkins
                                                  McGUIREWOODS LLP
5

6                                                 James B. Stoetzer
7                                                 Larry S. Gangnes
                                                  LANE POWELL PC
8

9                                              *Attorneys for Defendants Horizon Lines, Inc.,
                                               Horizon Lines LLC and Horizon Lines Holding
10                                             Corp.*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

GIBSON, DUNN & CRUTCHER LLP
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA  94105
415.393.8200  FAX: 415.393.8306