1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE HAWAIIAN & GUAMANIAN
CABOTAGE ANTITRUST LITIGATION

No.  08-md-1972 TSZ

This Document Relates to:
ALL CASES

ORDER NO. 5:  Dismissal
With Leave to Amend

THIS MATTER comes before the Court on defendants' joint motion, docket no. 86, to dismiss the Consolidated Class Action Complaint, docket no. 69 (the "Consolidated Complaint"), pursuant to Rule 12(b)(6).  The Court has reviewed all papers filed in support of and in opposition to the motion and has considered the oral arguments of counsel presented on July 29, 2009.  Having previously taken the matter under advisement, the Court now enters the following Order.

**Background**

Plaintiffs, purchasers of shipping services between the continental United States and Hawaii, Guam, or both, allege that defendants, providers of such shipping services, violated Section 1 of the Sherman Act,[1] by colluding to simultaneously increase fuel surcharges, by sharing vessel capacity, and by conspiring not to enter into extra-tariff rate agreements with customers.  These assertions of anticompetitive activities in the Hawaii and Guam ocean

---

[1] Section 1 of the Sherman Act provides in relevant part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.

1  trade were initially made by individual plaintiffs in separate cases filed in different districts,

2  nineteen of which were transferred to this Court by the Multidistrict Litigation ("MDL")

3  Panel pursuant to 28 U.S.C. § 1407.  The transferred cases were consolidated for pretrial

4  purposes with eight similar cases originally filed in this district.  *See* Order No. 3 (docket

5  no. 38).  Pursuant to the agreement of the parties, plaintiffs were permitted to file the

6  Consolidated Complaint now at issue.  *See id.* at ¶ 4.

7      According to the Consolidated Complaint, plaintiffs are individuals or entities that

8  directly purchased from defendants shipping services on ocean routes between the

9  continental United States and Hawaii, Guam, or both, during the period between October 11,

10 1999, and May 31, 2008.  Consolidated Complaint at ¶¶ 4-5 (docket no. 69).  Defendant

11 Matson Navigation Company, Inc. ("Matson") is a wholly-owned subsidiary of defendant

12 Alexander & Baldwin, Inc. *Id.* at ¶ 33.  Defendants Horizon Lines, LLC (formerly known as

13 CSX Lines), Horizon Lines Holding Co., and Horizon Lines, Inc. (collectively, "Horizon")

14 are affiliated companies. *Id.* at ¶¶ 36-38.

15     Pursuant to the Merchant Marine Act of 1920 (the "Jones Act"), trade between

16 domestic United States ports is limited to "ships built in American shipyards, owned by

17 American citizens, and operated under the American flag." *OSG Bulk Ships, Inc. v. United*

18 *States*, 132 F.3d 808, 809-10 (D.C. Cir. 1998); *see also* 46 U.S.C. §§ 12102, 12103, 12111,

19 & 12112.  This ocean trade has "significant legal and regulatory barriers to entry" and is "*not*

20 a contestable market." *Matson Navigation Co. v. Fed. Maritime Comm'n*, 959 F.2d 1039,

21 1047 (D.C. Cir. 1992) (emphasis in original) (observing that a contestable market is one in

22 which entry is possible with little or no sunk investment, exit is relatively cost-free, and no

23 legal or regulatory barriers to entry or exit exist).  Plaintiffs allege that Matson and Horizon

24 together control 96% of the trade between the west coast of the continental United States and

25 Hawaii and 100% of the trade between the west coast and Guam.  Consolidated Complaint at

26 ¶ 56 (docket no. 69).  According to plaintiffs, Matson's and Horizon's (or its predecessors')

relative market shares, at least in the Hawaii trade, remained fairly stable during the years between 1995 (68% and 28%, respectively) and 2003 (67% and 29%, respectively).  *Id.* at ¶ 63.

Matson and Horizon are members of the Maritime Cabotage Task Force ("MCTF"), as well as the Transportation Institute.  *Id.* at ¶¶ 68 & 69.  Matson and Horizon provide data on container sizes and quantities, as well as cargo quantities, weights, and volumes, to the Port Import Export Reporting Service ("PIERS"), but no allegation has been made that PIERS is supplied with any pricing information.  *Id.* at ¶ 71.  Matson and Horizon are required to file their rates with the Surface Transportation Board, except as to statutorily exempted cargo or cargo carried under separate written agreements with specific shippers, in which both parties agree to waive their statutory rights.  *See id.* at ¶ 80; *see also* 49 U.S.C. §§ 13702 & 14101(b).  In the Consolidated Complaint, plaintiffs allege that defendants have colluded not to use extra-tariff written agreements with their customers; plaintiffs suggest that such agreements would be "confidential" and would inhibit defendants' ability to "mutually police each other's conduct."  Consolidated Complaint at ¶ 80 (docket no. 69).

Beginning in October 1999, defendants began imposing fuel surcharges, which plaintiffs allege are calculated as a percentage of revenue.  *Id.* at ¶¶ 83 & 86.  These fuel surcharges have risen substantially from 1.75% at the outset to 33.75% just prior to the commencement of the first of these antitrust actions, although intermittent fluctuations downward have occurred.  *See id.* at ¶ 83 (table showing overall climb in surcharges, but also small decreases in November 2001, May 2003, October 2006, November 2006, and January 2007).  Plaintiffs allege that these fuel surcharges were effectuated in lockstep 29 different times during the period from 1999 to 2008.  *Id.*  Plaintiffs, however, provide no historical (*i.e.*, pre-1999) data concerning the relative timing of defendants' rate increases.  Plaintiffs also contend that the increase in fuel surcharges over the period at issue far outpaced the rising cost of diesel or residual fuel oil ("RFO"), also known as bunker fuel, *id.* at ¶¶ 87 &

88, and that defendants' parallel pricing bears no correlation to their actual, disparate fuel costs, which vary by carrier depending on vessel types, routes, cargos, and fuel conservation efforts, *id.* at ¶ 86.  Plaintiffs therefore infer that these fuel surcharges were set pursuant to an agreement between defendants in violation of Section 1 of the Sherman Act.

Around the time fuel surcharges were first being introduced, Matson and Horizon altered their fleet schedules.  Plaintiffs allege that, prior to 2000, Matson's sailings from Los Angeles to Hawaii were bi-weekly.  *Id.* at ¶ 98.  In 2000, Horizon began operating a vessel from Los Angeles during the opposite week.  *Id.*  Matson responded by employing a second ship that coincided with Horizon's bi-weekly service, resulting in Matson offering weekly availability.  *Id.*  Horizon then negotiated a favorable rate to haul its freight on Matson's vessels before removing its own ship from the Los Angeles to Hawaii route.  *Id.*  Plaintiffs allege that, in reaching their vessel capacity sharing agreement, Matson and Horizon also violated the antitrust laws.

**Discussion**

In their joint motion to dismiss, defendants assert that the Consolidated Complaint fails to sufficiently allege an antitrust claim and that, even if such claim is adequately pleaded, it is precluded by the "filed rate doctrine."  The Court will address these issues seriatim.

**A.    Pleading an Antitrust Claim**

At a minimum, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  With respect to an antitrust claim, the Supreme Court has provided substantial guidance concerning the quantum and nature of factual allegations required to satisfy Rule 8.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).  In *Twombly*, the Supreme Court made clear that an antitrust complaint must contain "enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556.  The *Twombly* Court observed that § 1 of the Sherman Act does not prohibit all

1   unreasonable restraints of trade, but only those "effected by a contract, combination, or

2   conspiracy." *Id.* at 553.  Thus, even "conscious parallelism" reflecting the "common reaction

3   of 'firms in a concentrated market [that] recogniz[e] their shared economic interests and their

4   interdependence with respect to price and output decisions' is 'not in itself unlawful.'" *Id.* at

5   553-54 (alterations in original) (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco*

6   *Corp.*, 509 U.S. 209, 227 (1993)).  As a result, a showing of parallel conduct, without more,

7   "mirrors the ambiguity of the behavior" and is just as consistent with the existence of a

8   conspiracy as it is "with a wide swath of rational and competitive business strategy

9   unilaterally prompted by common perceptions of the market." *Id.* at 554.  For this reason, an

10  allegation of parallel conduct and a bare assertion of conspiracy will not suffice.

11          Rather, to survive a Rule 12(b)(6) motion, an antitrust complaint must contain

12  "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal

13  agreement." *Id.* at 556.  The complaint must offer "more than labels and conclusions" and

14  contain more than a "formulaic recitation of the elements of a cause of action." *Id.* at 555.

15  Moreover, it must indicate more than mere speculation of a right to relief. *Id.*  In sum, on a

16  Rule 12(b)(6) motion, the question for the Court is whether the facts in the complaint

17  sufficiently state a "plausible" ground for relief. *Id.* at 556-57.

18          Although courts should "be cautious before dismissing an antitrust complaint in

19  advance of discovery," they must also remember that "proceeding to antitrust discovery can

20  be expensive." *Id.* at 558.  The *Twombly* Court considered it "no answer to say that a claim

21  just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the

22  discovery process through 'careful case management.'" *Id.* at 559.  The Supreme Court

23  ultimately concluded that "it is only by taking care to require allegations that reach the level

24  suggesting conspiracy that we can hope to avoid the potentially enormous expense of

25  discovery in cases with no 'reasonably founded hope that the [discovery] process will reveal

26  relevant evidence' to support a § 1 claim." *Id.* (quoting *Dura Pharms., Inc. v. Broudo*, 544

U.S. 336, 347 (2005) (alteration therein)).  Thus, when a complaint fails to adequately state a claim, such deficiency should be "exposed at the point of minimum expenditure of time and money by the parties and the court."  *Id.* at 558.

In this case, in framing their antitrust claim, plaintiffs rely on the following categories of factual allegations:  (i) information exchanges through trade associations and the like; (ii) evidence of antitrust behavior in a different ocean trade revealed by a Department of Justice ("DOJ") investigation; and (iii) parallel activities in a concentrated, incontestable market.  Plaintiffs ask the Court to consider these claims as a whole, but to do so, the Court must first evaluate whether and to what extent each assertion contributes to the entire package.  The Court will therefore examine the allegations individually before assessing their adequacy as a group.

### 1.    Bare Allegations Relating to Trade Associations

In the wake of *Twombly*, courts have reached opposite results as to the viability of the antitrust complaints before them.  A distinguishing factor between these cases has been the inclusion of specific allegations concerning time, place, and person versus general allusions to "secret meetings," "communications," or "agreements."  *See In re Less-Than-Truckload ("LTL") Shipping Servs. Antitrust Litig.*, 2009 WL 323219 at *10-*11 (N.D. Ga.) (contrasting *In re Oriented Strand Board ("OSB") Antitrust Litig.*, 2007 WL 2253419 (E.D. Pa.), and *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085 (N.D. Cal. 2007), in which specific dates and specific actions were pleaded, with *In re Air Cargo Shipping Antitrust Litig.*, E.D.N.Y. Case No. 06-md-1755, and *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007), involving, respectively, vague allegations of "secret meetings" and conclusory accusations of "conspiratorial activity" constituting "nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatsoever").

1    In this case, plaintiffs allege that Matson and Horizon belong to organizations via

2 which they had an "opportunity" to meet.  *See* Consolidated Complaint at ¶ 68 ("The MCTF

3 provides opportunities for information sharing."); *see also id.* at ¶ 70 ("At MCTF and

4 Transportation Institute meetings, as well as at other trade association meetings, the

5 Defendants had opportunities to exchange information and to enter into agreements . . . .").

6 Attendance at industry trade shows and events, however, "is presumed legitimate and is not a

7 basis from which to infer a conspiracy, without more." *In re Graphics Processing Units*

8 *Antitrust Litig.*, 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007) [hereinafter *In re GPU*] (citing

9 *In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999)).

10    In *In re GPU*, the Court found the complaint wanting despite the plaintiffs' attempt

11 "to correlate the trade shows to the release of products at certain price points, implying that

12 defendants must have met and made the decisions to do so." *Id.*  The *In re GPU* Court

13 concluded that the complaint was missing "any specific allegation that defendants'

14 representatives actually met to fix prices." *Id.*  Moreover, because the defendants were

15 alleged to have attended up to nine of the same trade events in the same year, the Court

16 concluded that it was "almost axiomatic that a product release would fall within a few

17 months of one trade meeting or another, there having been so many of them," and that the

18 plaintiffs' allegations were "just as consistent with coincidence as they [were] with

19 conspiracy." *Id.*

20    In this case, plaintiffs offer no particulars concerning the locations or dates of any

21 meetings, and although they name certain members of MCTF, they do not identify any

22 individuals who might have been involved in any illicit communications.  *See* Consolidated

23 Complaint at ¶¶ 68-71 (docket no. 69).  Moreover, plaintiffs make no attempt to compare the

24 timing of trade association meetings and fuel surcharge increases.  Thus, the complaint

25 contains even less factual matter than what was deemed inadequate in *In re GPU*, and the

26 Court does not view plaintiffs' general allegations of membership in trade organizations as

adding anything to the mix.  *Cf.* *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 942

(E.D. Tenn. 2008) ("To allege an agreement between antitrust co-conspirators, the complaint

must allege facts such as a 'specific time, place, or person involved in the alleged

conspiracies' to give a defendant seeking to respond to allegations of a conspiracy an idea of

where to begin." (quoting *Twombly*, 550 U.S. at 565 n.10)).

## 2.     Antitrust Behavior Limited to Puerto Rico Trade

On April 17, 2008, the DOJ announced that it had begun an investigation into "the

possibility of anticompetitive practices" in the shipping trade between the continental United

States and Puerto Rico.  Consolidated Complaint at ¶ 72 (docket no. 69).  On April 30, 2008,

Alexander & Baldwin, Inc. publicly disclosed that it had received a grand jury subpoena for

documents.  *Id.* at ¶ 73.  The following day, the first of these antitrust actions relating to the

Hawaii and Guam trade was filed.  *See* *Alpha Freight & Transp. Int'l, Inc. v. Horizon Lines,*

*Inc., et al.*, Case No. C08-1455Z (originally filed in the Middle District of Florida on May 1,

2008).  Two more cases were filed nine days later, *see* *Steinberg, et al. v. Matson Navigation*

*Co., et al.*, Case No. C08-1231Z (originally filed in the Northern District of California on

May 9, 2008); *Taste of Nature Inc. v. Matson Navigation Co., et al.*, Case No. C08-1235Z

(originally filed in the Central District of California on May 9, 2008), and all but one of these

related suits were commenced by early September 2008.  On October 1, 2008, four

individuals pleaded guilty to antitrust charges relating to the Puerto Rico trade.  Consolidated

Complaint at ¶ 75 (docket no. 69).

Plaintiffs focus much attention on these pleas, three of which were entered by Horizon

executives.  *Id.*  Plaintiffs, however, allege that only one of these individuals had any

involvement with Horizon's Hawaii or Guam routes, and they do not allege that this person's

charges or guilty plea implicated the Hawaii or Guam trade in any way.  *See id.*  Moreover,

although plaintiffs quote press reports relaying the DOJ's belief that more indictments will

follow, *id.* at ¶¶ 76-77, they provide no link between the Puerto Rico and Hawaii or Guam

1    markets.  Indeed, Matson is not alleged to be involved in the water trade between Puerto

2    Rico and the United States mainland, and any anticompetitive agreements Horizon's

3    executives made concerning shipping to and/or from Puerto Rico would necessarily have

4    been with entities other than Matson.

5        Similar attempts at cross-fertilization have been rejected by other courts, and the

6    Court finds plaintiffs' invocation of the DOJ investigation equally unavailing.[2]  _See, e.g._, _In_

7    _re Elevator_, 502 F.3d at 52 ("Allegations of anticompetitive wrongdoing in Europe . . . is

8    merely to suggest (in defendants' words) that 'if it happened there, it could have happened

9    here.'. . .  Without an adequate allegation of facts linking transactions in Europe to

10   transactions and effects here, plaintiffs' conclusory allegations do not 'nudge[ their] claims

11   across the line from conceivable to plausible.'" (insertion in original, quoting _Twombly_, 550

12   U.S. at 570)).  The cases on which plaintiffs primarily rely do not support a different view

13   because those cases involved defendants with overlapping involvement in different markets,

14   a factual scenario that plaintiffs in this case have not pleaded.  _See In re Flash Memory_

15   _Antitrust Litig._, -- F. Supp. 2d --, 2009 WL 1096602 at *11 (N.D. Cal.) (observing that

16   employees of two antitrust defendants, which controlled the majority of the flash memory

17   market, had responsibility for both flash memory and dynamic random access memory

18   ("DRAM") pricing, and concluding that the employees' guilty pleas concerning price fixing

19   as to DRAM gave rise to a reasonable inference that they engaged in similar activities

20   relating to flash memory); _In re Static Random Access Memory ("SRAM") Antitrust Litig._,

21   580 F. Supp. 2d 896, 903 (N.D. Cal. 2008) (ruling that, because "the same actors associated

22   with certain Defendants were responsible for marketing both SRAM and DRAM," the

23   DRAM guilty pleas supported an inference of a conspiracy in the SRAM industry, but also

24

25   [2] As indicated in a case cited by plaintiffs, "[a] plaintiff may surely rely on governmental investigations, but
     must also, under FRCP 11, undertake his own reasonable inquiry and frame his complaint with allegations of
26   his own design."  _In re Tableware Antitrust Litig._, 363 F. Supp. 2d 1203, 1205 (N.D. Cal. 2005).  "Simply
     saying 'me too' after a governmental investigation does not state a claim."  _Id._

holding that the DOJ investigation regarding SRAM did not itself support the plaintiffs'

SRAM antitrust claims).

### 3.    Nothing Beyond Parallel Activity

In light of _Twombly_'s admonition that parallel conduct alone does not establish a

plausible antitrust claim, _Twombly_'s progeny have identified certain types of factual

allegations that might save a complaint from dismissal pursuant to Rule 12(b)(6), including

direct evidence of an agreement or communications between antitrust defendants[3] and

descriptions of historical pricing practices suggesting a lack of precedent and no discernible

reason for change other than conspiracy.[4]  Unlike in cases in which antitrust complaints have

---

[3] _See William O. Gilley Enters., Inc. v. Atl. Richfield Co._, 561 F.3d 1004, 1010 (9th Cir. 2009) (reversing Rule 12(b)(6) dismissal and holding that actual contracts defendants separately executed could be considered in the aggregate in assessing antitrust liability, reasoning that "a defendant who restrains trade by an obvious pattern and practice of entering into individual contracts should not be allowed to do piecemeal what he would be prohibited from doing all at once"); _In re SRAM_, 580 F. Supp. at 901-02 (denying motion to dismiss antitrust claims, observing that "Plaintiffs include in their complaints a number of specific allegations of communications," "Plaintiffs cite various emails in which individual Defendants consider information obtained from other Defendants," and "Plaintiffs have further supported those allegations with evidence of communications between Defendant companies," including "a 1998 email chain between Hitachi and Samsung"); _In re Hypodermic Prods. Antitrust Litig._, 2007 WL 1959225 at *12 (D.N.J.) (denying 12(b)(6) motion, finding that "the instant Complaint sets forth allegations of specific anti-competitive agreements"); _see also_ _In re Flash Memory_, 2009 WL 1096602 at *6 (denying motion to dismiss direct purchasers' complaint, which alleged _inter alia_ that "Samsung's Vice President of Marketing sent an internal email to the various heads of the company's regional memory sales groups" instructing the recipients "to contact their _competitors_ to urge them that they '_must not retreat from the last quoted price_'" and that Samsung had made announcements to industry analysts concerning "severe shortages" in overall inventories, which would "bolster its margins," but about which it would have no knowledge absent communications with its competitors (emphasis in original)").

[4] _See_ _In re Flat Glass Antitrust Litig._, 2009 WL 331361 (W.D. Pa.) (denying Rule 12(b)(6) motion in the face of allegations that (i) historically, the defendant construction glass manufacturers had been unable to raise and maintain prices and they had varied their surcharges by region of the country, (ii) during the period of the supposed conspiracy, the manufacturers' prices increased by "identical percentages" and their surcharges did not differ by region, and (iii) the parallel conduct ceased after similar antitrust behavior was thwarted in Europe); _In re Thin Film Transitor Liquid Crystal Display (TFT-LCD / Flat Panel) Antitrust Litig._, 586 F. Supp. 2d 1109, 1115-16 (N.D. Cal. 2008) (denying motion to dismiss direct purchasers' complaint, concluding that "[t]he complaint alleges complex and unusual pricing practices by defendants, which cannot be explained by the forces of supply and demand" in that, prior to the conspiracy, "the industry faced declining TFT-LCD panel prices" due to "advances in technology and improving efficiencies," as well as new companies entering the market, but beginning in 1996, the TFT-LCD product market was "'characterized by unnatural and sustained price stability, as well as certain periods of substantial increases in prices' [and] a compression of price ranges . . . , which is inconsistent with natural market forces").

ORDER NO. 5                                    -10-

1    been deemed sufficient, plaintiffs here do not identify any specific communications or

2    contracts.[5]  Moreover, plaintiffs supply no data concerning pricing practices predating the

3    alleged anticompetitive agreement, and they fail to link the lockstep fuel surcharge

4    fluctuations[6] to anything other than the type of parallel conduct generally present in a

5    homogeneous market.  _See_ _In re LTL Shipping_, 2009 WL 323219 at *18 ("In a homogeneous

6    industry each major player has the same incentive to charge the same surcharge and realize

7    the same improved profit margin."); _see also_ _Matson_, 959 F.2d at 1045 (affirming the

8    Federal Maritime Commission's conclusion that, "instead of engaging in fierce price

9    competition with Matson, Sea-Land [Horizon's predecessor] was more likely to follow

10   Matson's price leadership and compete primarily on the basis of service"); _cf._ _DHX, Inc. v._

11   _Surface Transp. Bd._, 501 F.3d 1080, 1092 (9th Cir. 2007) ("All businesses . . . monitor their

12   competitors' pricing to see whether and how they should match or beat the discounts they are

13   offering.  Moreover, price watching is inherent in a tariff system that statutorily requires

14   carriers to publish their common carrier rates.").

15

16   _____

17   [5] The only allegation of a contractual relationship between Matson and Horizon involves vessel capacity
     sharing on the Los Angeles to Hawaii route.  _See_ Consolidated Complaint at ¶ 98 (docket no. 69).  This type

18   of arrangement, however, appears consistent with the water freight industry.  _See, e.g._, _DHX, Inc. v. Surface_
     _Transp. Bd._, 501 F.3d 1080, 1083 (9th Cir. 2007).  In _DHX, Inc._, the Ninth Circuit explained that, although

19   "some shipments via water carrier are arranged between the carrier and the shipper directly, others are
     handled through a third-party intermediary such as a freight forwarder."  _Id._  A freight forwarder "assembl[es]

20   and consolidat[es] shipments to take advantage of volume rates offered by the carrier actually hauling the
     goods," and it maintains the dual status of both carrier and shipper.  _Id._  Freight forwarders earn a profit by

21   charging rates lower than a water carrier's price for small shipments, but higher than the amount paid to the
     water carrier for the consolidated load.  _Id._  Absent some direct evidence of an anticompetitive agreement, the

22   Consolidated Complaint establishes nothing more than the customer-as-well-as-competitor relationship
     common in the water trade.

23   [6] Defendants complain that plaintiffs, in comparing a 333% and 396% increase in diesel and RFO prices,
     respectively, to a 1,929% increase in fuel surcharges over the same period, have performed "fuzzy math."

24   _See_ Reply at 7 n.7 (docket no. 97); _see also_ Consolidated Complaint at ¶ 88 (docket no. 69).  Although the
     Court accepts as true, as it must for purposes of defendants' Rule 12(b)(6) motion, the percentage increases

25   stated in the Consolidated Complaint, the Court is not required to and does not adopt plaintiffs' theory that
     the disparities in the percentages of change reflect a lack of correlation between fuel prices and fuel

26   surcharges.  Fuel prices and fuel surcharges involve different units of measurement and orders of magnitude,
     making a straight, uncalibrated comparison of their percentage increases inappropriate.

1      **4.      Viewing the Factual Allegations as a Whole**

2           In this case, the whole is not more than the sum of the parts.  Even when combined,

3  the pieces plaintiffs have supplied offer little support for their assertion of an antitrust

4  agreement.  Of the numerous post-*Twombly* cases, *In re LTL Shipping* is the most analogous

5  to the action currently before the Court.  Like the instant case, *In re LTL Shipping* involved

6  parallel increases in fuel surcharges, which the plaintiffs asserted were the product of an

7  antitrust conspiracy.  As in this case, the plaintiffs in *In re LTL Shipping* did not plead direct

8  evidence of an agreement to fix prices, such as, for example, "allegations of a particular

9  communication between the Defendants."  2009 WL 323219 at *12.  Instead, in *In re LTL

10 Shipping*, the plaintiffs "at most allege[d] parallel pricing conduct, the sharing of surcharge

11 price information publicly using websites, and the claim that opportunities arose at which the

12 Defendants could have met and hatched a price-fixing conspiracy."  *Id.* at *13.  Although the

13 plaintiffs in *In re LTL Shipping* described organizations to which the defendants belonged,

14 they included "no allegation that the Defendants attended the meetings, or that the

15 Defendants had any other communications through which they might have established an

16 agreement."  *Id.* at *14.  The same dearth of factual matter is evident in the Consolidated

17 Complaint now at issue.

18          As in the pending case, in *In re LTL Shipping*, the fuel surcharges were imposed by

19 freight carriers, but in *In re LTL Shipping*, the transportation was provided by truck, as

20 opposed to marine vessel.  *Id.* at *1-*2.  The defendants in *In re LTL Shipping* were engaged

21 in the less-than-truckload ("LTL") market, which is similar to the noncontiguous domestic

22 ocean trade in that it is concentrated and incontestable, with only a few companies competing

23 for business, and with new entities facing substantial barriers to entry.[7]  *Id.*  A typical LTL

24

25 [7] Unlike noncontiguous domestic carriers, however, LTL service providers are not subject to tariff filing
   requirements, the industry having been deregulated for more than a decade.  2009 WL 323219 at *3 (citing
26 the Motor Carrier Act enacted in 1980, the 1994 Trucking Industry Regulatory Reform Act, and the ICC
   Termination Act of 1995).

operation collects small (less than truckload) shipments from specific locations, aggregates

them for movement by truck between terminals, and then separates them at the destination

for local delivery. *Id.* at *2. Similar to noncontiguous domestic shipping, LTL services are

"effectively fungible and interchangeable between carriers," with customers distinguishing

"between LTL service providers primarily on the basis of price." *Id.*

In *In re LTL Services*, the Court concluded that the plaintiffs' allegations established

simply "a factual context suggesting 'parallel conduct that could just as well be independent

action.'" *Id.* at *15 (quoting *Twombly*, 550 U.S. at 557). Given the homogeneous nature of

the LTL market, with "all players . . . operating from essentially the same information at the

same time charging the same rates," and with "[a]ll carriers . . . equally impacted by market

variables, such as fuel costs, labor costs, taxes, and unanticipated costs such as natural

disasters and weather delays," the Court found "plausible that the Defendants' assessment of

fuel surcharges was directly the result of increased price of diesel fuel, not an anticompetitive

conspiracy." *Id.* at *15-*16. The Court further concluded that, even assuming the

defendants in *In re LTL Services* used the Internet and trade association meetings to discuss

anticompetitive agreements, the time period alleged, spanning four years from 2003 to 2007,

was "too broad for the Court to infer an agreement." *Id.* at *17. In the final analysis,

"Plaintiffs' allegations [did] not show enough facts for the Court to find that agreement was

plausible. What the allegations show[ed] instead [was] that all LTL service providers had the

same incentives to charge the same shipping rates, and that over time they eventually each

did so. . . . Plaintiffs must show that an agreement is the plausible reason for pricing

decisions, not an unintentional but common set of individual reactions to external stimuli.

Plaintiffs have not made this showing." *Id.* at *18.

Given the equally deficient pleadings and the similarities in the underlying facts,

particularly the characteristics of the markets at issue and the protracted durations of the

alleged anticompetitive activities, this Court reaches the same conclusions in this case as the

1    Court did in *In re LTL Shipping*.  The Court holds that the Consolidated Complaint pleads

2    nothing more than "parallel conduct and a bare assertion of conspiracy," which *Twombly*

3    teaches is insufficient to survive a Rule 12(b)(6) motion to dismiss.  550 U.S. at 556-57.

4    Because the Court must also consider whether to grant plaintiffs leave to amend, *see, e.g.*,

5    *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000), the Court must now turn to defendants'

6    argument that the "filed rate" doctrine precludes any antitrust claim, regardless of how well-

7    pled it might be.

8    **B.    The Filed Rate Doctrine**

9        The filed rate doctrine precludes monetary relief for antitrust and similar claims

10   relating to tariffs or schedules filed with a federal regulatory agency.  *See Keogh v. Chicago*

11   *& N.W. Ry. Co.*, 260 U.S. 156 (1922).  In *Keogh*, pursuant to the federal antitrust laws, the

12   plaintiff sued eight railroad companies, whose officers and agents participated in a

13   committee, the function of which was to "secure agreement in respect to freight rates."  *Id.* at

14   159-60.  The Supreme Court observed that, to the extent any illegal price fixing occurred, it

15   could be redressed in criminal proceedings or by way of injunction, but the plaintiff, a private

16   shipper, could not obtain a rebate on the theory that, but for the conspiracy, he would have

17   enjoyed lower rates.  *Id.* at 161-62.

18       The *Keogh* Court articulated four separate reasons for its decision.  First, the plaintiff

19   could not establish the requisite injury "in his business or property" under the antitrust laws

20   because the carrier was required to charge and the plaintiff was required to pay the filed rate.

21   *See id.* at 163 (reasoning that "[i]njury implies violation of a legal right, the "legal rights of

22   shipper as against carrier in respect to a rate are measured by the published tariff," and the

23   "rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the

24   carrier").  Second, Congress delegated to the Interstate Commerce Commission ("ICC") the

25   authority to determine whether a particular rate is legal, and the plaintiff's claim essentially

26   sought a remedy contrary to a decision of the ICC.  *See id.* at 161-62.  Third, in light of the

law prohibiting discrimination by carriers, the plaintiff could not be awarded monetary damages because they would "operate to give him a preference over his trade competitors." *Id.* at 163; *see also id.* ("It is no answer to say that each of these [shippers] might bring a similar [antitrust] action . . . .  Uniform treatment would not result, even if all sued, unless the highly improbable happened, and the several juries and courts gave to each the same measure of relief.").  Finally, the plaintiff's alleged damages "rest[ed] on hypothesis," requiring speculation as to what rate might have been in effect but for the allegedly collusive activities of the carriers, and relying on a flawed assumption that a lower rate would have inured to the plaintiff's, as opposed to his customers' or the ultimate consumer's, benefit.  *See id.* at 164-65.

Although the filed rate doctrine has been "the target of criticism since its inception," *County of Stanislaus v. Pac. Gas & Elec. Co.*, 114 F.3d 858, 862 (9th Cir. 1997), it has never been overruled.  Over sixty years after *Keogh*, the Supreme Court confirmed the vitality of the filed rate doctrine, concluding that certain legislative activity relating to common carrier rates "left *Keogh* undisturbed," lending "powerful support to *Keogh*'s continued viability." *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 419 (1986).  In *Square D*, certain shipping companies sued a tariff bureau and a number of its motor carrier members, alleging a conspiracy "to fix, raise and maintain prices and to inhibit or eliminate competition for the transportation of freight by motor carrier between the United States and the Province of Ontario, Canada." *Id.* at 411-12.  Pursuant to *Keogh*, on a motion brought under Rules 12(c) and 12(h)(2), the trial court dismissed the shippers' complaint, and the Second Circuit affirmed as to their claims for monetary damages. *Id.* at 414.

Observing that "the *Keogh* rule has been an established guidepost at the intersection of the antitrust and interstate commerce statutory regimes for some 6 ½ decades," the Supreme Court refused the shippers' invitation to overrule *Keogh*, indicating that such decision "must come from Congress," and not from the courts. *Id.* at 423-24.  The *Square D* Court rejected

the shippers' contention that _Keogh_ had been implicitly overruled by the Reed-Bulwinkle Act, 62 Stat. 472 (1948), which allowed the ICC to authorize the establishment of tariff bureaus and insulated from antitrust liability any common carrier that participated in an approved collective rate setting bureau. _Id._ at 413-14, 417-18. The shippers argued that _Keogh_ created an immunity from the antitrust laws, that the Reed-Bulwinkle Act delineated an immunity only for specific ratemaking activities, and that the broader immunity articulated in _Keogh_ had therefore been repudiated. _Id._ at 418. After examining the history of the Reed-Bulwinkle Act, the Supreme Court instead concluded that the law was enacted in response to _Georgia v. Pa. R. Co._, 324 U.S. 439 (1945), a case distinguishing _Keogh_ and holding that injunctive relief against the joint establishment of rates was available. _Square D_, 476 U.S. at 418-19. Congress had answered by creating "an absolute immunity from the antitrust laws for approved collective ratemaking activities." _Id._ at 419. In doing so, Congress indicated no intent "to change or supplant the _Keogh_ rule," but rather expressly stated that "the bill left the antitrust laws applicable to carriers unchanged 'so far as they are now applicable.'" _Id._ (quoting H.R. Rep. No. 80-1100, at 5 (1947), _reprinted in_ 1948 U.S.C.C.A.N. 1844, 1848).

More recently, the Ninth Circuit has recognized the applicability of the filed rate doctrine to regulated volumes, as opposed to just "rates." _County of Stanislaus_, 114 F.3d at 864 (the doctrine "is not limited to 'rates' _per se_" (quoting _Nantahala Power & Light Co. v. Thornburg_, 476 U.S. 953, 966 (1986))). In _County of Stanislaus_, the Ninth Circuit affirmed the trial court's dismissal, pursuant to Rule 12(b)(6) and the filed rate doctrine, of the plaintiffs' market preclusion claim, which alleged that the defendants' import practices detrimentally affected the plaintiffs' ability to obtain less expensive natural gas. 114 F.3d at 862-66. The Ninth Circuit reasoned that the quantity of natural gas imported by the defendants had been authorized by the Economic Regulatory Administration ("ERA"), one of two federal agencies that regulate the natural gas industry, thereby establishing the

"import volume as conclusively reasonable" and "foreclos[ing] any challenge to importation volumes." *Id.* at 860-61, 864. Moreover, the Ninth Circuit observed that the plaintiffs' claim for damages "would require us to engage in the speculation that *Keogh* and its progeny forbid." *Id.* at 865.

The Ninth Circuit has also held that an antitrust claim can be within *Keogh*'s preclusive ambit even when the rates at issue are not actually "filed" with a governing agency. *E.&J. Gallo Winery v. Encana Corp.*, 503 F.3d 1027 (9th Cir. 2007). In *Gallo*, the Ninth Circuit affirmed the denial of the defendant's summary judgment motion, but it concluded that many of the plaintiff's antitrust claims were barred by the filed rate doctrine. *Id.* at 1030, 1048-49. In *Gallo*, the plaintiff was a wine producer, which sued its natural gas supplier for state and federal antitrust law violations. *Id.* at 1030. Historically, the natural gas market had consisted of three segments: (i) producers, which procured natural gas at their wellheads; (ii) interstate pipelines, which purchased natural gas from producers and then transported it to various locations; and (iii) local distributors, who bought natural gas from interstate pipelines and sold it to consumers. *Id.* at 1036. During the Depression Era, Congress sought to curb the market power of interstate pipelines and granted to the Federal Energy Regulatory Commission ("FERC") jurisdiction over wholesale rates charged by producers at their wellheads and by interstate pipelines. *Id.* (citing Natural Gas Act, 52 Stat. 821 (1938)). By the late 1970s, however, the country was experiencing natural gas shortages and, as a result, Congress began deregulating the industry, culminating in the elimination of FERC's authority to set prices at wellheads, where "first sales" generally occurred. *Id.* at 1036-37 (citing Natural Gas Wellhead Decontrol Act of 1989, Pub. L. No. 101-60, and explaining that "first sales" are those not preceded by a sale to an interstate or intrastate pipeline, distribution company, or retail customer).

To further Congress's intent and provide consumers with better access to the newly deregulated and more competitive wellhead markets, FERC required interstate pipelines to

"unbundle" transportation from product sales and to offer common carrier services to those who purchased natural gas from another source and wished to ship it in a pipeline. *Id.* at 1038 (citing Order 636, 57 Fed. Reg. 13,267 (Apr. 16, 1992)). FERC also began issuing "blanket sale" certificates to interstate pipelines, allowing them to sell unbundled natural gas at market-based rates rather than at the rates filed with FERC. *Id.* During the period at issue in *Gallo*, market rates for natural gas were "pegged" to indices published in *Natural Gas Intelligence* and *Gas Daily*. *Id.* at 1031. These indices incorporated voluntarily submitted data concerning natural gas trading activity. *Id.* After an investigation completed in 2003, FERC concluded that the information being used to generate the natural gas indices "was reported in a less than meticulous manner," that the natural gas indices were "ripe for manipulation," and that market participants had actually engaged in misconduct, including providing "false reports of natural gas prices and trade volumes." *Id.* at 1032 (citing FERC's Final Report on Price Manipulation in Western Markets (2003)).

In *Gallo*, the plaintiff wine producer alleged it was injured by these illegal practices, which had artificially inflated the indices and thereby increased the rates the plaintiff had paid for natural gas. *Id.* The Ninth Circuit, however, concluded that the filed rate doctrine precluded many of the plaintiff's claims. The Ninth Circuit rejected the plaintiff's contention that only rates literally filed with and approved by FERC could render the *Keogh* doctrine applicable. *Id.* at 1039-43. The *Gallo* Court did not view FERC's decision to replace filed rates with market rates as an abdication of its responsibilities; rather, FERC was found to have continued in its efforts to regulate the natural gas industry, "albeit with a light hand," engaging in market oversight and taking corrective action upon the discovery of market manipulation. *Id.* at 1041-42.

Given the purposes of the filed rate doctrine, which include preserving the exclusive jurisdiction granted by Congress to a regulatory agency, the *Gallo* Court held that any claims relating to rates, whether filed with FERC or market based, for natural gas transactions under

FERC's jurisdiction were preempted under *Keogh*. *Id.* at 1041-43. Moreover, although FERC's jurisdiction did not extend beyond wholesale transactions, the Ninth Circuit ruled that the filed rate doctrine applied with equal preclusive effect to claims involving retail purchases of natural gas because such claims essentially challenged the upstream market-based rates within FERC's purview. *Id.* at 1043-45. To have held otherwise would have created an improper "cost trap," disabling retailers from recovering their wholesale costs. *See id.* at 1043-44 (analogizing a retail customer's antitrust claim to state regulations setting retail utility rates, which have been struck down as cost traps preempted by federal law). Having narrowed the permissible scope of the plaintiff's claims, the *Gallo* Court remanded the matter, indicating that "the district court may consider [the plaintiff's] claims to the extent they are based on rates that are not FERC-authorized rates." *Id.* at 1049. The Ninth Circuit explained that "[m]isreported rates and rates reported for fictitious transactions are not FERC-approved rates," and it observed that the indices at issue potentially included "transactions outside FERC's jurisdiction," *i.e.*, wellhead and retail sales. *Id.* at 1045.

## 1.   *Gallo* **Does Not Establish "All or Nothing" Standard**

Plaintiffs assert the Ninth Circuit's *Gallo* decision stands for the proposition that the pending Rule 12(b)(6) motion must be denied unless it "defeat[s] the entirety of the plaintiffs' claims." Response at 16 (docket no. 94). Plaintiffs' contention lacks merit. In *Gallo*, the Ninth Circuit made clear that certain of the wine producer's claims were not allowed in light of the filed rate doctrine and that those claims should not proceed forward on remand. Moreover, although the *Gallo* opinion provides substantial guidance concerning the contours of the filed rate doctrine, the ultimate result in *Gallo*, namely affirming the district court's denial of summary judgment in light of triable issues, does not translate into a standard applicable to the motion to dismiss pending before this Court. *See Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 23 (1st Cir. 1990) (Rule 12(b)(6) and Rule 56 motions "place different burdens on the parties at different times in the course of litigation"). Thus, rather

1    than restricting this Court's ability to grant a Rule 12(b)(6) motion unless "*all* of the

2    challenged conduct [is] subject to the filed rate doctrine," Response at 16 (docket no. 94)

3    (emphasis is original), the Court concludes that the <u>*Gallo*</u> decision authorizes it to narrow and

4    focus the claims at issue in light of the viable defenses.

5              **2.     The Consolidated Complaint Implicates the Filed Rate Doctrine**

6              In the Consolidated Complaint, plaintiffs have artfully avoided directly alleging that

7    the noncontiguous domestic water trade is regulated in a manner rendering the filed rate

8    doctrine applicable.  Plaintiffs have pleaded merely that "certain aspects of the Pacific Ocean

9    shipping industry may be governed by tariffs."  Consolidated Complaint at ¶ 80 (docket

10   no. 69).  Plaintiffs, however, in this same paragraph of the Consolidated Complaint,

11   explicitly acknowledge, as they must, the applicability of the ICC Termination Act of 1995

12   ("ICCTA"), Pub. L. No. 104-88, 109 Stat. 803 (1995).  Thus, plaintiffs cannot through artful

13   pleading circumvent the filed rate doctrine.

14             Pursuant to the ICCTA, tariffs must be filed with the Surface Transportation Board

15   ("STB") in connection with the movement of household goods or with transportation or

16   service in noncontiguous domestic trade.  49 U.S.C. § 13702(a).  A carrier "may not charge

17   or receive a different compensation for the transportation or service than the rate specified in

18   the tariff."  <u>*Id.*</u>  Moreover, the STB has jurisdiction over any claim that a filed tariff or

19   "related rule or practice" is unreasonable.[8]  49 U.S.C. § 13702(b)(6) (complaints concerning

20   "a rate or related rule or practice . . . may be submitted to the Board for resolution"); <u>*see also*</u>

21   49 U.S.C. § 13701(a) (a "rate, classification, rule, or practice related to transportation

22   or service" by a "water carrier in noncontiguous domestic trade" must be "reasonable").

23

24   _____

25   [8] By statute, port-to-port rates or divisions for noncontiguous domestic trade water carriers are presumed
     reasonable "if the aggregate of increases and decreases in any such rate or division is not more than 7.5
     percent above, or more than 10 percent below, the rate or division in effect 1 year before the effective date of

26   the proposed rate or division."  49 U.S.C. § 13701(d)(1); <u>*see also*</u> 49 U.S.C. § 13701(d)(2) (the percentages
     stated in § 13701(d)(1) must be annually adjusted in accordance with the Producers Price Index).

1    The only two exceptions to the requirement that a rate be filed with the STB are (i) if

2    the items being shipped in noncontiguous domestic trade constitute bulk cargo, forest

3    products, recycled metal scrap, waste paper, or paper waste, 49 U.S.C. § 13702(a)(1), and

4    (ii) if the carrier and the shipper have entered into a contract concerning "specified services

5    under specified rates and conditions" for cargo other than household goods, and they have

6    expressly waived in writing "any or all rights and remedies under this part," meaning Part B

7    of Subtitle IV of Title 49 of the United States Code," 49 U.S.C. § 14101(b). The rights

8    included within Part B include the ability to challenge "a rate or related rule or practice" as

9    unreasonable. *See* 49 U.S.C. §§ 13701 & 13702 (both within Part B of Subtitle IV of

10   Title 49). The exclusive remedy for an alleged breach of a contract executed pursuant to

11   § 14101(b) is an action in an appropriate state or federal court, unless the parties otherwise

12   agree. 49 U.S.C. § 14101(b)(2).

13       In asserting that their claims are not precluded by *Keogh* and its progeny, plaintiffs

14   contend that defendants have not proven they properly filed their rates and that defendants

15   have not shown the cargo at issue was subject to rate regulations. With regard to plaintiffs'

16   first argument, the Court notes that nowhere in the Consolidated Complaint have plaintiffs

17   alleged that defendants failed to maintain valid tariffs for any period of time.[9] Plaintiffs

18   merely argue that an improperly filed rate cannot be used to assert the *Keogh* doctrine as a

19   defense, citing *Sec. Servs., Inc. v. Kmart Corp.*, 511 U.S. 431 (1994). The *Kmart* case does

20   not support plaintiffs' broad assertion; rather, in *Kmart*, the Supreme Court specifically

21   observed that "neither procedural irregularity nor unreasonableness nullifies a filed rate." *Id.*

22   _____

23   [9] Defendants suggest that the Court may take judicial notice of their publicly filed tariffs without converting
     their Rule 12(b)(6) motion into a summary judgment motion. *See* Reply at 11 n.10 (docket no. 97); *see also*

24   Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are
     presented to and not excluded by the court, the motion must be treated as one for summary judgment under

25   Rule 56."). Defendants, however, have provided no documents or citations (for example, to an STB
     publication or website) based on which the Court could take such judicial notice, and the Court declines to do

26   so. *See* Fed. R. Evid. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that
     it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate
     and ready determination by resort to sources whose accuracy cannot reasonably be questioned.").

1    at 442.  In *Kmart*, the tariff at issue was considered void not due "to some blemish

2    independently remediable," but because it was so incomplete as to render "a reliable

3    calculation of charges" impossible.  *Id.* at 443.  In the Consolidated Complaint, plaintiffs

4    have not given notice of what, if any, deficiencies exist in defendants' tariffs, and the Court

5    cannot assess whether the rates at issue would be effective despite any irregularities or

6    absolutely void due to the type of catastrophic flaw that prevented the bankrupt motor carrier

7    in *Kmart* from relying on its tariff to recover previous undercharges.

8            As to plaintiffs' second contention concerning exempt cargo, plaintiffs have identified

9    four companies with "wood" or "tree" in their names that have joined in this antitrust action.

10   *See* Consolidated Complaint at ¶¶ 24, 26, 28, 30 (docket no. 69) (naming as plaintiffs

11   "Winkler Woods, LLC," "50th State Distributors, Inc., d/b/a Santa's Christmas Trees,"

12   "Honolulu Hardwoods, Inc," and "Jeanne Thomas, d/b/a Mr. Christmas Tree").  Plaintiffs

13   have not, however, indicated what cargo was shipped by any of these companies; rather, they

14   imply that the cargo was trees and wood.  *See* Response at 21 (docket no. 94).  Whether such

15   trees or wood would qualify as "forest products" or be otherwise excluded from tariffs was

16   not pleaded or briefed and remains unclear.  *See* 46 U.S.C. § 40102(10) ("The term 'forest

17   products' includes lumber *in bundles*, rough timber, ties, poles, piling, laminated beams,

18   bundled siding, bundled plywood, *bundled* core stock or veneers, bundled particle or fiber

19   boards, bundled hardwood, wood pulp in rolls, wood pulp in unitized bales, and paper and

20   paper board in rolls or in pallet or skid-sized sheets." (emphasis added)).

21           In their response to defendants' motion to dismiss, plaintiffs have attempted to place

22   the burden on defendants to prove the negative of allegations plaintiffs did not plead in their

23   Consolidated Complaint.  Plaintiffs cite no authority for doing so, and the Court declines to

24   impose such burden.  The question before the Court is whether the Consolidated Complaint

25   states a claim for which relief may be granted.  Fed. R. Civ. P. 12(b)(6).  The Court may not

26   consider matters outside the pleadings and must decide, on the face of the Consolidated

1    Complaint, whether the filed rate doctrine applies.  In the absence of any pleaded facts

2    indicating that the rates at issue are somehow void or that the cargo at issue was outside the

3    scope of the STB's jurisdiction, no basis exists for concluding that _Keogh_ does not control.

4    **3.    The ICCTA Did Not Repeal _Keogh_**

5         In an effort to avoid the preclusive effect of _Keogh_, plaintiffs contend that, in passing

6    the ICCTA, Congress nullified the filed rate doctrine with respect to water carriers.  Plaintiffs

7    provide no authority for support and offer no discussion of the legislative history of the

8    ICCTA.  In contrast, defendants cite to _Ocean Logistics Mgmt., Inc. v. NPR, Inc._, 38 F. Supp.

9    2d 77 (D.P.R. 1999), in which the Court rejected similar challenges to the application of the

10   _Keogh_ doctrine.  In response, plaintiffs complain that defendants "cite a single case," which

11   has "been cited in only one other reported decision . . . by the same Judge . . . for an

12   unrelated proposition."  Response at 19 & n.7 (docket no. 94).  Plaintiffs, however, offer no

13   contrary decision and no persuasive reason for disregarding the opinion in _Ocean Logistics_.

14        As noted in _Ocean Logistics_, until the enactment of the ICCTA, two different federal

15   agencies regulated the noncontiguous domestic ocean trade, namely the Federal Maritime

16   Commission ("FMC"), which had jurisdiction over port-to-port traffic, and the ICC, which

17   regulated "joint through" rail/water intermodal traffic.  38 F. Supp. 2d at 81.  The ICCTA

18   abolished the ICC, created the STB, and granted to the STB the jurisdiction previously

19   exercised by both the ICC and the FMC.  Although the ICCTA partially deregulated the

20   water trade by allowing carriers and shippers to form extra-tariff agreements as to freight

21   other than household goods, _see_ 49 U.S.C. § 14101(b)(1), the ICCTA continued the

22   requirement that ocean shipping rates be otherwise filed with a federal agency, except with

23   regard to certain types of cargo, _see_ 49 U.S.C. § 13702(a).  Thus, the ICCTA does not

24   evidence any Congressional intent to fully extinguish the preemptive effect of the filed rate

25   doctrine as to the noncontiguous domestic ocean trade.  _See_ _Ocean Logistics_, 38 F. Supp. 2d

26   at 87, 90-91 (holding that the carrier and shipper, in entering into a time volume agreement,

did not contract pursuant to § 14101(b) and had not opted out of tariff filing requirements, that the rates at issue "remained subject to the full scope of the regulatory system devised by Congress," and that the shipper's claims against the carrier were barred by the filed rate doctrine).

Plaintiffs attempt to discount *Ocean Logistics* as involving a shipper who was not seeking a lower rate for itself but instead was trying to prevent other shippers from obtaining the same reduced rate that it enjoyed. Plaintiffs identify a distinction without a difference. Regardless of whether a shipper wants to decrease its rates or increase those of its competition, the shipper seeks the same result, namely an edge over other shippers. The goal of the shipper, however, has no relevance in analyzing the continued viability of the filed rate doctrine in light of the ICCTA. Rather, as to that issue, the answer depends on whether the rates involved were filed, or required to be filed, with the STB or were memorialized in an unpublished contract.

Plaintiffs do not appear to contend that defendants are required by § 14101(b) to negotiate unregulated shipping agreements or that the parties to any shipping contract must waive the rights or remedies enumerated in Part B of Subtitle IV of Title 49. More importantly, plaintiffs do not, in the Consolidated Complaint, allege that any of them entered into any contract with any defendant pursuant to § 14101(b). To the contrary, plaintiffs contend that defendants conspired not to use such agreements with their customers. Consolidated Complaint ¶¶ 16 & 80 (docket no. 69). Thus, just as in *Ocean Logistics*, the claims here do not implicate the deregulatory provisions enacted by the ICCTA, and this case falls squarely within the ambit of *Keogh* and its progeny.

### 4.    Plaintiffs' Other Claims Implicate Rates

In an attempt to salvage a portion of their Consolidated Complaint, plaintiffs argue that *Keogh* does not reach their claims that defendants engaged in anticompetitive conduct other than "price fixing." Plaintiffs focus on two allegedly "non-rate" activities, namely that

1    defendants share vessel capacity, shipping each other's containers at lower rates than those

2    charged to customers, and that defendants have refused, except in one instance,[10] to forego

3    filed tariffs and form separate agreements with individual shippers pursuant to § 14101(b).

4    *See* Consolidated Complaint at ¶¶ 96-101 (docket no. 69).  Both of these allegations,

5    however, appear to implicate rates.  The gist of plaintiffs' contention is that, in the absence of

6    capacity sharing and/or in the presence of more § 14101(b) contracts, the price of shipping

7    would be lower.  Such claim relies on shear speculation, not only as to the measure of

8    damages, but also as to causation, and it embodies a key concern underlying the filed rate

9    doctrine.  *See* *County of Stanislaus*, 114 F.3d at 865 ("the only known rates are those that

10   defendants filed" with the regulating agencies, and the calculation of damages "would

11   require us to engage in the speculation that *Keogh* and its progeny forbid").

12       The authorities cited by plaintiffs do not support a different conclusion.  For example,

13   *Gallo* is distinguishable because, unlike this case, *Gallo* did not involve literally filed tariffs,

14   and the surviving claims in *Gallo* were based on conduct affecting rates that were themselves

15   outside the purview of the agency at issue.  503 F.3d at 1045-46 (rates for retail sales, "first

16   sales," and fictitious sales are not regulated by FERC).  Likewise, *Arroyo-Melecio v. Puerto*

17   *Rican Am. Ins. Co.*, 398 F.3d 56 (1st Cir. 2005), is not on point.  In *Arroyo-Melecio*, certain

18   claims brought by consumers of compulsory automobile insurance were dismissed as

19   precluded by the McCarran-Ferguson Act, which "exempts the 'business of insurance' from

20   review under the federal antitrust laws to the extent that it is 'regulated by State law.'" *Id.* at

21   66 (quoting 15 U.S.C. § 1012(b)).  The McCarran-Ferguson Act, however, contains an

---

[10] Plaintiffs contend that Matson negotiated § 14101(b) agreements with General Motors Corp. ("GM") and Ford Motor Co. ("Ford"), ostensibly in an effort to compete with Pasha Hawaii Transport Lines LLC ("Pasha"), which had, in 2005, secured a similar arrangement with Chrysler Group LLC.  Consolidated Complaint at ¶ 100 (docket no. 69).  Plaintiffs also assert that Matson chartered a particular vessel, the S.S. Great Land, to prevent Pasha from obtaining it and being in a position to offer weekly service.  *Id.*  These allegations do not implicate any entity other than Matson and therefore, standing alone, they do not plausibly identify an unlawful restraint of trade "effected by a contract, combination, or conspiracy."  *See* *Twombly*, 550 U.S. at 553, 556-57.

1    exception for boycotts, coercion, and intimidation. *Id.* (citing 15 U.S.C. § 1013(b)).  In

2    *Arroyo-Melecio*, the First Circuit concluded that one of the consumers' claims, namely that

3    the defendant insurers had *inter alia* threatened clients of an insurance broker not to do

4    business with the broker, fell within the boycott exception to the McCarran-Ferguson Act

5    and should not have been dismissed. *Id.* at 69, 71.  The First Circuit further observed that

6    such boycott has "little to do with the filed rate doctrine." *Id.* at 73.  It also has "little to do"

7    with the issues in this case.  The McCarran-Ferguson Act does not apply here, plaintiffs

8    make no allegations in this case of any threats or boycotts, and plaintiffs' reason for citing

9    *Arroyo-Melecio* remains a mystery.

10    Finally, *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144 (3d Cir. 1993),

11    to which plaintiffs make passing reference, *see* Response at 22 n.10 (docket no. 94), has been

12    discounted by the Ninth Circuit as irrelevant in circumstances analogous to those in this case.

13    As explained in *County of Stanislaus*,

14    > The claims that survived dismissal in *Lower Lake Erie* have no relevance here.
         In that case, if the anticompetitive conduct had not occurred, an entirely new

15    > alternative -- shipping by truck as opposed to rail -- would have been available
         to the steel companies.  The railroads' rates were only coincidentally

16    > implicated because "the steel companies were compelled to continue to pay the
         railroad fixed rates."  In the instant case, by contrast, no matter what the reality

17    > of the alleged anticompetitive behavior, plaintiffs here would still be paying
         [the defendant's] rates.  That those rates could theoretically be lower is

18    > precisely what compels application of the filed rate doctrine. *Lower Lake Erie*
         simply is not relevant.

19

20    114 F.3d at 865 (citation omitted).  As in *County of Stanislaus* and in contrast to *Lower Lake*

21    *Erie*, in this case, plaintiffs are not proposing some alternative mode of transportation or

22    some drastic shift in the balance of market power; they are simply identifying factors that

23    might or might not have influenced defendants' rates.  Plaintiffs' claims are more

24    appropriately addressed to the STB.[11] *See DHX, Inc. v. CSX Lines, LLC*, Case No. C02-

25    _____
      [11] At oral argument, plaintiffs asserted that the STB has not engaged in "meaningful review" of the fuel
      surcharges at issue and that, therefore, the filed rate doctrine does not apply, relying on *Brown v. Ticor Title*

26    *Ins. Co.*, 982 F.2d 386 (9th Cir. 1992), and *Wileman Bros. & Elliott, Inc. v. Giannini*, 909 F.2d 332 (9th Cir.
      1990).  These cases are distinguishable. *Brown* involved state, as opposed to federal, regulatory schemes, and

6740-RJK, Slip Op. at 3 (C.D. Cal. Jan. 24, 2003) (reprinted in Exh. B to Reply (docket no. 97)) ("Determining whether the rates and practices of an ocean carrier in the noncontiguous domestic trade are reasonable (*i.e.*, lawful) is a matter committed to the expertise of the STB."); *see also DHX, Inc.*, 501 F.3d at 1089 ("if the STB believed that the oligopolist shippers' pricing was aimed at eliminating competition in a manner harmful to consumers, the STB is empowered to step in and regulate any such anticompetitive behavior as part of its statutory responsibilities"); *cf. Matson*, 959 F.2d at 1043 (ratemaking is "'an intensely practical affair' requiring the conversion of inexact data into exact rates or limits upon rates," and an agency is accorded substantial deference as to ratemaking in recognition of "both the difficulty of the task and the expertise of the agency performing it" (quoting *Puerto Rico Maritime Shipping Auth. v. Fed. Maritime Comm'n*, 678 F.2d 327, 335 (D.C. Cir. 1982))).

**Conclusion**

For the foregoing reasons, the Court GRANTS defendants' joint motion to dismiss, docket no. 86, on the grounds that the Consolidated Complaint does not sufficiently plead an antitrust claim and that, even if adequately pleaded, the current antitrust claim is barred by

---

both cases dealt with "non-disapproval" regimes pursuant to which the agency did not and was not required to engage in antecedent review of the rate or standard at issue. *Brown*, 982 F.2d at 393 (the "Arizona and Wisconsin statutes do not provide for affirmative governmental approval"); *Wileman Bros.*, 909 F.2d at 338 (observing that "nondisapproval requires neither publication and comment nor explicit findings" and that "non-disapproval is equally consistent with lack of knowledge or neglect as it is with assent"); *see also McCray v. Fidelity Nat'l Title Ins. Co.*, -- F. Supp. 2d --, 2009 WL 2170694 at *5 (D. Del.) ("Other than the Ninth Circuit in *Brown*, no other court has taken such a narrow view of the applicability of the filed rate doctrine."). In this matter, plaintiffs do not assert that the STB, a federal agency, lacks the authority to review the fuel surcharges. Indeed, as recently as September 1998, the Government of the Territory of Guam ("GovGuam") filed a complaint with the STB, challenging the reasonableness of "rates, rules, classifications, and practices for all transportation by water" to and from Guam provided by Sea-Land Service, Inc. (now Horizon) and Matson. *Guam v. Sea-Land Serv., Inc.*, 2007 WL 295310 (STB). The STB never reached the merits, however, because GovGuam voluntarily dismissed the proceedings. Plaintiffs' complaints about the manner in which the STB has or has not exercised its jurisdiction with regard to noncontiguous domestic shipping tariffs do not remove this case from the realm of the filed rate doctrine. *See In re Pa. Title Ins. Antitrust Litig.*, 2009 WL 2190669 at *9 (E.D. Pa.) (holding that "as long as the regulatory scheme requires the filing of rates with a government agency that has legal authority to review those rates, the filed rate doctrine applies regardless of the actual degree of agency review of those filed rates").

the filed rate doctrine.  The Consolidated Complaint, docket no. 69, is DISMISSED without

prejudice and with leave to amend within thirty (30) days of the date of this Order.[12]  Any

amended complaint must allege claims that are not barred by the filed rate doctrine and that

are otherwise consistent with this Order.

IT IS SO ORDERED.

DATED this 18th day of August, 2009.

Thomas S. Zilly
United States District Judge

---

[12] Plaintiffs have asked for permission to conduct discovery before amending their complaint.  Plaintiffs' request is DENIED.  *See* *Twombly*, 550 U.S. at 558-59.

ORDER NO. 5                                        -28-