1    THE HONORABLE THOMAS S. ZILLY

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT
                         WESTERN DISTRICT OF WASHINGTON
8                                   AT SEATTLE

9

10   IN RE:  HAWAIIAN AND GUAMANIAN
     CABOTAGE ANTITRUST LITIGATION              NO. 08-md-1972 TSZ

11

12   This Document Relates to:                  **DEFENDANTS' JOINT MOTION TO
                                                DISMISS SECOND AMENDED
     ALL ACTIONS                                CONSOLIDATED CLASS ACTION
13                                              COMPLAINT AND MEMORANDUM
                                                IN SUPPORT THEREOF**
14
                                                Note on Motion Calendar:
15                                              September 24, 2010

16

17

18

19

20

21

22

23

24

25

26

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................1

II. DISMISSAL OF THE CONSOLIDATED AMENDED COMPLAINT ...........................1

III. PLAINTIFFS HAVE FAILED TO ALLEGE A CONSPIRACY IN VIOLATION OF THE SHERMAN ACT ...................................................................2

    A. Plaintiffs Fail Adequately To Allege A Section 1 Or 3 Violation Regarding Ocean Shipping Services ...................................................................3

        1. Plaintiffs Fail To Allege An Agreement ...................................................................3

        2. Plaintiffs' Allegations Regarding The Industry Still Fail To Support An Inference Of Unlawful Agreement ...................................................................4

        3. Plaintiffs Have Not Pleaded A Plausible Conspiracy Regarding Fuel Surcharges ...................................................................7

        4. Plaintiffs Have Not Pleaded A Plausible Conspiracy Regarding Confidential Contracts ...................................................................10

        5. Plaintiffs Have Not Pleaded A Plausible Conspiracy That Defendants Agreed To Allocate Customers ...................................................................10

    B. Plaintiffs Have Not Pleaded Section 1 Or 3 Claims Regarding Capacity ...................................................................11

        1. Plaintiffs' Allegations About Matson's Agreement To Carry Cargo For Horizon Are Consistent with Common Industry Practice ...................................................................11

        2. Plaintiffs' Allegation Of Meetings Between Executives Does Not Allege Any Agreement To Reduce Or Limit Capacity ...................................................................12

        3. Independent Decisions Concerning Vessel Acquisition And Disposal Do Not Establish An Unlawful Agreement ...................................................................13

IV. THE FILED RATE DOCTRINE BARS PLAINTIFFS' CLAIMS ...................................................................14

    A. The Court Previously Rejected The Filed Rate Arguments Advanced In The SACC ...................................................................15

    B. The Filed Rate Doctrine Applies To All Rates At Issue Here Regardless Of Whether Carriers Are Excused From Tariff-Filing Requirements ...................................................................17

    C. The Filed Rate Doctrine Applies To Rates Within The "Zone of Reasonableness" ...................................................................19

DEFENDANTS' MOTION TO DISMISS      – i –      **GIBSON, DUNN & CRUTCHER LLP**
Case No. 08-md-1972 TSZ                      555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA 94105
415.393.8200 FAX: 415.393.8306

D. The Filed Rate Doctrine Bars Claims Based On Cargo Shipped Pursuant To Matson Tariff No. 14-f ..................................................22

V. CONCLUSION..................................................24

DEFENDANTS' MOTION TO DISMISS
Case No. 08-md-1972 TSZ

– ii –

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA 94105
415.393.8200 FAX: 415.393.8306

**Cases**

*Alvord-Polk, Inc. v. Schumacher & Co.*,
   37 F.3d 996 (3rd Cir. 1994) ........................................................................ 12

*Arkansas Louisiana Gas Co. v. Hall*,
   453 U.S. 571 (1981) ................................................................................... 20

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009) ...................................................................... 2, 11, 12

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................ *passim*

*In re Citric Acid Antitrust Litig.*,
   191 F.3d 1090 (9th Cir. 1999) .................................................................... 12

*DHX, Inc. v. Surface Transp. Bd.*,
   501 F.3d 1080 (9th Cir. 2007) ........................................................... 6, 20, 21

*E. & J. Gallo Winery v. Encana Corp.*,
   503 F.3d 1027 (9th Cir. 2007) ......................................................... 16, 18, 23

*In re Elevator Antitrust Litig.*,
   502 F.3d 47  (2d Cir. 2007) .......................................................................... 7

*GovGuam v. Sea-Land Service, Inc.*,
   2001 STB LEXIS 863 (Nov. 13, 2001) ................................................. 20, 21

*GovGuam v. Sea-Land Service, Inc.*,
   2007 STB LEXIS 52 (Feb. 1, 2007) ...................................................... 16, 21

*Kendall v. Visa USA, Inc.*,
   518 F.3d 1042 (9th Cir. 2008) .................................................................... 10

*Keogh v. Chicago & N.W. Ry. Co.*,
   260 U.S. 156 (1922) ............................................................................ *passim*

*In re LTL Shipping Servs. Litig.*,
   2009 WL 323219 (N.D. Ga. Jan. 28, 2009) ......................................... 3, 8, 9

*In re Network Assoc., Inc. II Sec. Litig.*,
   2003 U.S. Dist. LEXIS 14442 (N.D. Cal. Mar. 25, 2003) ........................... 6

*Int'l Norcent Tech. v. Koninklijke Philips Elects. N.V.*,
   2007 WL 4976364 (C.D. Cal. Oct. 29, 2007) ...................................... 4, 13

*In re OSB Antitrust Litig.*,
   2007 WL 2253419 (E.D. Pa. Aug. 3, 2007) ............................................... 13

*Ocean Logistics Mgmt., Inc. v. NPR, Inc.*,
   38 F. Supp. 2d 77 (D.P.R. 1999) ......................................................... 16, 18

DEFENDANTS' MOTION TO DISMISS      – iii –      **GIBSON, DUNN & CRUTCHER LLP**
Case No. 08-md-1972 TSZ      555 MISSION ST, SUITE 3000
     SAN FRANCISCO, CA  94105
     415.393.8200  FAX: 415.393.8306

*In re Pa. Title Ins. Antitrust Litig.*,
   648 F. Supp. 2d 663 (E.D. Pa. 2009) ..................................................................... 16

*In re Parcel Tanker Shipping Servs. Antitrust Litig.*,
   541 F. Supp. 2d 487 (D. Conn. 2008) ...................................................................... 7

*Sea-Land Serv., Inc. v. Atl. Pac. Int'l, Inc.*,
   61 F. Supp. 2d 1102 (D. Haw. 1999) ........................................................................ 5

*Security Services, Inc. v. Kmart Corp.*,
   511 U.S. 431 (1994) ................................................................................................. 23

*Security Servs. v. Kmart Corp.*,
   996 F.2d 1516 (3d Cir. 1993) .................................................................................. 23

*Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*,
   476 U.S. 409 (1986) .............................................................................. 14, 15, 16, 19

*Stanislaus v. Pacific Gas & Electric Co.*,
   114 F.3d 858 (9th Cir. 1997) .................................................................................. 20

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2010 U.S. Dist. LEXIS 64930 (N.D. Cal. June 29, 2010) .................................. 7, 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   127 S. Ct. 2499 (2007) .............................................................................................. 7

*Texas & Pacific R. Co. v. Abilene Cotton Oil Co.*,
   204 U.S. 426 (1907) .......................................................................................... 15, 16

*In re Text Messaging Antitrust Litig.*,
   2009 WL 5066652 (N.D. Ill. Dec. 10, 2009) ......................................................... 13

*The TJX Companies, Inc., Petition for Declaratory Order – Certain Rates and Practices of
   Sweeney Transportation, Inc., and Knickerbocker East-West, Inc.*,
   1997 STB LEXIS 317 (Jan. 6, 1998) ...................................................................... 23

*The TJX Companies, Inc., Petition for Declaratory Order – Certain Rates and Practices of
   Sweeney Transportation, Inc., and Knickerbocker East-West, Inc.*,
   2002 STB LEXIS 554  (Sept. 17, 2002) .................................................................. 23

*In re Travel Agent Comm'n Antitrust Litig.*,
   583 F.3d 896  (6th Cir. 2009) ................................................................................... 4

*Wah Chang v. Duke Energy Trading & Marketing, LLC*,
   507 F.3d 1222 (9th Cir. 2007) ................................................................................ 21

*In re White Elec. Designs Corp. Sec. Litig.*,
   416 F. Supp. 2d 754 (D. Ariz. 2006) ........................................................................ 6

**Statutes**

15 U.S.C. § 1 ................................................................................................................... 3

15 U.S.C. § 3 ................................................................................................................... 3

49 U.S.C. § 22 ......................................................................................................... 15, 16

49 U.S.C. § 13101(a)(1)(D) .......................................................................................... 20

DEFENDANTS' MOTION TO DISMISS     – iv –
Case No. 08-md-1972 TSZ

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA  94105
415.393.8200  FAX: 415.393.8306

49 U.S.C. § 13103 ........................................................................................ 15, 16

49 U.S.C. § 13701 ................................................................................ 17, 18, 19

49 U.S.C. § 13702(a) ........................................................................................ 19

49 U.S.C. § 13702(a)(1) .............................................................................. 17, 19

49 U.S.C. § 14101(b)(1) ........................................................... 10, 15, 17, 18

Interstate Commerce Commission Termination Act of 1995 ....................... 14

**Other Authorities**

C. Wright & A. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004 & Supp. 2007).......... 7

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................... 1, 2, 5

Fed. R. Civ. P. 8(a) ............................................................................................ 2

Fed. R. Evid. 201(b) .......................................................................................... 6

DEFENDANTS' MOTION TO DISMISS     – v –     **GIBSON, DUNN & CRUTCHER LLP**
Case No. 08-md-1972 TSZ     555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA 94105
415.393.8200 FAX: 415.393.8306

Defendants Matson Navigation Company, Inc., Alexander & Baldwin, Inc., Horizon Lines, LLC, Horizon Lines, Inc., and Horizon Lines Holding Co. (collectively "Defendants") hereby move for an order dismissing the Second Amended Consolidated Class Action Complaint ("SACC") with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).

## I.    INTRODUCTION

Plaintiffs' Consolidated Class Action Complaint ("CAC") charged Defendants with violating Section 1 of the Sherman Antitrust Act. This Court dismissed the CAC on two independent bases: (1) Plaintiffs had failed to adequately plead a violation of Section 1, including "enough factual matter (taken as true) to suggest that an agreement was made" and (2) Plaintiffs' claims were barred by the filed rate doctrine. Doc #105 at 4; *see also id*. at 27-28. While the Court dismissed the CAC without prejudice, it directed that "[a]ny amended complaint must allege claims that are not barred by the filed rate doctrine and that are otherwise consistent with this Order." Doc #105 at 28. Despite taking more than nine months to formulate the SACC, Plaintiffs have not overcome the deficiencies that caused the Court to dismiss the CAC. Therefore, Defendants respectfully request that this Court dismiss the SACC with prejudice.

## II.    DISMISSAL OF THE CONSOLIDATED AMENDED COMPLAINT

In February 2009, Plaintiffs filed the CAC alleging that "defendants, providers of [] shipping services, violated Section 1 of the Sherman Act by colluding to simultaneously increase fuel surcharges, by sharing vessel capacity, and by conspiring not to enter into extra-tariff rate agreements with customers." Doc #105 at 1. Defendants brought a joint motion to dismiss the CAC and, on August 18, 2009, this Court dismissed the CAC on two grounds.

First, the Court held that "the Consolidated Complaint pleads nothing more than 'parallel conduct and a bare assertion of conspiracy,' which *Twombly* teaches is insufficient to survive a Rule 12(b)(6) motion to dismiss." *Id*. at 14 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). Second, this Court dismissed the CAC on the independent ground that Plaintiffs' claims related to rates governed by the Surface Transportation Board ("STB") and were therefore barred

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA  94105
415.393.8200  FAX: 415.393.8306

by the filed rate doctrine.  Doc #105 at 27-28; *id.* at 14 (citing *Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156 (1922)).

### III.  PLAINTIFFS HAVE FAILED TO ALLEGE A CONSPIRACY IN VIOLATION OF THE SHERMAN ACT

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To survive a Rule 12(b)(6) motion, an antitrust complaint must "contain 'enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement'" such that those facts "sufficiently state a 'plausible' ground for relief."  Doc #105 at 5 (quoting *Twombly*, 550 U.S. at 556-57).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*) (internal citations and quotations omitted).

As this Court explained in dismissing the CAC, under that standard, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice" because "a showing of parallel conduct, without more, 'mirrors the ambiguity of the behavior' and is just as consistent with the existence of a conspiracy as it is 'with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.'"  Doc #105 at 5 (quoting *Twombly*, 550 U.S. at 554).  Thus, a distinguishing factor determining the viability of an antitrust complaint is "the inclusion of specific allegations concerning time, place, and person versus general allusions to 'secret meetings,' 'communications,' or 'agreements.'"  *Id.* at 6 (citations omitted).

This Court held that the CAC did not meet this standard because bare allegations of trade association membership, investigation by the Department of Justice ("DOJ") in another trade

DEFENDANTS' MOTION TO DISMISS
Case No. 08-md-1972 TSZ

– 2 –

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA  94105
415.393.8200  FAX: 415.393.8306

lane, and parallel conduct did not establish a plausible antitrust claim, whether viewed separately or as a whole.  Doc #105 at 6-14.  It found that the CAC "pleads nothing more than 'parallel conduct and a bare assertion of conspiracy,'" *id*. at 14, and dismissed the CAC for that reason.

The SACC suffers from the same deficiencies.  Plaintiffs' allegations that Matson and Horizon engaged in a conspiracy to affect the prices for domestic noncontiguous ocean shipping services are still bereft of any specific allegations establishing an agreement between Matson and Horizon to raise, fix, maintain or stabilize prices or otherwise restrain trade, much less any specific times, places or persons involved in the formation of such a conspiracy.  Nor do they allege any factual support for their theories that Matson and Horizon conspired to fix fuel surcharges, impede potential competitors from entering the trade, refrain from entering confidential contracts, or allocate customers.  And, in the single instance in which Plaintiffs actually allege the existence of an agreement—a contract under which Matson agreed to carry a certain number of Horizon's containers as its customer on a mid-week sailing—Plaintiffs still provide no factual allegations to support an inference that the agreement is unlawful.  In the words of the district court in the *LTL Shipping* case, which this Court previously found most analogous to this one:  "While the allegations allow one to imagine that a conspiracy may have occurred, imagination is not enough."  *In re LTL Shipping Servs. Litig.*, 2009 WL 323219, at *12 (N.D. Ga. Jan. 28, 2009).

A.     **Plaintiffs Fail Adequately To Allege A Section 1 Or 3 Violation Regarding Ocean Shipping Services**[1]

1.     **Plaintiffs Fail To Allege An Agreement**

Like the CAC, the SACC contains no direct factual allegations that Defendants entered into an unlawful agreement regarding ocean shipping services, including fuel surcharges,

---

[1]     The CAC alleged a violation of Section 1 of the Sherman Act.  The SACC alleges a violation of Sections 1 and 3 of the Sherman Act.  Section 1 applies to trade or commerce among the several States, and Section 3 applies to trade or commerce in any Territory of the United States; the sections are otherwise substantively similar.  *See* 15 U.S.C. §§ 1, 3.

confidential contracts or allocation of customers. It offers bare and conclusory allegations of agreement, but "[t]he addition of 'magic words' [, such as 'combined' and 'coerced',] [is] not alone sufficient to state a claim under § 1 of the Sherman Act." *Int'l Norcent Tech. v. Koninklijke Philips Elects. N.V.*, 2007 WL 4976364, at *8 (C.D. Cal. Oct. 29, 2007) (citing *Twombly*, 550 U.S. at 555-56); *see also In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (6th Cir. 2009) (rejecting "legal conclusion masquerading as a factual allegation") (internal quotations omitted).

Nor does the SACC contain factual allegations that "actively" and "plausibly" suggest conspiracy. The SACC, like the CAC, relies on allegations of parallel activity and asks the Court to infer conspiracy. But the Court previously found Plaintiffs' allegations of parallel activity insufficient to meet the *Twombly* standard because Plaintiffs' failed to "identify any specific communications or contracts," "supply [] data concerning pricing practices predating the alleged anticompetitive agreement," or "link the lockstep fuel surcharge fluctuations to anything other than the type of parallel conduct generally present in a homogenous market." Doc #105 at 10-11 (citations omitted). The SACC addresses none of these deficiencies.

### 2. Plaintiffs' Allegations Regarding The Industry Still Fail To Support An Inference Of Unlawful Agreement

The few new allegations in the SACC as to Matson and Horizon's participation in industry groups and the DOJ's investigation not only still fail to support an inference of conspiracy but instead actually undermine Plaintiffs' claims.

*Participation in Trade Associations and Industry Groups and Retention of Third Party Service Providers.* While Plaintiffs again attempt to draw some inference of conspiracy from each Defendant's participation in trade associations and industry groups, as this Court noted in dismissing the CAC, "vague allegations of 'secret meetings' and conclusory accusations of 'conspiratorial activity' constituting 'nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatsoever," do not satisfy the requirements of

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA 94105
415.393.8200 FAX: 415.393.8306

Rule 12(b)(6). Doc #105 at 6 (internal citations omitted). The Court previously found Plaintiffs' allegations that "Matson and Horizon belong to organizations via which they had an 'opportunity' to meet" insufficient to meet this standard because Plaintiffs "offer[ed] no particulars concerning the location or dates of any meetings, and although they name[d] certain members of MCTF, they [did] not identify any individual [ ] who might have been involved in any illicit communications." Doc #105 at 7. The Court further noted that "plaintiffs ma[de] no attempt to compare the timing of trade association meetings with fuel surcharge increases" and concluded that these general allegations of membership in trade organizations did not "add[] anything to the mix." *Id.* at 7-8. The SACC does not cure these deficiencies.

Instead, Plaintiffs have added new allegations that each Defendant retained TAG/ICIB Services, Inc. to monitor each other's adherence to agreements. SACC ¶ 49. Plaintiffs allege that "TAG/ICIB offers 'container inspection – cargo verification services' and 'audits,'" that "Matson and Horizon employed TAG/ICIB to board one another's ships and to inspect the goods being shipped by each" and then conclude that Defendants hired TAG/ICIB "to ensure that each was accurately reporting what was being shipped and to discourage cheating on the conspiracy." *Id.* at ¶ 49. At most, these allegations establish that each Defendant *independently* retained a *third party* (TAG/ICIB) to inspect containers and verify the cargo contained within. Although Plaintiffs assert that "TAB/ICIB then reported to each Defendant about the other's cargo," they allege no specific facts to support this bald assertion. As the court recognized in *Sea-Land Serv*., *Inc. v. Atl. Pac. Int'l, Inc*., 61 F. Supp. 2d 1102, 1106 (D. Haw. 1999), carriers use TAG/ICIB's services to ensure their *customers'* compliance with applicable tariffs: "TAG is an independent contractor which inspects cargo on behalf of carriers to ensure tariff compliance. TAG obtains information from the carriers that customers furnish regarding their cargo. TAG may open and examine the contents of shipments to verify the accuracy of that information." The use of this third-party independent service by Matson and Horizon to verify what their own customers claim they are shipping does not establish any inference of unlawful agreement. *See* Doc #105 at 11

DEFENDANTS' MOTION TO DISMISS
Case No. 08-md-1972 TSZ

– 5 –

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA 94105
415.393.8200 FAX: 415.393.8306

(quoting *DHX, Inc. v. Surface Transp. Bd.*, 501 F.3d 1080, 1083 (9th Cir. 2007)).

**DOJ Investigation.** As in the CAC, the SACC attempts to draw inferences based on the existence of a DOJ investigation and of the guilty pleas of some individuals for their conduct in the Puerto Rico trade lane. SACC ¶¶ 87-95. The Court previously found these allegations insufficient because they provided "no link between the Puerto Rico and Hawaii or Guam markets" and rejected Plaintiffs' "attempts at cross-fertilization." Doc #105 at 8-9. In an attempt to establish that missing link, Plaintiffs add two allegations: (1) that the Hawaii/Guam and Puerto Rico trades are structured similarly and (2) that Matson owned a minority interest in a Puerto Rico competitor. SACC ¶¶ 52-54. Neither supports an inference of agreement.

Plaintiffs allege that the Hawaii/Guam trade lane and the Puerto Rico trade lane are similar because: "[b]oth markets are highly concentrated with a limited number of players, both are protected from foreign competition by the Jones Act's restrictions, both concern the same commodity service where few, if any, substitutes exist, and both have high barriers to entry." SACC ¶ 52. But nothing about any of these purported similarities, even when taken as true, establishes any "link" between the markets necessary to support an inference that unlawful conduct in the Puerto Rico trade is indicative of similar conduct in the Hawaii/Guam trade.

Plaintiffs have attempted to establish that link by alleging that "[u]ntil 2004, Matson, with partner Saltchuk, was an investor in Sea-Star" and together "Matson and Saltchuk operated Sea-Star in the Puerto Rico market." SACC ¶ 54. At the relevant time, Matson owned a 20% interest in Sea Star, which operates in the Puerto Rico trade lane but not in the Hawaii-Guam trade lane.[2] Plaintiffs then allege that two Sea Star executives have pleaded guilty to engaging in

---

[2] *See Alexander & Baldwin, Inc. Form 10-K* (Mar. 10, 2003) at 29 (noting that Matson's ownership interest in Sea Star declined to twenty percent in 2002). This Court may take judicial notice of the Alexander & Baldwin 10-K because "judicial notice is appropriate for SEC filings, press releases, and accounting rules as they are 'capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned.'" *In re White Elec. Designs Corp. Sec. Litig.*, 416 F. Supp. 2d 754, 760 (D. Ariz. 2006); *In re Network Assoc., Inc. II Sec. Litig.*, 2003 U.S. Dist. LEXIS 14442, at *2 n.3 (N.D. Cal. Mar. 25, 2003) (citing Fed. R. Evid. 201(b)). The Court may consider matters subject to judicial

a price-fixing conspiracy with Horizon in the Puerto Rico market beginning in 2002 (*id*. at ¶ 54), and attempt to draw an inference of unlawful behavior in a wholly separate trade lane from these facts. Plaintiffs still do not allege, however, that these two Sea Star executives had any responsibility for or contact with the Hawaii/Guam trade or that any employee of Matson was involved in illegal conduct with respect to Puerto Rico.

This "if it happened there, it could have happened here" fallacy was expressly rejected by the Second Circuit, which found a government investigation in one market did not raise inferences of antitrust violations in a separate market. *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No. 1827, 2010 U.S. Dist. LEXIS 64930, at*17-19 (N.D. Cal. June 29, 2010). Matson's minority interest in Sea Star does not make an allegation of price fixing in the Hawaii/Guam trade lane any more plausible. Plaintiffs' inability to allege any meaningful connection between plea agreements regarding conduct in a different market from the one at issue here renders these allegations irrelevant to their claims. *See In re Parcel Tanker Shipping Servs. Antitrust Litig.*, 541 F. Supp. 2d 487, 492 (D. Conn. 2008).

### 3. Plaintiffs Have Not Pleaded A Plausible Conspiracy Regarding Fuel Surcharges

Like the SACC, the CAC alleged an agreement between Matson and Horizon regarding fuel surcharges. The Court identified deficiencies with the fuel surcharge allegations in the CAC: Plaintiffs did "not identify any specific communications or contracts" (Doc #105 at 11 (footnote omitted)) and "suppl[ied] no data concerning pricing practices predating the alleged anticompetitive agreement, and they fail[ed] to link the lockstep fuel surcharge fluctuations to anything other than the type of parallel conduct generally present in a homogenous market." *Id.* (footnote omitted).

---

notice in deciding a motion to dismiss. *Tellabs*, *Inc. v. Makor Issues & Rights*, *Ltd.*, 127 S. Ct. 2499, 2509 (2007) (citing C. Wright & A. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004 & Supp. 2007)).

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA 94105
415.393.8200 FAX: 415.393.8306

The SACC does not overcome those problems. It contains nothing more than conclusory allegations of agreement or communications between Defendants, and this alone is fatal to Plaintiffs' claims. Plaintiffs' half-hearted attempts to address the Court's previous concerns are likewise insufficient. Plaintiffs attempt to show a departure from historical practice by alleging that Matson began to match Horizon's prices sometime after 1995 and that "[i]n or about October 1999, Matson and Horizon's behavior changed dramatically" and "they began to implement their conspiracy to fix prices in the ocean shipping industry, imposing for the first time lockstep fuel surcharges on all cargo shipped in the Hawaii/Guam market." SACC ¶¶ 58-59. These allegations, however, do not suggest conspiracy. Instead, these allegations are equally consistent with independent business decisions. While Plaintiffs allege that Matson and Horizon each began imposing fuel surcharges at the same time, they also suggest that both began to do so in the face of rising fuel costs.[3] *Id.* at ¶¶ 59, 63. It is not surprising that rising fuel prices would lead both competitors to impose fuel surcharges, as happened in other transportation industries around the same time. *See, e.g., In re LTL Shipping*, 2009 WL 323219, at *16. This is a far cry from situations in which defendants historically offered varied prices, which then inexplicably became identical. *See, e.g.*, Doc #105 at 10 n.4. These new allegations do not address the Court's directive to "link the lockstep fuel surcharge fluctuations to anything other than the type of parallel conduct generally present in a homogeneous market." Doc #105 at 11.

Nor do Plaintiffs' new allegations with respect to the Guam trade satisfy Plaintiffs' burden regarding fuel surcharges. Plaintiffs allege that "[i]n 2007, Horizon purchased five new

---

[3]   In this regard, it is notable that Plaintiffs do not allege that Defendants raised their fuel surcharges simultaneously, but rather only during the same month. SACC ¶ 61. Such conduct does not raise any inference of conspiracy; it is consistent with parallel conduct in a homogenous market and nothing more. Doc #105 at 11. Indeed, Plaintiffs themselves characterize rate matching as "vigorous[] compet[ition]." SACC ¶ 58. Likewise, Plaintiffs' assertion that "[i]t was only after the DOJ's antitrust investigation was announced in April 2008 that Defendants ceased their lockstep fuel surcharges and began to impose surcharges at different times and at different rates" (*id.* at ¶ 62) provides no details that might support any inference of unlawful agreement.

DEFENDANTS' MOTION TO DISMISS          – 8 –
Case No. 08-md-1972 TSZ

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA 94105
415.393.8200 FAX: 415.393.8306

Korean-built ships to be used in the Transpacific trade, including service to Guam" and conclude that Horizon's decision to increase fuel surcharges for Guam routes "demonstrates that Defendants' fuel surcharge increases were the product of their collusive dealings, and did not represent the actual fuel cost incurred." SACC ¶ 66. Plaintiffs' point seems to be that Horizon's fuel surcharge was not closely tied to its actual fuel costs, so it must have been the product of collusion. This is false logic. It is equally or more plausible that the amount of Horizon's fuel surcharge was a product of conscious parallelism—in other words, an independent response to Matson. *In re LTL Shipping*, 2009 WL 32219, at *18.[4]

Plaintiffs also attempt to draw some inference from their allegation that "Matson provided shipping services to Guam using ships operated by American President Lines ("APL") and "[b]etween 1998 and 2006, pursuant to a long-term agreement with Matson, APL incurred all of the costs and expenses related to the operation." SACC ¶ 67. They conclude that "Matson had no fuel expenses for Guam" and "[i]n a truly competitive environment, Matson would have taken advantage of this significant cost savings to compete against Horizon on price." *Id.*[5] However, courts have rejected the argument that the existence of a price-fixing conspiracy can be inferred from surcharge increases that do not correlate with costs. *See, e.g., In re LTL Shipping*, 2009 WL 32219, at *18 ("Defendants' use of fuel surcharges as a profit generator also does not show anticompetitive behavior."). Plaintiffs' attenuated allegations concerning the Guam trade are irrelevant. Plaintiffs have still failed to adequately allege an agreement to fix fuel surcharges.

---

[4] Similarly, Plaintiffs' allegations relating to Defendants' fuel surcharges for the Transpacific route (SACC ¶¶ 68-69) provide no support to their claims. Even Plaintiffs acknowledge that these fuel surcharge rates involve different markets and are calculated differently (*id.* at ¶ 68), rendering them inapposite to these claims.

[5] Plaintiffs acknowledge that it is impossible to draw any conclusions from the prices charged for shipping services to Guam. SACC ¶ 42 ("[b]ecause the Guam trade is subsumed within the Transpacific trade, it is difficult to allocate the costs of fuel, crew, and other expenses between items shipped to and from Guam and items shipped to and from Asia"); *id.* at ¶ 42 n.1 (noting that the costs to ship cargo to Asia differ from those imposed to ship cargo within the United States).

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA  94105
415.393.8200  FAX: 415.393.8306

### 4.    Plaintiffs Have Not Pleaded A Plausible Conspiracy Regarding Confidential Contracts

The SACC also alleges "a refusal by Horizon and Matson to enter into private contracts with freight forwarder customers as permitted by 49 U.S.C. § 14101(b)(1)." SACC ¶ 82.  But as Plaintiffs admit, ocean carriers in the Hawaii/Guam trade are allowed by law to use either tariffs *or* confidential contracts.  *Id*. at ¶ 100.  They assert that Matson and Horizon's purported refusal to enter into confidential contracts with freight forwarders was "a departure from pre-conspiracy practices" (*id*. at ¶ 82), but provide no facts to support this bald assertion.  Plaintiffs fail to allege facts answering any of the "basic questions" about an alleged conspiracy not to enter private contracts.  *Kendall v. Visa USA, Inc*., 518 F.3d 1042, 1047-48 (9th Cir. 2008) (a complaint must contain facts about the basic who, what, when and where of the alleged conspiracy).  Plaintiffs' allegations are equally consistent with unilateral decisions not to enter such contracts.  *Cf. DHX, Inc.*, 501 F.3d at 1085 (STB found it was not unreasonable for ocean carrier to act to protect its market share from diversion to competitor freight forwarders).  In short, Plaintiffs allege nothing but parallel conduct.

### 5.    Plaintiffs Have Not Pleaded A Plausible Conspiracy That Defendants Agreed To Allocate Customers

Plaintiffs newly allege that "Matson and Horizon allocated customers between themselves in the Hawaii/Guam market," and that "customers were referred to as 'Matson' customers and others were referred to as 'Horizon' customers."  SACC ¶ 80.  Plaintiffs allege three "facts" in support of their assertion that "[e]ach Defendant agreed not to deal with the other's customers": (1) Horizon retained Wal-Mart as a customer "despite Matson's industry dominance" (*id*. at ¶ 80); (2) "Matson and Horizon's respective market shares of the westbound trade to Hawaii remained virtually unchanged during the Class Period" (*id*. at ¶ 81); and (3) "[a]fter the announcement of the DOJ investigation [] both Matson and Horizon began doing business with customers who had been traditionally allocated to the other []."  *Id*.

---

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA  94105
415.393.8200  FAX: 415.393.8306

None of these allegations is sufficient to allow Plaintiffs' claims to cross the threshold from possible to plausible. *Iqbal*, 129 S. Ct. at 1949 ("The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully") (quoting *Twombly*) (internal citations and quotations omitted). The SACC contains no allegations indicating why the Court should infer any agreement from Horizon's success in retaining Wal-Mart as a customer or from stable market shares, neither of which is surprising in a two-competitor market. *See* SACC ¶ 58. Nor does the SACC explain why success by either Defendant at obtaining business from some unnamed customers who may have previously used the other's services indicates conspiracy. Both retaining and gaining customers are plausible results of ongoing competition. Plaintiffs have not alleged the details of an agreement nor facts sufficient to infer one.

**B.      Plaintiffs Have Not Pleaded Section 1 Or 3 Claims Regarding Capacity**

In the SACC, Plaintiffs continue to contend that the Defendants conspired to "reduce the shipping capacity in the Hawaii/Guam market." SACC ¶ 73. The allegations concerning this alleged "conspiracy" fall into three categories: (1) allegations concerning "capacity sharing agreements" (*id*. at ¶¶ 74-75); (2) an allegation that executives of Matson and Horizon met and "discussed [ ] how Jones Act vessels would be distributed among the different Jones Act routes" (*id*. at ¶¶ 56, 76) and (3) allegations concerning unilateral actions to purchase or dispose of vessels (*id*. at ¶ 79). None enables the SACC to cross the threshold to plausibility.

**1.      Plaintiffs' Allegations About Matson's Agreement To Carry Cargo For Horizon Are Consistent with Common Industry Practice**

Once again, the only actual allegation of a specific agreement in the SACC involves the agreement under which Matson (as carrier) contracts with Horizon (as shipper) to carry a certain number of Horizon containers on one of its mid-week sailings to Hawaii. SACC ¶ 74. The Court previously found Plaintiffs' allegations regarding the "contractual relationship between Matson and Horizon involv[ing] vessel capacity sharing on the Los Angeles to Hawaii route" insufficient to establish a conspiracy because they established "nothing more than the customer-

DEFENDANTS' MOTION TO DISMISS
Case No. 08-md-1972 TSZ

– 11 –

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA 94105
415.393.8200 FAX: 415.393.8306

as-well-as-competitor relationship common in the water trade." Doc #105 at 11 n.5. Plaintiffs' allegations are no different this time around.[6] *See, e.g.*, *Iqbal*, 129 S. Ct. at 1950 (explaining that defendant's conduct in *Twombly* "was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior").

## 2. Plaintiffs' Allegation Of Meetings Between Executives Does Not Allege Any Agreement To Reduce Or Limit Capacity

The SACC contains a new allegation that "[i]n 2002, a number of Horizon executives met with Matson executives in Honolulu, Hawaii and Charlotte, North Carolina, to discuss capacity in the Hawaii, Guam, and Puerto Rico markets." SACC ¶ 56. Plaintiffs allege that these executives "discussed, *inter alia*, how Jones Act vessels would be distributed among the different Jones Act routes in order to control capacity in the markets." *Id.*; *see also* ¶ 76.[7] Plaintiffs do not allege that these executives *agreed* to control capacity in these markets, much less detail how a conspiracy was formed or implemented. *In re Citric Acid Antitrust Litig.*, 191 F.3d 1090, 1103 (9th Cir. 1999) (holding that it is improper "to infer participation in the conspiracy from the opportunity to do so") (citing *Alvord-Polk Inc. v. Schumacher & Co.*, 37 F.3d 996, 1013 (3rd Cir. 1994) (communications between competitors do not permit an inference of an agreement without further evidence of an actual or tacit agreement)).

This generalized allegation about some unspecified number of meetings during one year of what was allegedly a decade-long conspiracy does nothing to push Plaintiffs' claims across

---

[6]   Plaintiffs' assertion that this agreement is "strikingly similar" to when "Sea-Star and Horizon entered into an agreement where Sea-Star purchased cargo space from Horizon in order to reduce capacity in that market" establishes nothing to support any inference of conspiracy. SACC ¶ 75 n.3. Plaintiffs do not suggest that the guilty pleas entered by employees of Horizon or Sea Star were based on this alleged agreement or establish any link between the two trade lanes that would support such an inference.

[7]   Plaintiffs also hypothesize that "a carrier can take capacity out of one market and shift or 'dump' it into another" and assert that "[t]he three Jones Act carriers communicate with one another to ensure that surplus ships in one trade route will not harm the profits of the carriers in the other Jones Act markets." SACC ¶ 55. But Plaintiffs' failure to allege any facts showing that the carriers entered into an agreement with respect to capacity (or the time, place and participants in such an agreement) renders these musings insufficient to state a claim.

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA 94105
415.393.8200 FAX: 415.393.8306

the threshold to plausibility; it lacks any context or explanation as to what specifically these executives purportedly agreed to do or how they would implement such an alleged agreement. *See, e.g., In re Text Messaging Antitrust Litig.* ("*In re Text Messaging*"), 2009 WL 5066652, at *6 (N.D. Ill. Dec. 10, 2009) (dismissing antitrust complaint where plaintiffs failed to allege details about the structure or content of meetings, statements by any defendant suggesting the presence of an agreement or the terms of the alleged agreement). Indeed, they do not allege that the executives agreed to do anything, much less reached agreement connected to any of Plaintiffs' claims.[8]

### 3. Independent Decisions Concerning Vessel Acquisition And Disposal Do Not Establish An Unlawful Agreement

Plaintiffs again allege that Matson acquired vessels from or desired by other ocean carriers (SACC ¶¶ 77-78) and that Defendants' contracts with scrapyards require that their obsolete vessels actually be scrapped. *Id.* at ¶ 79. There is no allegation of any *agreement* between Matson and Horizon to do any of this. Plaintiffs' addition of conclusory assertions that they pursued these strategies "[p]ursuant to their agreement to limit capacity in the Hawaii and Guam trades" does not make an unlawful agreement plausible. *Id.* at ¶ 79; *see, e.g., Int'l Norcent Tech.*, 2007 WL 4976364, at *8 (citing *Twombly*, 550 U.S. at 555-56). Such contracts are consistent with each company's unilateral interest to manage its fleet and avoid liability for vessels beyond their useful life. Indeed, the Court rejected this same theory the last time. Doc #105 at 12.

---

[8] *Compare In re TFT-LCD Antitrust Litig.*, 586 F. Supp. 2d 1109, 1116 (N.D. Cal. 2008) (alleging intricate details of price-fixing agreements, including specific instances of invitations to agree and subsequent agreements; *In re OSB Antitrust Litig.*, 2007 WL 2253419, at *3 (E.D. Pa. Aug. 3, 2007) (alleging specific dates on which company communicated its intention to reduce capacity to its competitors, and actual capacity reduction following those communications at a time when industry demand was increasing).

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA 94105
415.393.8200 FAX: 415.393.8306

## IV.    THE FILED RATE DOCTRINE BARS PLAINTIFFS' CLAIMS

The allegations in the SACC likewise fail to remedy the defects that led the Court to dismiss Plaintiffs' claims as barred by the filed rate doctrine.  In this Court's decision dismissing the CAC, the Court noted that although Plaintiffs had "artfully avoided directly alleging that the noncontiguous domestic water trade is regulated in a manner rendering the filed rate doctrine applicable," the noncontiguous domestic trade is in fact a regulated industry in which the Surface Transportation Board ("STB") has jurisdiction over rates.  Doc #105 at 20.  Therefore, the Court found that Plaintiffs could not pursue a private antitrust action for damages with respect to rates that are subject to the jurisdiction of a federal regulatory body.  *Id.* at 14 (citing *Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156 (1922), *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409 (1986), and their progeny); *see also* Doc #105 at 23 (holding that unless "the rates at issue are … outside the scope of the STB's jurisdiction, no basis exists for concluding that *Keogh* does not control.").

Although Plaintiffs endeavor in the SACC to avoid the preclusive effect of the filed rate doctrine, the SACC provides no basis for the Court to revise its prior holding.  As an initial matter, the Court has already rejected Plaintiffs' allegations that the passage of the Interstate Commerce Commission Termination Act of 1995 ("ICCTA") (SACC ¶¶ 96-99) and the creation of the STB (which does not "affirmatively approve" rates (*Id.* at ¶ 107)) nullified the filed rate doctrine.  Accordingly, these arguments should not be revisited.  Although the SACC newly alleges that the filed rate doctrine does not apply to commodities excused from tariff filing (*id.* at ¶ 100); to rates that fall under the safe harbor created by Congress called "the zone of reasonableness" (*id.* at ¶ 107); or to freight shipped under Matson Tariff No. 14-f (*id.* at ¶ 101), the SACC still lacks any allegation establishing that any of these rates are outside of the STB's jurisdiction.  Without such an allegation, the SACC fails to plead any claim that avoids the filed rate doctrine, and should be dismissed with prejudice.

DEFENDANTS' MOTION TO DISMISS                     – 14 –
Case No. 08-md-1972 TSZ

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA  94105
415.393.8200  FAX: 415.393.8306

**A.     The Court Previously Rejected The Filed Rate Arguments Advanced In The SACC**

As this Court has already held, Congress did not nullify the filed rate doctrine with respect to water carriers by passing ICCTA.  Doc #105 at 23.  Although ICCTA allows carriers and shippers to enter into confidential contracts expressly waiving STB remedies, *see* 49 U.S.C. § 14101(b)(1), water carriers are otherwise required (with few exceptions) to publish tariffs which are subject to review by the STB.  Doc #105 at 20-21.  The Court therefore held that "ICCTA does not evidence any Congressional intent to fully extinguish the preemptive effect of the filed rate doctrine as to the noncontiguous domestic trade." *Id*. at 23.

Notwithstanding the Court's holding, Plaintiffs renew their contention that 49 U.S.C. § 13103, which states that "[e]xcept as otherwise provided in this part, the remedies provided under this part are in addition to the remedies existing under another law or common law," renders the filed rate doctrine inapplicable to the noncontiguous domestic trade.  *Compare* CAC ¶ 79 with SACC ¶ 99.  Plaintiffs again argue that this statutory provision means that "tariff filing does not relieve carriers of liabilities imposed by courts for violations of law, such as the antitrust laws." *Id.*

Over 100 years ago, even before *Keogh*, the Supreme Court considered and explicitly rejected the argument that the comparable provision of the Interstate Commerce Act ("ICA") gave courts jurisdiction to hear statutory or common law claims that challenged filed rates.[9] *Texas & Pacific R. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 446-48 (1907) (holding that

---

[9]     Although Plaintiffs assert that § 13103 is some form of deregulation under ICCTA, this or a similar statutory provision has been a part of the statutory scheme for over 100 years.  A nearly identical statutory provision was part of the ICA, ICCTA's predecessor statute, when *Keogh* first held that the filed rate doctrine barred private antitrust actions based on filed rates.  *See* 25 Stat. 862 (1889) (codified as amended at 49 U.S.C. § 22 (1925) ("[N]othing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies.").  A nearly identical provision was also part of the ICA when *Square D* reaffirmed the validity of the filed rate doctrine.  *See* 49 U.S.C. § 13103 (1982) ("Except as otherwise provided in this subtitle, the remedies provided under this subtitle are in addition to remedies existing under another law or at common law.").

---

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA  94105
415.393.8200 FAX: 415.393.8306

1    notwithstanding 49 U.S.C. § 22, "a shipper seeking reparation predicated upon the

2    unreasonableness of the established rate must … primarily invoke redress through the Interstate

3    Commerce Commission ["ICC"]."). Recently, in *Ocean Logistics Management, Inc. v. NPR,*

4    *Inc.*, 38 F. Supp. 2d 77, 88 (D.P.R. 1999), the court rejected the very argument advanced by

5    Plaintiffs here. Relying on *Abilene*, the court held that 49 U.S.C. § 13103 "d[oes] not override

6    the preemptive power of the agency when complaints were based upon rates reflected in tariffs

7    filed with regulatory transportation agencies." *Id.* Accordingly, it is clear that 49 U.S.C. §

8    13103 does not affect the applicability of the filed rate doctrine.

9        Plaintiffs further allege that the filed rate doctrine does not apply to the noncontiguous

10   domestic trade because the STB does not affirmatively review or approve published rates.

11   SACC ¶¶ 109-111. But as this Court has noted, "as long as the regulatory scheme requires the

12   filing of rates with a government agency that has legal authority to review those rates, the filed

13   rate doctrine applies regardless of the actual degree of agency review of those filed rates." Doc

14   #105 at 26–27 n.11 (quoting *In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663 (E.D. Pa.

15   2009)). This holding is consistent with settled precedent establishing that the filed rate doctrine

16   applies as long as a regulatory body has *the authority* to review and approve rates. *See Square*

17   *D*, 476 U.S. at 417 (holding that the filed rate doctrine applied where the rates in question were

18   merely filed with the ICC, but were not formally reviewed or approved); *E. & J. Gallo Winery v.*

19   *Encana Corp.*, 503 F.3d 1027, 1039 (9th Cir. 2007) (holding that unless a federal regulatory

20   body has completely abdicated its rate-making authority, the filed rate doctrine preempted

21   antitrust claims based on rates subject to that authority).[10]

22

23   [10]  Plaintiffs' argument that the STB does not assert its rate-making authority is unfounded. As
     this Court previously noted, the STB had recently exercised its authority to review the
24   reasonableness of rates to and from Guam. Doc #105 at 26-27 n.11. Indeed, the STB's level
     of oversight and control over the reasonableness of rates is apparent from the STB's
25   discussion of the appropriate methodology for determining the reasonableness of the rates for
     shipments to and from Guam in response to the Government of Guam's complaint.
26   *GovGuam v. Sea-Land Service, Inc.*, STB Docket No. WCC-101, 2007 STB LEXIS 52, at
     *15-30 (Feb. 1, 2007) (assessing whether to apply a rate of return methodology referred to as

Because Plaintiffs had not alleged that the STB lacks authority to review rates, the Court held that Plaintiffs' "complaints about the manner in which the STB has or has not exercised its jurisdiction with regard to noncontiguous domestic shipping tariffs do not remove this case from the realm of the filed rate doctrine." Doc #105 at 26-27 n. 11.

Because the SACC still fails to allege that the STB lacks the authority to review filed rates, the filed rate doctrine bars Plaintiffs' claims.

**B.      The Filed Rate Doctrine Applies To All Rates At Issue Here Regardless Of Whether Carriers Are Excused From Tariff-Filing Requirements**

In the SACC, Plaintiffs now assert that even if the filed rate doctrine applies generally to the noncontiguous domestic trade (as this Court has already concluded it does), it does not apply to shipments for which the carriers are excused from tariff-filing pursuant to 49 U.S.C. § 13702(a)(1). SACC ¶ 100. Plaintiffs misstate the import and effect of that statutory provision. Section 13702(a)(1) states that a water carrier may provide transportation in the noncontiguous trade only "if the rate for such transportation or service is contained in a tariff," except that the carriers are excused from tariff-filing requirements with respect to bulk cargo, forest products, recycled metal scrap, waste paper, and paper waste. *Id.* Based upon this relaxation of the requirement to maintain tariffs, Plaintiffs make the illogical leap that the STB does not have jurisdiction over the reasonableness of the rates charged for shipment of such commodities. SACC ¶ 100. There is nothing in the statutory scheme that would support such a conclusion.

Pursuant to 49 U.S.C. § 13701, the STB has jurisdiction over the reasonableness of rates for shipments by water carriers in the noncontiguous domestic trade, regardless of whether or not a tariff has been filed.[11] This provision states:

---

"GO-11" or the stand-alone cost methodology to determine whether rates in the Guam market are reasonable).

[11]      There is an exception to this rule if a shipper and a carrier enter into a confidential contract pursuant to 49 U.S.C. § 14101(b)(1) in which the parties expressly waive their rights and remedies under ICCTA, including the STB's rate reasonableness authority. Under those circumstances, the "transportation provided under the contract shall not be subject to the waived rights and remedies and may not be subsequently challenged on the ground that it

A rate, classification, rule, or practice related to transportation or service provided
. . . by or with a water carrier in noncontiguous domestic trade . . . must be
reasonable.

49 U.S.C. § 13701(a)(1). Section 13701 further provides that the STB "shall proscribe" any

practices that violate § 13701(a), and may hear complaints regarding violations of § 13701(a).

49 U.S.C. § 13701(b)-(c). Upon finding a violation of § 13701(a), the STB "shall award

reparations" in the amount of "all sums assessed and collected that exceed the determined

reasonable rate, division, rate structure, *or* tariff." 49 U.S.C. § 13701(d)(4) (emphasis added).

Thus, according to the plain language of § 13701, the STB's jurisdiction over the reasonableness

of rates charged is not limited to those actually contained within a tariff. *See also Ocean*

*Logistics*, 38 F. Supp. at 85 (rejecting argument that commodities which carriers may transport

without filing tariffs with the STB fall totally outside of the STB's regulatory jurisdiction).

Indeed, the Ninth Circuit made clear in *Gallo* that it is not the *filing* of tariffs that triggers

the preemptive effect of the filed rate doctrine. Rather, the filed rate doctrine is triggered by

Congress's creation of a regulatory body with the authority to set rates. 503 F.3d at 1035. In

*Gallo*, FERC had determined that market-based rates were presumptively "just and reasonable,"

and therefore suspended tariff-filing requirements. *Id.* at 1038. Nevertheless, FERC continued

to monitor the operation of the market through the complaint process. *Id.* The Ninth Circuit

held that the filed rate doctrine applied because even though FERC had acted "with a light

hand," FERC had not abdicated its rate-making authority. *Id.* at 1042. Consistent with that

decision, this Court previously found that "an antitrust claim can be within *Keogh*'s preclusive

ambit even when the rates at issue are not actually 'filed.'" Doc #105 at 17. Accordingly, even

---

violates the waived rights and remedies." *Id.* Notably absent from the SACC, however, are
allegations that any of the Plaintiffs entered into a confidential contract pursuant to 49 U.S.C.
§ 14101(b)(1) that contained such a waiver. This Court previously held that absent such
allegations, the filed rate doctrine barred Plaintiffs' claims. Doc # 105 at 24 (holding that
absent allegations that the parties contracted pursuant to § 14101(b)(1), the CAC fell
"squarely within the ambit of *Keogh* and its progeny").

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA 94105
415.393.8200 FAX: 415.393.8306

though § 13701 excuses water carriers from the administrative requirement of maintaining tariffs for certain commodities, it does not eliminate the STB's rate-making authority as to those commodities.

Moreover, in *Square D*, the Supreme Court made clear that the filed rate doctrine would continue to apply to regulated industries absent a "*specific* statutory provision or legislative history indicating a *specific* congressional intention to overturn the longstanding *Keogh* construction." 476 U.S. at 420 (emphasis added). Although Plaintiffs here rely upon 49 U.S.C. § 13702(a)(1) for their theory that the STB does not have jurisdiction over commodities for which the carriers are excused from tariff filing, this provision does not contain any express intention by Congress to set that commerce outside of the reach of the STB or render the filed rate doctrine inapplicable.[12]

Because Plaintiffs have failed to meet their burden to plead that they shipped cargo that was outside of the STB's jurisdiction, Doc #105 at 23, the SACC should be dismissed.

## C. The Filed Rate Doctrine Applies To Rates Within The "Zone of Reasonableness"

Plaintiffs also allege that even if the filed rate doctrine applies generally to the noncontiguous domestic trade, it does not apply to rates that fall within the zone of reasonableness, or "ZOR," 49 U.S.C. § 13701(d)(1), a safe harbor created by Congress which allows carriers to increase their tariff rates up to 7.5% or lower them up to 10% within a twelve-month period. SACC ¶ 105. Plaintiffs apparently reason that because *rate increases* within the ZOR cannot be challenged before the STB, shippers can instead challenge such rates in court. This contention—that courts can review *rates* that Congress has declared are the result of increases that are presumed to be conclusively reasonable—defies logic and would defeat the very purpose of a safe harbor.

---

[12] Plaintiffs' argument that the filed rate doctrine does not apply to commodities excused from tariff-filing is a red herring because Plaintiffs concede that they actually shipped all of their goods pursuant to tariff. SACC ¶ 100 n.5 (acknowledging that Defendants voluntarily filed tariffs for cargo excused from tariff-filing by 49 U.S.C. § 13702(a)).

DEFENDANTS' MOTION TO DISMISS     – 19 –     **GIBSON, DUNN & CRUTCHER LLP**
Case No. 08-md-1972 TSZ     555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA 94105
415.393.8200 FAX: 415.393.8306

As part of its commitment to establish and maintain reasonable rates for transportation (49 U.S.C. § 13101(a)(1)(D)), Congress created a safe harbor within which water carriers may adjust tariff rates without such adjustments being challenged to the STB. *See, e.g., DHX, Inc.*, 501 F.3d at 1082; *GovGuam*, 2007 STB LEXIS 52, at *30-32 (acknowledging that the ZOR was established primarily to protect a water carrier's ability to increase rates within congressionally set limits). Congress did so in order to "give water carriers some degree of certainty as to whether rate changes could be challenged." *GovGuam v. Sea-Land Service, Inc.*, 2001 STB LEXIS 863, at *22 (Nov. 13, 2001). Allowing Plaintiffs to challenge the rate changes within the ZOR, therefore, would disrupt the statutory scheme Congress has created.

Allowing courts to invalidate rates resulting from increases that are within the ZOR would also contravene the very purpose of the filed rate doctrine, which is to prevent courts from acting as rate-makers where there exists a regulatory body with the authority and expertise to set rates. In *Stanislaus v. Pacific Gas & Electric Co.*, 114 F.3d 858 (9th Cir. 1997), for example, the Ninth Circuit acknowledged that courts apply the filed rate doctrine "out of deference to a 'congressional scheme of uniform . . . regulation.'" 114 F.3d at 862 (citing *Arkansas Louisiana Gas Co. v. Hall ("Arkla")*, 453 U.S. 571 (1981)). According to the Ninth Circuit, the filed rate doctrine prevents courts from "'usurp[ing] a function that Congress has assigned to a federal regulatory body.'" *Id.* (citing *Arkla*, 453 U.S. at 582). Thus, allowing shippers to challenge rate changes within the ZOR would allow courts to usurp the rate-making authority of the STB in contravention of the very premise of the filed rate doctrine. *See id.* at 861, 863 (holding that FERC-approved rates were conclusively just and reasonable, and thus not subject to challenge in court).

Plaintiffs incorrectly confuse an ability to challenge the reasonableness of rate increases within the ZOR with the STB's *jurisdiction* over such rates. Although the STB cannot invalidate rate changes within the ZOR, it has jurisdiction over grievances related to such rates. For instance, even though rate increases within the ZOR cannot be challenged, this provision does

DEFENDANTS' MOTION TO DISMISS
Case No. 08-md-1972 TSZ

– 20 –

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA  94105
415.393.8200 FAX: 415.393.8306

not prevent the STB from considering the reasonableness of the base rates. *GovGuam,* 2001 STB LEXIS 863, at \*19-20. The STB also has authority over determinations of whether or not challenged rates fall within the ZOR. *GovGuam*, 2007 STB LEXIS 52, at \*32 (declaring its intention to determine whether tariff rates to and from Guam were within the ZOR by first determining whether the base rates in effect as of September 10, 1996 were reasonable, and then increasing those rates by the ZOR amount each succeeding year). Thus, the ZOR protections do not eliminate the STB's *jurisdiction* over such rates.

Plaintiffs contend that unless courts are found to have jurisdiction over rate increases within the ZOR, they will improperly be left without a remedy. SACC ¶ 106. However, the Ninth Circuit has already rejected that argument, recognizing that while ICCTA eliminated certain remedies once available under the ICA, the unavailability of a remedy from the STB does not give rise to a remedy in court. In *DHX*, the freight forwarder plaintiff filed a complaint with the STB and a civil complaint in federal district court alleging that Horizon and Matson engaged in unreasonable practices by charging it and other freight forwarders higher prices than other customers. 501 F.3d at 1084-85. The district court had dismissed the complaint on the ground that the STB had primary jurisdiction to determine the reasonableness of the rates and practices of water carriers. *Id.* at 1085. As such, "the only relief available to DHX was whatever relief might be available" from the STB. *Id.* The STB also dismissed DHX's complaint, reasoning that under ICCTA, shippers had no cause of action to challenge discriminatory pricing. *Id.* at 1085-86. DHX filed a motion for reconsideration with the STB, arguing that if DHX had no remedy under ICCTA, then there had to be a remedy at common law for such a claim. *Id.* at 1086. However, both the STB and the Ninth Circuit confirmed that DHX did not have a remedy in either venue. *Id.* at 1086, 1093; *see also Wah Chang v. Duke Energy Trading & Marketing, LLC*, 507 F.3d 1222, 1226-27 (9th Cir. 2007) (holding that the unavailability of a separate right of action for damages is irrelevant to the applicability of the filed rate doctrine).

DEFENDANTS' MOTION TO DISMISS
Case No. 08-md-1972 TSZ

– 21 –

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA 94105
415.393.8200 FAX: 415.393.8306

Here, Plaintiffs' argument that they are left without a remedy to challenge rates that they allege are within the ZOR is similarly unavailing. Congress has determined that a *rate increase* within the ZOR is just and reasonable, and that policy decision is not subject to judicial review. If courts were permitted to review ZOR rates, it would render this Congressional safe harbor ineffectual.[13]

## D. The Filed Rate Doctrine Bars Claims Based On Cargo Shipped Pursuant To Matson Tariff No. 14-f

Finally, Plaintiffs allege that the filed rate doctrine does not apply to commodities shipped pursuant to Matson Tariff No. 14-f because (they allege) this tariff did not comply with the STB's tariff filing regulations. SACC ¶¶ 101-104. Specifically, Plaintiffs allege that Matson's Tariff No. 14-f states that one of its governing publications is the National Motor Freight Classification ("NMFC"), even though Matson is not a participant in the National Motor Freight Tariff Association, Inc. ("NMFTA"). SACC ¶¶ 101-102.

Even if the Court takes Plaintiffs' allegation as true,[14] the validity of Matson Tariff No. 14-f is irrelevant to Plaintiffs' ability to pursue their antitrust claims in court. In the absence of a valid tariff, it is the *STB*'s job to determine a reasonable price for the services provided. For example, in *The TJX Companies, Inc., Petition for Declaratory Order – Certain Rates and Practices of Sweeney Transportation, Inc., and Knickerbocker East-West, Inc.*, Doc 41192, 1997

---

[13] Plaintiffs have alleged that all rates that they are challenging fall within the ZOR. (SACC ¶ 6) (alleging that "all of the fuel surcharges and rates that form the basis of Plaintiffs' price-fixing claim" fall within the ZOR). By Plaintiffs' logic, then, the reasonableness of every rate for every shipment between the United States and Hawaii or Guam during the class period is subject to review by this Court. Clearly, that was not Congress' intent when it created the ZOR as a safe harbor for rate changes.

[14] Defendants do not concede the accuracy of or conclusions contained in these allegations. The NMFC does not provide rates; it merely provides classifications for commodities. *See* http://www.nmfta.org/Pages/Nmfc.aspx ("The National Motor Freight Classification (NMFC) is a standard that provides a comparison of commodities moving in interstate, intrastate and foreign commerce. It is similar in concept to the groupings or grading systems that serve many other industries. Commodities are grouped into one of 18 classes—from a low of class 50 to a high of class 500—based on an evaluation of four transportation characteristics: density, stowability, handling and liability. Together, these characteristics establish a commodity's 'transportability.'").

DEFENDANTS' MOTION TO DISMISS
Case No. 08-md-1972 TSZ

– 22 –

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA 94105
415.393.8200 FAX: 415.393.8306

STB LEXIS 317, at *10 (Jan. 6, 1998), the shipper argued that the tariff rate could not be charged because the tariff filed was void pursuant to *Security Services, Inc. v. Kmart Corp.* ("*Kmart*"), 511 U.S. 431 (1994). The STB held that even if the tariff were void, the carrier was entitled to "reasonable" compensation, in an amount to be determined by the STB. *Id.* In a subsequent opinion in that same case, the STB reiterated that even if the rates charged "were not set out in filed tariffs, [that would] not affect our analysis of whether they were reasonable." 2002 STB LEXIS 554, at *30 (Sept. 17, 2002).

Thus, even if a tariff is void, the STB has jurisdiction over the question of what rate should have been paid. Indeed, one of the arguments raised by Kmart in *Security Services* was that Security Services could not collect the tariff rate because that rate was unreasonable. *See Security Servs. v. Kmart Corp.*, 996 F.2d 1516, 1519 n.1 (3d Cir. 1993). The district court declined to address this issue on the ground that the ICC had jurisdiction over the question of rate reasonableness. *Id.* This holding is also consistent with the Ninth Circuit's holding in *Gallo*. In that case, the Court held that the filed rate doctrine applied and preempted the plaintiffs' antitrust claims even where no tariffs were filed at all, but where FERC retained jurisdiction over the reasonableness of market-based rates. 503 F.3d at 1035. This Court has similarly acknowledged that the filed rate doctrine can apply "even when the rates at issue are not actually 'filed.'" Doc #105 at 17.

Thus, even accepting Plaintiffs' allegations concerning the validity of Matson Tariff No. 14-f as true, the STB would still have jurisdiction to determine whether the rate charged for shipments under that tariff was reasonable and the filed rate doctrine accordingly bars Plaintiffs' antitrust claims based on those rates.

DEFENDANTS' MOTION TO DISMISS
Case No. 08-md-1972 TSZ

– 23 –

**GIBSON, DUNN & CRUTCHER LLP**
555 MISSION ST, SUITE 3000
SAN FRANCISCO, CA 94105
415.393.8200 FAX: 415.393.8306

# V.    CONCLUSION

For the foregoing reasons, the SACC should be dismissed with prejudice.

DATED: July 12, 2010                    GIBSON, DUNN & CRUTCHER LLP

By_____s/Joel S. Sanders_____

Joel S. Sanders
Rachel S. Brass
Rebecca Justice Lazarus
GIBSON, DUNN & CRUTCHER LLP

*Attorneys for Defendants Matson Navigation
Company, Inc. and Alexander & Baldwin, Inc.*

DATED: July 12, 2010                    McGUIREWOODS LLP

By_____s/Richard J. Rappaport_____

Richard J. Rappaport
Amy B. Manning
Tammy L. Adkins
McGUIREWOODS LLP


James B. Stoetzer
Larry S. Gangnes
LANE POWELL PC

*Attorneys for Defendants Horizon Lines, Inc.,
Horizon Lines LLC and Horizon Lines Holding
Corp.*