1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE HAWAIIAN & GUAMANIAN
CABOTAGE ANTITRUST LITIGATION

No. 08-md-1972 TSZ

This Document Relates to:
ALL CASES

ORDER NO. 6: Dismissal
With Prejudice

THIS MATTER comes before the Court on defendants' joint motion, docket no. 125, and defendant Alexander & Baldwin, Inc.'s separate motion, docket no. 124, to dismiss the Second Amended Consolidated Class Action Complaint, docket no. 119 (the "Amended Complaint"), pursuant to Rule 12(b)(6). Having reviewed all papers filed in support of and in opposition to the motion,[1] the Court now enters the following Order.

///

///

///

---

[1] As they did in connection with their earlier Rule 12(b)(6) motions, defendants have suggested that the Court take judicial notice of their publicly-filed fuel surcharge tariffs. *See* Order No. 5 at 21 n.9 (docket no. 105); Request for Judicial Notice (docket no. 133). Defendants have also asked that the Court take judicial notice of a Form 10-K filed with the Securities and Exchange Commission by CSX Corporation. The Court declines to take judicial notice of these materials, which are outside the pleadings and, at least with regard to the Form 10-K, might require explanations that are subject to reasonable dispute. *See* Fed. R. Civ. P. 12(d); Fed. R. Evid. 201(b).

ORDER NO. 6                                                    -1-

## Background

Plaintiffs initially made the assertions of anticompetitive activities now at issue in separate cases filed in different districts. A number of these cases were transferred to this Court by the Multidistrict Litigation ("MDL") Panel, pursuant to 28 U.S.C. § 1407, and were consolidated for pretrial purposes with cases originally filed in this district. Pursuant to the agreement of the parties, plaintiffs were permitted to file a Consolidated Class Action Complaint ("Consolidated Complaint"). In August 2009, the Court granted defendants' joint motion to dismiss the Consolidated Complaint. Order No. 5 (docket no. 105). The dismissal was without prejudice and was based on two alternative grounds: (i) failure to adequately plead an antitrust claim under the standards set forth in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and its progeny; and (ii) failure to allege an antitrust claim that is not barred by the filed rate doctrine, as articulated in *Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156 (1922), and subsequent cases.[2] Although the filed rate doctrine would preclude plaintiffs' antitrust claim even if sufficiently pleaded under *Twombly*, plaintiffs were given leave to amend in light of their contention that certain types of cargo, namely "bulk cargo" and "forest products," are statutorily excluded from tariff-filing requirements. *See* Order No. 5 at 22. After three extensions of time, spanning almost nine months, *see* Minute Order No. 8 (docket no. 118), plaintiffs filed the Amended Complaint now at issue.

The Amended Complaint incorporates most of the allegations set forth in the earlier Consolidated Complaint. Like the Consolidated Complaint, the Amended Complaint

---

[2] The filed rate doctrine precludes monetary relief for antitrust and similar claims relating to tariffs or schedules filed with a federal regulatory agency. *Keogh*, 260 U.S. at 161-65; *see also Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409 (1986); *Wah Chang v. Duke Energy Trading & Mktg., LLC*, 507 F.3d 1222 (9th Cir. 2007). The filed rate doctrine also applies when rates are within the jurisdiction granted by Congress to a regulatory agency even if the rates are not actually "filed" or are not "rates" per se. *E.&J. Gallo Winery v. Encana Corp.*, 503 F.3d 1027 (9th Cir. 2007) (holding that claims involving rates within the Federal Energy Regulatory Commission's jurisdiction were barred by the filed rate doctrine even though such rates were not "filed" and were regulated with only "a light hand"); *County of Stanislaus v. Pac. Gas & Elec. Co.*, 114 F.3d 858 (9th Cir. 1997) (concluding that the filed rate doctrine foreclosed "any challenge to importation volumes" of natural gas).

identifies various plaintiffs as purchasers of shipping services between the continental United States and Hawaii, Guam, or both,[3] and alleges that defendants,[4] providers of such shipping services, violated the Sherman Act,[5] by colluding to simultaneously increase fuel surcharges, by sharing vessel capacity, and by conspiring not to enter into extra-tariff rate agreements with customers.  Amended Complaint at ¶ 5.  In addition, the Amended Complaint asserts that defendants violated the Sherman Act by "allocating customers."  *Id.*; *see also id.* at ¶¶ 80-81.

In the Amended Complaint, as in the earlier Consolidated Complaint, plaintiffs have artfully avoided directly alleging that the noncontiguous domestic trade is regulated in a manner rendering the filed rate doctrine applicable.  *See* Order No. 5 at 20; *compare* Amended Complaint at ¶ 100 (indicating that defendants are "permitted" to file tariffs, citing 49 U.S.C. § 13101, which sets forth the transportation policies of the United States, but which contains no provision concerning the filing of tariffs).  The Amended Complaint, however, refers indirectly in three ways to the statutory requirement that defendants file their rates with the Surface Transportation Board ("STB").  First, the Amended Complaint pleads

---

[3] The Amended Complaint describes the class period as between October 11, 1999, and "at least" April 19, 2008.  Amended Complaint at ¶ 1.  The Consolidated Complaint defined a slightly longer class period, namely between October 11, 1999, and May 31, 2008.  Consolidated Complaint at ¶ 5 (docket no. 69).

[4] Defendant Matson Navigation Company, Inc. is a wholly-owned subsidiary of defendant Alexander & Baldwin, Inc.  Amended Complaint at ¶ 24.  Both of these defendants are Hawaii corporations.  *Id.* at ¶¶ 24 & 25.  Defendants Horizon Lines, LLC (formerly known as CSX Lines, LLC, successor to Sea-Land Corp., which acquired assets from United States Lines), Horizon Lines Holding Co., and Horizon Lines, Inc. are affiliated companies, each incorporated in Delaware.  *Id.* at ¶¶ 27-29 & 57.

[5] The Consolidated Complaint referenced only Section 1 of the Sherman Act, which provides in relevant part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  The Amended Complaint also cites Section 3 of the Sherman Act, which criminalizes restraints of trade or commerce "in any Territory of the United States" or "between any such Territory and another, or between any such Territory or Territories and any State or States or the District of Columbia, or with foreign nations."  15 U.S.C. § 3.

that six of the original 25 plaintiffs[6] shipped "bulk cargo" or "forest products," which are exempt from tariff requirements. _See_ Amended Complaint at ¶¶ 13, 15, 17, 18, 20, & 23; _see also_ 49 U.S.C. § 13702(a)(1).[7] Second, the Amended Complaint alleges that defendant Matson Navigation Company, Inc. ("Matson") has filed at least one tariff that does not comport with the applicable regulations, pursuant to which at least one plaintiff shipped products during the class period. Amended Complaint at ¶¶ 101-104. Third, the Amended Complaint asserts that defendants have colluded not to use extra-tariff written agreements with their customers, as permitted by 49 U.S.C. § 14101(b).[8] _See_ Amended Complaint at ¶¶ 82-84. Thus, the Amended Complaint squarely places the filed rate doctrine at issue, and the Court will first address whether plaintiffs' antitrust claims, even if adequately pleaded, are precluded under _Keogh_ and its progeny. Because the Court concludes that the filed rate doctrine forecloses plaintiffs' antitrust claims, the Court declines to further evaluate whether plaintiffs have satisfied the pleading standards of _Twombly_.

---

[6] The antitrust claims being made in this litigation were initially asserted in eight different cases filed in this district and nineteen separate cases transferred to this Court by the MDL Panel. _See_ Order No. 3 (docket no. 38). Two of the transferred cases involved the same plaintiff, and one of the transferred cases was voluntarily dismissed. Of the remaining 25 plaintiffs, only eleven were specifically identified in the Consolidated Complaint, and those same eleven are described in the Amended Complaint.

[7] Plaintiffs cite this statutory provision several times in the Amended Complaint. It mandates that "a carrier . . . may provide transportation . . . in noncontiguous domestic trade, except with regard to bulk cargo, forest products, recycled metal scrap, waste paper, and paper waste . . . _only if_ the rate for such transportation . . . is contained in a tariff that is in effect under this section." 49 U.S.C. § 13702(a)(1) (emphasis added). The statute further prohibits a carrier from charging or receiving "a different compensation for the transportation . . . than the rate specified in the tariff, whether by returning a part of that rate to a person, giving a person a privilege, allowing the use of a facility that affects the value of that transportation . . . , or another device." _Id._

[8] As indicated in Order No. 5, the rate charged by a carrier operating in the noncontiguous domestic trade must be "reasonable," and the STB has jurisdiction over any claim that (i) "a rate, classification, rule, or practice," or (ii) "a rate or related rule or practice maintained in a tariff" is unreasonable. Order No. 5 at 20; _see_ 49 U.S.C. §§ 13701(a)&(c) and 13702(b)(6). Except as to the movement of household goods, this reasonableness requirement may be expressly waived in a written contract, between a carrier and a shipper, regarding the provision of "specified services under specified rates and conditions." 49 U.S.C. § 14101(b)(1). The exclusive remedy for breach of such contract is an action in an appropriate court, unless the parties otherwise agree. 49 U.S.C. § 14101(b)(2).

## Discussion

A complaint can be lacking for one of two reasons: (i) absence of a cognizable legal theory, or (ii) insufficient facts under a cognizable legal claim. _Robertson v. Dean Witter Reynolds, Inc._, 749 F.2d 530, 534 (9th Cir. 1984). In moving under Rule 12(b)(6), defendants present both potential grounds for dismissal, but the Court addresses only the first contention.[9] In ruling on defendants' motion, the Court must assume the truth of the allegations in the Amended Complaint and draw all reasonable inferences in plaintiffs' favor. _See_, _e.g._, _Usher v. City of Los Angeles_, 828 F.2d 556, 561 (9th Cir. 1987). The question for the Court is whether the "non-conclusory 'factual content,' and reasonable inferences from that content" are "plausibly suggestive of a claim entitling the plaintiff[s] to relief." _Moss v. U.S. Secret Serv._, 572 F.3d 962, 969 (9th Cir. 2009).

In their opposition to defendants' joint motion to dismiss, plaintiffs present five reasons for why the filed rate doctrine should not be applied in this case: (i) the STB does not engage in meaningful review of filed tariffs; (ii) rates falling within the "zone of reasonableness" are not subject to review by the STB; (iii) antitrust remedies are available under the "savings clause" of the Interstate Commerce Commission Termination Act of 1995; (iv) at least one of Matson's filed tariffs is defective; and (v) certain cargo is exempt from tariff-filing requirements. These arguments essentially revisit, with some modifications

---

[9] At least one court has refused to dismiss an antitrust and unfair practices complaint pursuant to the filed rate doctrine because the plaintiffs did not explicitly plead that the defendants had filed their rates with the relevant regulatory body. _Rivera-Muñiz v. Horizon Lines Inc._, -- F. Supp. 2d --, 2010 WL 3604173 at *5 (D.P.R.). The _Rivera-Muñiz_ Court reasoned that, because it is an affirmative defense, the filed rate doctrine does not constitute a basis for dismissal unless the defense is apparent from the face of the complaint. _Id._ The decision in _Rivera-Muñiz_ was issued after plaintiffs in this case filed their response to defendants' Rule 12(b)(6) motion, and the opinion has not been cited by the parties. Nevertheless, the Court has considered the case and concludes that it is distinguishable. In the Amended Complaint, plaintiffs have indicated, "[o]n information and belief, Defendants filed tariffs that were not required in order to signal each other and communicate with each other regarding prices for particular customers." Amended Complaint at n.5 (docket no. 119 at 30). Thus, unlike in _Rivera-Muñiz_, in this case, not only have plaintiffs repeatedly referenced the statutory provisions mandating the filing of tariffs, they have expressly alleged that defendants in fact filed tariffs.

and based on additional factual allegations, the contentions plaintiffs made before Order No. 5 was issued, and the Court finds them equally unavailing.

### A. <u>Meaningful Review</u>

Plaintiffs repeat their earlier assertion that the STB does not engage in the level of tariff review that warrants application of the filed rate doctrine, citing the same cases previously distinguished by the Court. <u>See</u> Response at 13-14 (docket no. 128 at 19-20) (citing <u>Brown v. Ticor Title Ins. Co.</u>, 982 F.2d 386 (9th Cir. 1992), and <u>Wileman Bros. & Elliott, Inc. v. Giannini</u>, 909 F.2d 332 (9th Cir. 1990)); <u>see also</u> Order No. 5 at 26 n.11. For the reasons stated in Order No. 5, plaintiffs' argument lacks merit, and the Court reiterates its previous ruling that the filed rate doctrine controls. Moreover, since the issuance of Order No. 5 in August 2009, several cases have examined the contours of the filed rate doctrine, and they strongly support the Court's prior decision. <u>See In re Title Ins. Antitrust Cases</u>, 702 F. Supp. 2d 840, 852-55 (N.D. Ohio 2010); <u>Carlin v. Dairy Am., Inc.</u>, 690 F. Supp. 2d 1128, 1136-37 (E.D. Cal. 2010) (citing <u>In re Pa. Title Ins. Antitrust Litig.</u>, 648 F. Supp. 2d 663, 674-75 (E.D. Pa. 2009) ("as long as the regulatory scheme requires the filing of rates with a government agency that has legal authority to review those rates, the filed rate doctrine applies regardless of the actual degree of agency review of those filed rates")); <u>In re N.J. Title Ins. Litig.</u>, 2009 WL 3233529 at *2 (D.N.J.) ("application of the filed rate doctrine does not depend upon meaningful agency review of filed rates" (citing <u>Square D</u>, 476 U.S. at 417 n.19)).

Indeed, in <u>In re Title Ins.</u>, after distinguishing both <u>Brown</u> and <u>Wileman</u>, the court criticized <u>Brown</u> as offering "no meaningful discussion" of the regulatory schemes at issue and being "nearly devoid of analysis," and it characterized <u>Brown</u> as "an outlier case." 702 F. Supp. 2d at 853-55; <u>see also</u> Order No. 5 at 26 n.11 (citing <u>McCray v. Fidelity Nat'l Title Ins. Co.</u>, 636 F. Supp. 2d 322, 329 (D. Del. 2009) ("Other than the Ninth Circuit in <u>Brown</u>, no other court has taken such a narrow view of the applicability of the filed rate doctrine.")).

The *In re Title Ins.* court went on to hold that a rate need not "undergo a certain 'meaningful'
level of scrutiny to fall within the gambit of the filed rate doctrine." 702 F. Supp. 2d at 855.
In reaching this decision, the court in *In re Title Ins.* observed that the filed rate doctrine is
premised on two companion principles: "first, that legislative bodies design agencies for the
specific purpose of setting uniform rates, and second, that courts are not institutionally well
suited to engage in retroactive rate setting." *Id.* at 849 (quoting *Wegoland Ltd. v. NYNEX
Corp.*, 27 F.3d 17, 19 (2d Cir. 1994)). It further concluded that, for the same reasons courts
should avoid ascertaining whether rates are reasonable, courts are ill-equipped to make "*ex
post* inquiries as to whether or not an agency's review of a particular rate was 'meaningful.'"
*Id.* at 855.

Similarly, in *Carlin*, the court held that the plaintiffs' various state law claims[10] were
precluded by the filed rate doctrine. The *Carlin* court distinguished earlier cases in which the
filed rate doctrine was deemed inapplicable, identifying as the "common theme" of those
cases "the existence of some feature of the regulatory system itself that prevent[ed] review of
those rates." 690 F. Supp. 2d at 1136. As an example, the *Carlin* court cited *Brown*, in
which the regulatory regime did not provide for "affirmative governmental approval."
*Brown*, 982 F.2d at 393. In contrast, in *Carlin*, pursuant to the broad powers granted under
the legislative scheme, the United States Department of Agriculture ("USDA") issued
Federal Milk Marketing Orders ("FMMOs") that contained mathematical methods for
determining minimum prices for milk and milk products. 690 F. Supp. 2d at 1130-31. After
discovering the misreporting of certain wholesale prices,[11] the USDA disapproved of the

---

[10] All of the plaintiffs' claims in *Carlin* were under California common law (negligent misrepresentation,
interference with prospective economic advantage, and unjust enrichment) or statute (Unfair Business
Practices Law). 690 F. Supp. 2d at 1131.

[11] During the time period at issue in *Carlin*, the defendants had improperly reported wholesale prices for
nonfat dry milk ("NFDM") based on forward contracts. 690 F. Supp. 2d at 1130-31. A forward contract
establishes a selling price more than 30 days before the transaction. During the period at issue in *Carlin*, *i.e.*,

minimum prices computed pursuant to FMMOs between April 2006 and April 2007, and issued corrected prices for this period that were about two cents per pound higher.[12] *Id.* at 1138-39.

In concluding that the filed rate doctrine applied even though the USDA did not engage in antecedent review of minimum prices or the information on which they were based, the *Carlin* court was guided by the "animating purposes" of the filed rate doctrine, namely (i) to avoid discrimination in rates between ratepayers (nondiscrimination), and (ii) to preserve the exclusive role of agencies in approving rates (nonjusticiability). *Id.* at 1135 (quoting *Blaylock v. First Am. Title Ins. Co.*, 504 F. Supp. 1091, 1102 (W.D. Wash. 2007)).[13] The *Carlin* court observed that the nondiscrimination and nonjusticiability concerns underlying the filed rate doctrine were consistent with the legislative goals of achieving parity pay for dairy farmers, as well as reasonable prices for consumers, and with Congress's authority to allocate jurisdiction over commodity pricing away from the courts and with a federal agency. *Id.* at 1135.

In addition, the *Carlin* court rejected the plaintiffs' contention that "meaningful review" of rates did not occur because the USDA lacked authority to audit the data submitted by the defendants. *Id.* at 1137. The plaintiffs made no allegation that any of the defendants'

_____

January 1, 2002, to April 30, 2007, the prices reflected in forward contracts were generally lower than "spot prices," which were contained in contracts executed at or near the time of the transaction. *Id.* at 1129-30, 1131.

[12] Although the USDA invalidated the minimum prices for the period from April 2006 to April 2007, such disapproval did not operate retroactively, and the *Carlin* court ruled that it lacked authority to void the rates in effect prior to April 2006. 690 F. Supp. 2d at 1140.

[13] *Accord Dolan v. Fidelity Nat'l Title Ins. Co.*, 365 Fed. Appx. 271, 273 (2d Cir. 2010) (indicating that the filed rate doctrine "is applied strictly to prevent a plaintiff from bringing a cause of action even in the face of apparent inequities whenever either the nondiscrimination strand or the nonjusticiability strand underlying the doctrine is implicated by the cause of action the plaintiff seeks to pursue"); *see In re Title Ins.*, 702 F. Supp. 2d at 849-50; *see also Woodhams v. Allstate Fire & Cas. Co.*, -- F. Supp. 2d --, 2010 WL 3858440 (S.D.N.Y.); *Winn v. Alamo Title Ins. Co.*, 2010 WL 2102332 (W.D. Tex.); *Schilke v. Wachovia Mortgage, FSB*, 705 F. Supp. 2d 932 (N.D. Ill. 2010); *Roussin v. AARP, Inc.*, 664 F. Supp. 2d 412, 415-19 & 417 n.4 (S.D.N.Y. 2009) (applying New York law), *aff'd*, 379 Fed. Appx. 30 (2d Cir. 2010).

pricing inputs were outside the USDA's jurisdiction, *id.* at 1138 (distinguishing *Gallo*, 503 F.3d at 1045-48 (discussed in Order No. 5 at 17-20)), and they offered no support for the proposition that an agency cannot conduct "meaningful review" unless it has the authority to audit, *id.* at 1137. Finally, as the *Carlin* court recognized, the plaintiffs' monetary damages could be ascertained only by adjusting the rates indirectly set by the USDA via the governing FMMOs, which was "precisely what the filed rate doctrine forbids." *Id.* at 1136; *accord In re Title Ins.*, 702 F. Supp. 2d at 851 ("The only way to quantify [the plaintiffs'] harm would require this Court . . . to make a determination of 'what the rate would have been.' This quantification is the very relief the filed rate doctrine *expressly forbids*." (emphasis in original)).

Both *In re Title Ins.* and *Carlin* are consistent with the Court's earlier analysis of the filed rate doctrine. Although plaintiffs, in their Amended Complaint, allege that the STB does not actually review or approve cabotage rates, *see* Amended Complaint at ¶¶ 107, 108, & 110, plaintiffs still do not, nor can they, assert that the STB lacks authority to review the fuel surcharges at issue. *See* Order No. 5 at n.11; *see also* 49 U.S.C. §§ 13701(c) & 13702(b)(6). In addition, plaintiffs cite no authority that calls into question the Court's previous rejection of their "no meaningful review" theory or the reasoning of *In re Pa. Title Ins.*, on which the Court relied, and plaintiffs fail to even discuss, let alone distinguish, *In re Title Ins.* or *Carlin*. The Court HOLDS that the STB's jurisdiction over noncontiguous domestic trade rates is itself sufficient to trigger the filed rate doctrine, even assuming that the STB does not engage in antecedent review or post-filing approval of tariffs, and that both the reasonableness of rates and the meaningfulness of rate review are beyond this Court's purview.[14]

---

[14] Plaintiffs' "meaningful review" argument essentially challenges the STB's inaction with respect to steadily increasing fuel surcharges. Plaintiffs, however, are not pursuing an action in the nature of mandamus pursuant to 28 U.S.C. § 1361, nor could they, because review of cabotage rates does not constitute the type of "plainly defined and peremptory duty" of an agency for which such remedy is available. *See, e.g.*, *Starke County Farm Bureau Coop. Ass'n v. Interstate Commerce Comm'n*, 839 F. Supp. 1329, 1334 (N.D. Ind.

**B.    Zone of Reasonableness**

Plaintiffs present their "lack of meaningful review" contention in yet another way. They assert that the filed rate doctrine should be disregarded because the STB has "no legal authority" to review the reasonableness of rates falling within a certain range of values, which are measured against the rates in effect during the previous year. This range is statutorily defined and is denominated as the "zone of reasonableness." *See* 49 U.S.C. § 13701(d).[15]  Plaintiffs' argument proves too much. The Court is in no better position than the STB to countermand the methodology Congress has prescribed for assessing whether rate increases or decreases are reasonable. Plaintiffs cannot obtain via an antitrust claim a remedy that is allegedly precluded by statute, namely an adjustment to rates that are within the zone of reasonableness.

Plaintiffs' position, however, is also inconsistent with a fair reading of the statutory language. In a provision separate from the one defining the zone of reasonableness, Congress has dictated that the STB "*shall* prescribe the rate . . . to be applied" whenever "necessary to stop or prevent a violation of subsection (a)," which requires that noncontiguous domestic water trade rates be reasonable. 49 U.S.C. § 13701(b) (emphasis added). To interpret the zone of reasonableness definition in the manner that plaintiffs

1993). Instead, plaintiffs' only avenue of recourse is to initiate a proceeding before the STB, any appeal from which would lie exclusively with the Court of Appeals. 28 U.S.C. §§ 2321(a) & 2342(5). By attempting to confer on this Court the authority to second guess the STB's rate determination, whether affirmatively or acquiescently made, plaintiffs' "meaningful review" theory runs contrary to the express restraints Congress has placed on this Court with respect to the STB.

[15] The zone of reasonableness is described as follows: "a rate or division of a motor carrier for service in noncontiguous domestic trade or water carrier for port-to-port service in that trade is reasonable if the aggregate of increases and decreases in any such rate or division is not more than 7.5 percent above, or more than 10 percent below, the rate or division in effect 1 year before the effective date of the proposed rate or division." 49 U.S.C. § 13701(d)(1). The percentages set forth in § 13701(d)(1) are adjusted by "the percentage change in the Producers Price Index, as published by the Department of Labor, that has occurred during the most recent 1-year period before the date the rate or division in question first took effect." 49 U.S.C. § 13701(d)(2).

suggest, *i.e.*, as precluding the STB from evaluating the reasonableness of the prior rate against which the proposed rate is being measured, would render § 13701(b) superfluous. *Cf. Greenwood v. CompuCredit Corp.*, 615 F.3d 1204, 1209 (9th Cir. 2010) (courts "must, if possible, interpret a statute such that all its language is given effect, and none of it is rendered superfluous").

Plaintiffs offer no support for their proposition that Congress intended to "*deprive*" the STB of the authority to set rates, *see* Response at 17 (docket no. 128 at 23) (emphasis in original), and they fail to explain how such nugatory purpose could be derived from the tenor of § 13701(b), which both grants power to the STB and compels its exercise. Instead, the section defining the zone of reasonableness must be construed as guiding the STB's analysis of proposed rates, but not as hindering in any way its ability to evaluate whether the prior rates against which prospective rates are measured were themselves reasonable. *See Guam v. Sea-Land Serv., Inc.*, 2007 WL 295310 at *10 (STB) (The zone of reasonableness or ZOR "provides a safe harbor for rate changes. Under the ZOR, a rate increase is deemed reasonable if the amount by which it exceeds the prior year's rate is within the ZOR. But the language and legislative history of the ZOR indicate that the provision was intended to apply only to 'base rates' that themselves are at reasonable levels. Thus, a party may challenge the base rate to which the ZOR is applied."), *reconsideration denied*, 2007 WL 2457445 (STB). Given this interpretation of the statute, the zone of reasonableness provision offers no basis for ignoring the filed rate doctrine.

## C.   Savings Clause

In addition to repeating their "meaningful review" theory (in two different ways), plaintiffs have recast their previously rejected contention that, in passing the Interstate Commerce Commission Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (1995) (the "ICCTA"), Congress nullified the filed rate doctrine. *See* Order No. 5 at 23-24. Plaintiffs now assert that the "savings clause" of the ICCTA, which states that "the remedies

provided under this part are in addition to remedies existing under another law or common law," 49 U.S.C. § 13103, renders the filed rate doctrine obsolete.  Plaintiffs' argument is flatly contradicted by the history of § 13103.

When the ICCTA was enacted in 1995, the "savings clause" was not some new provision from which a legislative intent to unravel the filed rate doctrine might be inferred. Instead, the "savings clause" predated the ICCTA by over one hundred years, having been incorporated into the Interstate Commerce Act ("ICA") by an amendment passed in 1889. *See* 49 U.S.C. § 10103 (1994) (repealed 1995) ("the remedies provided under this subtitle are in addition to remedies existing under another law or at common law"); S. Rep. No. 104-176 at 41, *as reprinted in* 1995 WL 701522 ("New 49 U.S.C. 13103 . . . would import the existing provisions of 49 U.S.C. 10103, so as to preserve the current relationship between those remedies provided for in the ICA and other remedies that may be available."); *see also* Act of Mar. 2, 1889, ch. 382, 25 Stat. 855, 862 (1889) (initially codified as 49 U.S.C. § 22, and subsequently amended and recodified as 49 U.S.C. § 10103) ("nothing in this act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies").  The "savings clause" existed when the Supreme Court decided both *Keogh* and *Square D*, and it therefore constitutes no ground for asserting that Congress, in crafting the ICCTA, meant to override these Supreme Court precedents.

Plaintiffs' reliance on *Fulfillment Servs. Inc. v. United Parcel Serv., Inc.*, 528 F.3d 614 (9th Cir. 2008), is similarly misleading.  In *Fulfillment Servs.*, the plaintiff alleged that the defendant, United Parcel Service ("UPS"), a motor carrier engaged in the interstate transportation of goods, violated a provision of the Motor Carrier Act, namely 49 U.S.C. § 13703(f), which required it to participate in any "publication" governing its rates or classifications.  528 F.3d at 617.  In 1988, while UPS was still participating in the National Motor Freight Classification ("NMFC"), the type of publication referenced in § 13703(f),

UPS introduced its "Hundredweight Service," pursuant to which shippers would receive lower rates if they sent multiple packages to the same location on the same day. *Id.* at 617. Under the NMFC, commodities are classified within a range of 50 to 500, according primarily to density, with the most dense items having the lowest numbers. For example, books might qualify as Class 50, while ping pong balls would be assigned to Class 500. UPS restricted its Hundredweight Service to goods falling within Classes 50 to 125. In October 2000, UPS ceased participating in the NMFC, but continued to refer to the NMFC in its Hundredweight Service tariffs until mid-2004. *Id.* For this reason, the plaintiff challenged the validity of UPS's tariffs and sought either disgorgement or a penalty similar to what the Interstate Commerce Commission could have imposed prior to the ICCTA.[16] *Id.* at 619, 621.

In *Fulfillment Servs.*, the Ninth Circuit reiterated its previous rulings that the Motor Carrier Act authorizes private actions for violations of its provisions and attendant regulations. *Id.* at 620 (citing 49 U.S.C. § 14704(a)(2) ("A carrier . . . is liable for damages sustained by a person as a result of an act or omission of that carrier . . . in violation of this part.")). To state a claim under the Motor Carrier Act, however, a plaintiff is required to allege damages, which the plaintiff in *Fulfillment Servs.* failed to do, as disgorgement and penalties do not qualify as damages. *Id.* at 621-22. In an attempt to salvage its claim under § 14704(a)(2), the plaintiff pointed to the "savings clause" codified in 49 U.S.C. § 13103. The Ninth Circuit rejected the plaintiff's argument, observing that "the plain language of § 14704(a)(2) requires a plaintiff [to] allege damages, regardless of whether other remedies may also be available under § 13103." *Id.* at 621. The Ninth Circuit further noted that § 13103 does not authorize equitable remedies (like disgorgement), and it explained that the "savings clause" did nothing more than preserve preexisting causes of action and remedies to the extent that they "do not conflict with the Act." *Id.* at 622.

---

[16] The ICCTA abolished the Interstate Commerce Commission and transferred the responsibility for enforcing the Motor Carrier Act to the STB. *See* 528 F.3d at 616-17.

Plaintiffs' suggestion that the Ninth Circuit "views the savings clause . . . as having considerable efficacy," Response at 22 (docket no. 128 at 28), simply ignores the very decision plaintiffs have cited. In *Fulfillment Servs.*, the Ninth Circuit explicitly limited the "savings clause," refusing to interpret it as creating any remedies or as expanding the remedies specified by statute. 528 F.3d at 622. Moreover, even if *Fulfillment Servs.*, which did not involve either an antitrust claim or the filed rate doctrine, could be interpreted in the manner plaintiffs propose, *i.e.*, as allowing antitrust remedies that are not inconsistent with the statutory scheme, the opinion would be of no avail to plaintiffs because the monetary damages they seek are in direct conflict with the legislative grant to the STB of jurisdiction over cabotage rates. Plaintiffs' "savings clause" argument lacks merit.

### D. <u>Defective Tariff</u>

In its previous Order, the Court rejected plaintiffs' suggestion that, before the filed rate doctrine can be employed, defendants must prove that they properly filed their rates. Order No. 5 at 21-22. The Court instead viewed plaintiffs as having the burden to at least allege that defendants did not maintain valid tariffs. Plaintiffs, however, did not plead such facts in their Consolidated Complaint.

In the Amended Complaint, plaintiffs identify only one tariff that is allegedly defective, namely Matson's Tariff No. 14-F (aka STB MATS 034), Rule 100 of which lists the NMFC as a "governing publication" even though Matson does not participate in the NMFC. Amended Complaint at ¶¶ 101 & 102; *see Fulfillment Servs.*, 528 F.3d at 617 (describing the NMFC). In asserting that this deficiency in Tariff No. 14-F renders the filed rate doctrine inapplicable, plaintiffs cite no authority for the proposition that an imperfection in one tariff filed by one defendant can be imputed to other tariffs or other defendants. In addition, plaintiffs offer no support for the contention that this Court, as opposed to the STB, is the appropriate forum for determining the rate that should have been charged in the absence of the alleged defect.

Instead, plaintiffs again overstate the holding of *Sec. Servs., Inc. v. Kmart Corp.*, 511 U.S. 431 (1994). *See* Order No. 5 at 21-22. As noted in Order No. 5, the *Kmart* case did not involve a carrier's reliance on an improperly filed rate to assert the *Keogh* doctrine as a shield or defense to an antitrust claim. *See id.* at 21. Rather, in *Kmart*, the plaintiff motor carrier attempted to invoke the filed rate doctrine as a sword. The plaintiff had, for approximately three years, transported goods for Kmart Corporation ("Kmart"), pursuant to a contract executed in 1986. In 1989, the motor carrier filed a Chapter 11 bankruptcy petition. 511 U.S. at 434. As debtor-in-possession, the plaintiff billed Kmart for undercharges calculated as the difference between the contract rate and a higher tariff rate that was allegedly on file with the Interstate Commerce Commission. Kmart refused to pay and the plaintiff instituted suit. The *Kmart* Court held that the motor carrier's filed tariff was void and that, as a result, the plaintiff could not collect the undercharges.

As the Supreme Court noted in *Kmart*, this type of dispute is common. After Congress passed the Motor Carrier Act in 1980, many carriers responded to competitive pressures by ignoring their filed rates and negotiating lower prices with shippers. *Id.* at 437-38. As some of these carriers went bankrupt, the trustees or debtors-in-possession attempted to recover for the previous undercharges. In response, the Interstate Commerce Commission adopted a policy that deemed unreasonable the practice of negotiating a rate, failing to publish it, billing it (sometimes repeatedly), and then demanding additional payment at a higher rate. The Supreme Court struck down this policy, reasoning that it permitted the very price discrimination that the filed rate scheme was designed to prevent. *See Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 130 (1990), *superseded in part by statute*, Negotiated Rates Act of 1993, Pub. L. No. 103-180, 107 Stat. 2044.

Referring to *Keogh*, *Square D*, and their progeny, the *Maislin* Court observed that a carrier's duties to file rates and then to charge only those rates have "always been considered essential to preventing price discrimination and stabilizing rates." 497 U.S. at 126. As a

result, a rigid approach has developed, pursuant to which equitable defenses to the collection of a filed rate, including "[i]gnorance or misquotation" of the rate, are not recognized. *Id.* at 127 (quoting *Louisville & Nashville R.R. Co. v. Maxwell*, 237 U.S. 94, 97 (1915)). In this manner, carriers are discouraged from intentionally making "errors" or "mistakes" concerning rates as a method of offering rebates or discounts to favored shippers. *Id.* at 127-28. The only exception to the rule that shippers must pay the filed rate is when the tariff is not enforceable because, for example, the regulatory agency has deemed it unreasonable. *Id.* at 128. In *Maislin*, however, the filed rates were not themselves questioned; rather, the practice of negotiating a lower rate and then seeking to collect the higher tariff was challenged. *Id.* at 129. The Supreme Court rejected this objection and held that strict adherence to the filed rate doctrine was required.

In contrast to *Maislin*, in *Kmart*, the shipper contested the enforceability of the carrier's tariff, albeit on the basis of a deficiency and not on any unreasonableness in the rates. Unlike in other cases, however, in which the shipper identified a mere "technical defect" in the tariff, in *Kmart*, the described blemish was not "independently remediable," but rather resulted in "an incomplete tariff insufficient to support a reliable calculation of charges." 511 U.S. at 442-43. In the case now before the Court, the parties disagree as to whether Matson's reference to the NMFC, absent the requisite participation, renders Tariff No. 14-F void, as opposed to technically defective. Plaintiffs cite *Zurek Express, Inc. v. Intermetro Indus. Corp.*, 1995 WL 319931 (ICC), for the proposition that nonparticipation in the NMFC invalidates Tariff No. 14-F.[17] Defendants counter that the NMFC does not itself

---

[17] In *Zurek Express*, the bankrupt carrier sought to recover for undercharges, calculated with reference to the "NMF 100 Series" tariff, for a period of time during which the carrier did not participate in the tariff. 1995 WL at 319931 at *3. The now defunct Interstate Commerce Commission observed that "[i]f a tariff does not apply to the transportation under consideration, then the undercharges a carrier seeks to collect by virtue of that tariff have no legal basis." *Id.* at *5. Citing *Kmart*, the Commission denied the carrier's claim for undercharges relating to the period predating its participation in the NMF 100 Series tariff. *Id.* at *6. Whether *Zurek Express* supports plaintiffs' assertion about the effect of Matson's nonparticipation in the NMFC remains unclear because plaintiffs have not explained how the NMFC and the NMF 100 Series tariff compare.

specify any rates; it merely classifies commodities based on density and other transportability characteristics.

With regard to defendants' invocation of the filed rate doctrine as a defense, whether nonparticipation in the NMFC constitutes a fatal flaw in Tariff No. 14-F is irrelevant. Unlike the shippers and carriers in _Kmart_ and _Zurek Express_, in this case, plaintiffs have paid, and defendants have received, the actually filed rates, which have not been declared unreasonable or otherwise invalid by the STB.[18] The claim at issue here is not one by defendants to recover undercharges, but rather by plaintiffs to obtain refunds,[19] and the filed rate doctrine is

_____

[18] In an effort to cast doubt on the reasonableness of defendants' rates, plaintiffs have indicated in the Amended Complaint that, in 2005, the cost to ship a 40-foot container from the west coast of the United States to Japan was $4,250 (and to Hong Kong was $3,575), while the rate for the same size container to Hawaii was $10,373. Amended Complaint at ¶ 42 n.1. Notably, the Amended Complaint does not provide similar pricing data for shipping to Guam. This silence is telling in light of the new allegations in the Amended Complaint. In contrast to the Consolidated Complaint, the Amended Complaint avers that shipping between the continental United States and Guam is governed by substantively different rules than the ocean trade between the United States mainland and Hawaii. _Compare_ Consolidated Complaint at ¶ 65 (describing the distinctions as "irrelevant for purposes of this action") _with_ Amended Complaint at ¶¶ 38-42. Pursuant to the Merchant Marine Act of 1920 (also known as the Jones Act), to operate in the domestic ocean trade to and from Hawaii, a vessel must have a "coastwise endorsement," which is available only to "ships built in American shipyards, owned by American citizens, and operated under the American flag." _OSG Bulk Ships, Inc. v. United States_, 132 F.3d 808, 809-10 (D.C. Cir. 1998); _see_ 46 U.S.C. §§ 12102, 12103, 12111, & 12112. On the other hand, to engage in foreign trade with Guam, a vessel need have only a "registry endorsement," which may be issued to any foreign-built ship satisfying citizen ownership and U.S. registry requirements. 46 U.S.C. §§ 12103 & 12111(a)&(b). As a result, according to the Amended Complaint, the Hawaii ocean trade operates in "turnaround" mode, on routes exclusively to and from Honolulu, while Guam is serviced by ships traveling between the United States and Asia. Amended Complaint at ¶¶ 41 & 42. Hawaii trade vessels are generally almost full on the westbound trip from the mainland, but virtually empty on the return eastbound. _Id._ at ¶ 41. Thus, although many factors affect pricing, the differences plaintiffs have identified between the Hawaii and Asia/Guam markets are consistent with the higher costs plaintiffs have quoted for shipping cargo to Hawaii, which must, unlike goods transported to Asia, cover the expenses of both legs of the journey.

[19] Because plaintiffs' claims implicate rates, _see_ Order No. 5 at 24-27, with plaintiffs seeking in damages the difference between what they paid and what they calculate the rates should have been in the absence of the alleged antitrust behavior, this case is distinguishable from recent cases refusing to apply the filed rate doctrine. For example, in _Alston v. Countrywide Fin. Corp._, 585 F.3d 753 (3d Cir. 2009), the filed rate doctrine was not a basis for dismissal because the plaintiffs were challenging illegal kickbacks between their lender and their primary mortgage insurer, as opposed to the rate they paid for private mortgage insurance ("PMI"). Moreover, the Real Estate Settlement Procedures Act of 1974 authorizes suit for violation of the provisions thereof and establishes an exact measure of damages (three times the price of PMI), thereby eliminating any need to parse or second guess the rates. _Id._ at 764. Likewise, in _Abels v. JPMorgan Chase Bank, N.A._, 678 F. Supp. 2d 1273 (S.D. Fla. 2009), the filed rate doctrine did not support the defendant lender's motion to dismiss because the plaintiffs were not complaining about the rate charged by the insurer

not being interposed as a sword, but merely as a shield. Having charged the rates required by law, defendants are, consistent with *Keogh*, *Maislin*, and *Kmart*, insulated from this type of collateral attack on those rates. Any challenge to defendants' tariffs must be addressed to the entity having the necessary expertise, as well as the authority delegated by Congress, to consider such claim, namely the STB.

### E.    Exempt Cargo

Plaintiffs again raise their earlier argument that the cargo at issue is not subject to rate regulation. In Order No. 5, the Court did not address the merits of this contention because plaintiffs had not indicated what cargo had been shipped during the class period. Because the Amended Complaint alleges that six of the plaintiffs shipped "bulk cargo" or "forest products," the Court must now consider whether, with regard to those particular plaintiffs, the filed rate doctrine still precludes the antitrust claims asserted in this litigation. The Court concludes that the filed rate doctrine also applies to the "exempt" cargo at issue.

In presenting their exempt cargo theory, plaintiffs continue to confuse tariff-filing requirements with rate regulation. They are not the same. As the Ninth Circuit explicitly recognized in *Gallo*, an agency may regulate rates without mandating that rates be filed. *See* Order No. 5 at 18 (discussing *Gallo*, 503 F.3d at 1039-43). Congress has long understood this axiom, as evidenced by the statutory provisions at issue and their evolution. In one section, Congress has mandated that rates for water carriage in noncontiguous domestic trade be reasonable, without regard to the type of cargo, and it has vested jurisdiction in the STB to regulate such rates and, if necessary, to prescribe applicable rates. *See* 49 U.S.C. § 13701(a)(1)(B), (b), & (c). In an entirely distinct section, Congress has required that rates for certain cargo[20] be contained in "a tariff that is in effect," and it has delegated to the STB a

that had been selected by the lender, but rather about the lender's choice of insurer, which was allegedly improper because the lender and insurer were affiliated companies.

[20] Rates for the movement of household goods must be filed regardless of the mode of transportation or service. 49 U.S.C. § 13702(a)(2). Rates for transportation or service in noncontiguous domestic trade must

different bundle of powers, namely the authority to declare that a tariff specifies an unreasonable rate or violates a filing requirement and to invalidate such tariff. _See_ 49 U.S.C. § 13702(a)(1), (b)(6), & (d). The separate treatment of rate regulation and rate filing indicates unequivocally that, contrary to plaintiffs' suggestion, Congress intended for the STB to _regulate_ domestic cabotage rates, regardless of the type of cargo and irrespective of whether the rates are filed. _See_ S. Rep. No. 104-176 at 43 (1995), _reprinted in_ 1995 WL 701522 (indicating that the ICCTA would "retain _rate regulation_ for only two categories of traffic," one of which is "movements in non-contiguous domestic trade," observing that "[o]ther types of traffic . . . are sufficiently competitive that those shippers can adequately protect their interests without such regulation" (emphasis added)).

The history of the current tariff-filing exceptions further supports this conclusion. The Shipping Act of 1916 contained no such specific cargo exclusions to the requirement that "every common carrier by water in interstate commerce shall establish, observe, and enforce just and reasonable rates, fares, charges, classification, and tariffs . . . . [and] shall file with the [United States Shipping Board] and keep open to public inspection . . . the maximum rates, fares, and charges for or in connection with transportation between points on its own route." Shipping Act of 1916, ch. 451, § 18, 39 Stat. 728, 735 (codified as 46 U.S.C. § 817). In 1961, the "bulk cargo" exemption was first introduced in recognition of the differences

_____

be filed unless the goods at issue constitute "bulk cargo, forest products, recycled metal scrap, waste paper, [or] paper waste." 49 U.S.C. § 13702(a)(1). The STB has issued regulations concerning the publication, posting, and filing of tariffs by water carriers in noncontiguous domestic trade. 49 C.F.R. §§ 1312.1-1312.16. Plaintiffs have cited to these regulations as "confirm[ing] that the [STB] does not regulate the rates for the excluded products." Response at 15 (docket no. 128 at 21). The section on which plaintiffs rely, however, does nothing more than define the purpose of the regulations: "The provisions of this part address the requirements in 49 U.S.C. 13702 that carriers subject to the Board's jurisdiction . . . and providing transportation or service for the movement of property (except bulk cargo, forest products, recycled metal scrap, waste paper, and paper waste) by or with a water carrier in noncontiguous domestic trade shall publish and file with the Board tariffs containing the rates for such transportation." 49 C.F.R. § 1312.1. Notably missing from this statement is the "movement of household goods," over which the STB unquestionably has jurisdiction. Indeed, tariff requirements for carriers of household goods are set forth in 49 C.F.R. Part 1310. Thus, contrary to plaintiffs' suggestion, § 1312.1 merely specifies the scope of the regulations in Part 1312, and it neither abdicates responsibility for regulating, nor acknowledges an absence of authority to regulate, rates for domestic water carriage of bulk cargo, forest products, or the like.

between common carriage and contract carriage. _See_ S. Rep. No. 87-860 (1961), _reprinted in_ 1961 U.S.C.C.A.N. 3108.

Common carriers "hold themselves out to serve the public in a nondiscriminatory manner and on a regularly scheduled, previously announced basis," usually moving a variety of materials ("general cargo") for numerous different shippers at the same time. _Id._ at 4. In contrast, contract carriers, often called "tramps," generally transport bulk cargo, for example, "coal, ore, and fertilizer," in "full ship load lots for a shipper who hires the vessel for a single trip." _Id._ Unlike with tramps, which can arrange charters at very little expense, setting up and operating a regularly scheduled liner service "costs a great deal." _Id._ Moreover, a common carrier vessel sails and incurs the expenses of a voyage whether full or three-quarters empty. _Id._ at 5. The same is not true for tramps. Based on these distinctions, and because bulk cargo shippers were being discriminated against by certain shipping conferences operating in the international water trade, Congress made dual-rate contracts[21] inapplicable to cargo "loaded and carried in bulk without mark or count," and exempted such bulk cargo from the tariff-filing requirements applicable to common carriers engaged in foreign commerce. _Id._ at 11, 14, 18; _see_ Act of Oct. 3, 1961, §§ 1, 4, Pub. L. No. 87-346, 75 Stat. 762 (codified as 46 U.S.C. § 842 and 46 U.S.C. § 817(b)). Nothing about this legislation evinces a congressional intent to remove rates relating to bulk cargo from the purview of the responsible agency, which was then the Federal Maritime Commission. _See_ S. Rep. No. 87-860 at 14 (describing the Commission as having a "broad rulemaking mandate"). The amendment merely responded to concerns about the relative volatility of, and resulting need for transparency in, the ocean common carrier market.

The next cargo exception was lumber. In 1963, Congress expressed its intent to treat "rough, or unfinished, lumber which is usually carried either in full-cargo or substantial

---

[21] A dual-rate contract specifies both a lower rate charged to merchants that agree to ship cargo only on vessels of shipping conference members and a higher rate for shippers who do not so commit. S. Rep. No. 87-860 at 9.

partial-cargo lots in the same manner as 'cargo loaded and carried in bulk without mark or count' notwithstanding the fact that such lumber cargoes are tallied." H.R. Rep. No. 88-630 at 1 (1963), *reprinted in* 1963 U.S.C.C.A.N. 826. The legislation responded to complaints by "lumber-producing interests" in the Northwest, which were engaged in "intense competition with Canadian lumber interests." *Id.* Because Canada did not have similar tariff-filing requirements, common carriers engaged in U.S. foreign commerce were unable to "meet the flexible ratemaking opportunities of the unregulated competitive carriers serving Canada." *Id.*; *see* Act of Aug. 22, 1963, Pub. L. 88-103, 77 Stat. 129.

Only two years later, Congress narrowed the lumber exemption to encompass only "softwood lumber." Act of Oct. 30, 1965, Pub. L. 89-303, 79 Stat. 1124. The Northwest industry exported predominately softwood lumber, while companies in other areas of the United States exported hardwood lumber. S. Rep. No. 89-873 (1965), *reprinted in* 1965 U.S.C.C.A.N. 3834. The hardwood lumber exporters had found the tariff exemption detrimental to their business because the rates they could negotiate for transportation to European ports were unstable and high, and they preferred instead to have reliable rates and to know, via tariff filings, what their competitors were paying for shipping. *Id.*

In 1984, the bulk cargo and softwood lumber exclusions were significantly modified, resulting in the language that is now part of § 13702(a)(1). *See* Shipping Act of 1984, § 8, Pub. L. No. 98-237, 98 Stat. 67, 74 (codified as 46 U.S.C. § 1707). The new verbiage attempted to treat "as equally and fairly as possible for transportation purposes" virgin bulk cargoes (ores, woodchips, woodpulp) and their recycled competitors (recycled metal scrap and waste paper). H.R. Conf. Rep. No. 98-600 at 12 (1984), *reprinted in* 1984 U.S.C.C.A.N. 283. Because the forest products, recycled metal scrap, and waste paper exemptions were conceived for the same purpose as the bulk cargo exception, the Court concludes that they likewise evidence a legislative understanding of the varying degrees of transparency needed

in the common carrier and contract carrier markets, as opposed to some congressional effort to strip from the governing agency the authority to regulate the distinct markets.

To date, only one court has explicitly held that an exemption from tariff-filing requirements renders the filed rate doctrine inapplicable. *Iberia Credit Bureau, Inc. v. Cingular Wireless*, 668 F. Supp. 2d 831 (W.D. La. 2009). Neither side has cited this case, and the Court concludes that it is distinguishable. In *Iberia*, the district court rejected the defendant's federal preemption argument because the plaintiff was not challenging the rate for cellular phone service, also called commercial mobile radio service ("CMRS"), but instead was contending that she was not advised of the defendant's billing practices and did not receive the number of "talking minutes" contractually promised to her. *Id.* at 839-44. Thus, the posture of *Iberia*, in which the plaintiff's breach of contract claims did not implicate rates, distinguishes it from the case before the Court. Moreover, for the same reason that the plaintiff's breach of contract claims were not preempted, they would not have been precluded by the filed rate doctrine.

The district court in *Iberia*, however, went further and rejected the defendant's invocation of the filed rate doctrine because *inter alia* the Federal Communications Commission ("FCC") had exempted CMRS providers from filing tariffs. *Id.* at 844-47. The FCC has waived[22] rate regulations for CMRS providers in recognition of the hardships to

///

///

///

---

[22] Unlike the FCC, which has been statutorily granted "forbearance authority," *In re Wireless Consumers Alliance, Inc.*, 15 F.C.C.R. 17021, 17030 (2000) (citing 47 U.S.C. § 332(c)(1)(A)), the STB "may not exempt a water carrier from the application of, or compliance with, section 13701 or 13702 for transportation in the non-contiguous domestic trade." 49 U.S.C. § 13541(e)(2). With its forbearance authority, the FCC has not only excused CMRS providers from filing tariffs, it has prohibited them from doing so. 47 C.F.R. § 20.15(c). In contrast, the STB permits the filing of tariffs for "information purposes," even when the rates thereby disclosed relate to transportation not subject to regulation by the STB. 49 C.F.R. § 1312.2(c). In sum, while the FCC, with Congress's express permission, has relinquished control over CMRS rates, the STB has expanded the transparency afforded by tariff filing to rates for shipping not even within its jurisdiction.

1  consumers that can result from strict application of the filed rate doctrine,[23] and based on its

2  assessment that sufficient competition exists in the cellular industry to obviate any need for

3  "conventional regulation." *Id.* at 846 (citing Second Report & Order, 9 FCC Rec. 1411,

4  1418, 1478 (1994)).  The same cannot be said of the noncontiguous domestic water trade.[24]

5  Unlike the FCC, the STB has made no pronouncements about tariffs being somehow

6  outdated or anachronistic or about the filed rate doctrine no longer having relevance to the

7  domestic shipping industry.  Instead, with respect to the Hawaii and Guam ocean trade, the

8  reasons that gave rise to the filed rate doctrine remain as compelling today as they were when

9  *Keogh* was decided.

10  **Conclusion**

11      For the foregoing reasons, defendants' joint motion to dismiss, docket no. 125, is

12  GRANTED.  Defendants' request for judicial notice, docket no. 133, is DENIED, and

13  Alexander & Baldwin, Inc.'s separate motion to dismiss, docket no. 124, is STRICKEN as

14  moot.  Plaintiffs' request for discovery and leave to amend, docket no. 128, is DENIED

15  because any amendment would be futile.  *See In re Pa. Title Ins.*, 648 F. Supp. 2d at 685 n.17

16  ("Due to the preclusive effect of the filed rate doctrine, plaintiffs' claim for damages fails as

17  a matter of law.  Therefore, no amendment can cure this problem and dismissal with

18  prejudice is warranted.").  Plaintiffs' antitrust claims are DISMISSED as not cognizable or

19  justiciable in this Court, but without prejudice to plaintiffs' ability to raise them in some

20  _____

21  [23] *See In re Wireless Consumers*, 15 F.C.C.R. at 17030 (quoting *Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 222 (1998) ("Thus, even if a carrier intentionally misrepresents its rate and a customer relies on

22  the misrepresentation, the carrier cannot be held to the promised rate if it conflicts with the published tariff.")).

23  [24] In large part due to the competitive nature of the business, CMRS providers typically enter into service contracts with their customers, which diminish the force of law associated with tariffs, particularly with

24  respect to "other terms and conditions." *Iberia*, 668 F. Supp. 2d at 846-47.  In contrast, the Hawaii and Guam ocean trades remain highly concentrated, with "significant barriers to entry."  Amended Complaint at ¶¶ 43 & 44; *accord Matson Navigation Co. v. Fed. Maritime Comm'n*, 959 F.2d 1039, 1047-48 (D.C. Cir. 1992)

25  (describing the domestic shipping market as "incontestable").  In addition, although carriers and shippers may enter into contracts for "specified services under specified rates and conditions," only approximately 20% of

26  the Hawaii and Guam market operates under such agreements.  Amended Complaint at ¶ 84 n.4; *see also* 49 U.S.C. § 14101(b)(1).

fashion before the Surface Transportation Board. The Clerk is DIRECTED to enter final judgment consistent with this Order and to send a copy of this Order to plaintiffs' liaison counsel, defendants' liaison counsel, and the Clerk of the Multidistrict Litigation Panel.

IT IS SO ORDERED.

DATED this 30th day of November, 2010.

_____
Thomas S. Zilly
United States District Judge